## IN THE UNITED STATES BANKRUPTCY COURT
## FOR THE NORTHERN DISTRICT OF TEXAS
## LUBBOCK DIVISION

**IN RE:**

| | |
|---|---|
| **REAGOR-DYKES MOTORS, LP** *et al.* | **Case No. 18-50214-rlj-11** |
| | **Jointly Administered** |
| *Debtors*. | |

**REAGOR AUTO MALL LTD.;**
**REAGOR-DYKES AMARILLO, LP;**
**REAGOR DYKES FLOYDADA, LP;**
**REAGOR-DYKES IMPORTS, LP;**        **Adversary No. _____**
**REAGOR DYKES AUTO COMPANY, LP;**
**REAGOR-DYKES PLAINVIEW, LP;**
**REAGOR-DYKES MOTORS, LP;**
**REAGOR-DYKES  SNYDER, LP**

  *Plaintiffs,*

  **vs.**

**FIRSTCAPITAL BANK OF TEXAS, N.A.,**

  *Defendant*.

### PLAINTIFFS' ORIGINAL COMPLAINT

TO THE HONORABLE UNITED STATES BANKRUPTCY JUDGE:

In accordance with Rule 7001, *et seq.* of the Federal Rules of Bankruptcy Procedure:

- the "FCB Account Debtor Plaintiffs"—Reagor Auto Mall Ltd. ("RAM");

  Reagor-Dykes Amarillo, LP ("Amarillo"); Reagor-Dykes Floydada, LP

  ("Floydada"), and

- the "RD Debtor Plaintiffs"—Plaintiffs Reagor-Dykes Imports, LP

  ("Lmitsu"); Reagor Dykes Auto Company, LP ("RDAC"); and Reagor-

Dykes Plainview, LP ("RDT"); Reagor Dykes Motors, LP; and Reagor

Dykes Snyder, LP,

as debtors and debtors-in-possession in the above-styled and captioned cases (the

"Bankruptcy Cases"), file this complaint (the "Complaint") to turnover property of the

estate, avoid certain obligations and recover certain transfers against FirstCapital Bank (the

Defendant"), to disallow any claims held by Defendant and to recover compensatory

damages for Defendant's willful violations of the automatic stay. Plaintiffs allege, the

following:

I.    **PARTIES.**

    A.    **Plaintiffs**

    1.    Plaintiff Reagor Auto Mall Ltd. ("RAM") is a debtor in possession in Chapter

11 Case No. 18-50324 pending in this Court.

    2.    Plaintiff Reagor-Dykes Amarillo, LP ("Amarillo") is a debtor in possession

in Chapter 11 Case No. 18-50216 pending in this Court.

    3.    Plaintiff Reagor-Dykes Floydada, LP ("Floydada") is a debtor in possession

in Chapter 11 Case No. 18-50219 pending in this Court.

    4.    Plaintiff Reagor-Dykes Imports, LP ("Lmitsu") is a debtor in possession in

Chapter 11 Case No. 18-50215 pending in this Court.

    5.    Plaintiff Reagor Dykes Auto Company, LP ("RDAC") is a debtor in

possession in Chapter 11 Case No. 18-50217 pending in this Court.

    6.    Plaintiff Reagor-Dykes Plainview, LP ("RDT") is a debtor in possession in

Chapter 11 Case No. 18-50218 pending in this Court.

7.      Plaintiff Reagor Dykes Motors, LP is a debtor in possession in Chapter 11 Case No. 18-50214 pending in this Court.

8.      Plaintiff Reagor Dykes Snyder, LP is a debtor in possession in Chapter 11 Case No. 18-50218 pending in this Court.

9.      Each Plaintiff is a limited partnership or limited liability company formed under the laws of the State of Texas.  Each Plaintiff operates at a principal place of business located within the State of Texas. Each Plaintiff is authorized to transact business within the State of Texas. Each Plaintiff currently operates and manages its business as a "debtor-in-possession" pursuant to §§ 1107 and 1108 of the Bankruptcy Code.  Plaintiffs are the exclusive entities authorized with standing and capacity, among other things, to prosecute, settle, dismiss, abandon, or otherwise dispose of the assets of the Bankruptcy Estates (as defined below) in these Bankruptcy Cases, including, without limitation, the claims and causes of action asserted in this adversary proceeding.

**B.      Defendant**

10.      Defendant FirstCapital Bank of Texas, N.A. ("FirstCapital" or "Defendant") is a depository banking and lending institution domiciled in the State of Texas.  Defendant operates as an insured financial depository institution with its principal place of business in the State of Texas.  Pursuant to Rule 7004(h) of the Bankruptcy Rules, service of process in this adversary proceeding may be made on Defendant by mailing a copy of the Summons and Complaint via first-class mail prepaid to Defendant's attorney of record appearing on behalf of Defendant in the Bankruptcy Cases.  By the nature of Plaintiffs' claims against Defendant, the Court has personal jurisdiction over Defendant in this adversary proceeding.

Defendant is named as a party in this action in the proper capacity as a member of the Federal Reserve System registered with the Federal Deposit Insurance Corporation as an insured financial depository institution.

## II.   JURISDICTION AND VENUE.

11.      This Court has subject-matter jurisdiction over this action under 28 U.S.C. §§ 157 and 1334(b) because it arises under Title 11 and arises in and relates to those certain cases under Title 11 currently pending in the United States Bankruptcy Court for the Northern District of Texas, Lubbock Division (the "Court"), captioned *In re Reagor-Dykes Motors, LP, et al.,* Jointly Administered under Case No. 18-50214-rlj-11.

12.      The legal predicates for the relief requested in this adversary proceeding are §§ 105, 362, 363, 502, 541, 544, 547, 548, 549, 550, and 551 of Title 11 of the United States Code, 11 U.S.C. §§ 101 *et seq.* (the "Bankruptcy Code"); Rules 3007, 7001(1), and 7003 of the Federal Rules of Bankruptcy Procedure (the "Bankruptcy Rules"); and the Local Bankruptcy Rules for the United States Bankruptcy Court for the Northern District of Texas (the "Local Rules").

13.      This adversary proceeding is a "core" proceeding to be heard and determined by the Court pursuant to 28 U.S.C. § 157(b)(2), and the Court may enter final orders for matters contained herein.

14.      Venue is proper in this District pursuant to 28 U.S.C. §§ 1408 or 1409 because the Debtors' above-captioned bankruptcy cases are pending in this Court.

### III.   FACTUAL BACKGROUND.

#### A.   FirstCapital Knowingly and Intentionally Participated in Shane Smith's Fraudulent Schemes to Defraud the Debtors and the Debtors' Creditors.

15.     Plaintiffs owned and operated automotive dealerships in the State of Texas along with several other affiliates.  Together Plaintiffs and the nonparty affiliates employed approximately 700 employees and reported over $800 million in sales.

16.     Shane Smith was the Chief Financial Officer for the Plaintiffs and other Reagor-Dykes businesses.  At some point, but no later than February 2017, Mr. Smith began collaborating with FirstCapital in fraudulent schemes to defraud the Debtors and their creditors.  At the core of Smith's schemes was the willingness of FirstCapital to allow Smith to engage in a massive transfer of funds between Reagor-Dykes account and to let him use checking accounts and sight drafts to create multi-million dollar unsecured loan facilities that he could never legitimately repay without engaging in even further fraudulent activity.  And FirstCapital's decisions were not the fault of a low-level employee who Smith took advantage of.  Rather, Smith worked directly with FirstCapital's CEO, Brad Burgess.

17.     In fact, in 2017 and 2018, Burgess and Smith communicated multiple times per week about the FCB Account Debtor Plaintiffs financial transactions involving FCB. For example, in a December 20, 2017 email, Smith responded to Burgess's daily report of the negative balances on RAM and Amarillo's checking accounts.  In his response, Smith stated that "I am working like crazy personally on RAM.  I have several deals in my office working to get funded.  We will keep battling, I am really trying to get it back positive by

year end.  Thank you for working with us.  Sorry you have to do this everyday."

18.      But as early as March 2017, Burgess expressed that he "was passed where [his] comfort level is" when one FCB account of Amarillo was overdrawn by about $611,000.   Apparently, Burgess got comfortable with the situation because the FCB Account Debtors Plaintiffs' overdrafts of their FCB checking accounts continued and grew.

19.      In January 2018, Burgess emailed Smith and noted that RAM, Amarillo, and Floydada each had overdrawn checking accounts totally nearly $1.4 million.  Burgess again stated "This is really past my comfort zone."  But again, neither Burgess nor FirstCapital stopped Smith from his manipulations and fraud.

20.      Again, the FCB Account Debtor Plaintiffs' overdrafts continued to grow.  By the end of May 2018, RAM's checking accounts were consistently overdrawn by more than $2 million a day.

21.      In short, FirstCapital and Burgess let Smith use the FCB Account Debtor Plaintiffs' demand deposit accounts as unsecured lending facilities that had not gone through FirstCapital's standard loan review or underwriting processes.   For example, in February 2018, RAM's account x3144 had an average daily ledger balance of negative $1,414,770.82 and an average float of $2,535,736.33, which resulted in an average daily available balance of ***negative $3,950,507.15***.   Similarly, in February 2018, Amarillo's account x9488 had an average daily ledger balance of negative $295,586.39 and an average float of $1,030,948.46, which resulted in an average daily balance of ***negative $1,328,534.85***.   FirstCapital then charged RAM and Amarillo interest on the negative available balance at a rate of 6.25% (in addition to other fees).

22.     And February 2018 was not an isolated month.  FCB's bank statements reflect that RAM and Amarillo had a negative average ledger balance and a negative average available balance ***every month from December 2016 through February 2018***. Suffice to say, nothing changed in the following months.

23.     Moreover, the volume and amount of funds being transferred into and out of the FCB Account Debtor Plaintiffs' accounts at FCB made it crystal clear to anyone who paid attention to the accounts that Smith was engaged in a massive fraudulent scheme.  In early 2017 and early 2018, Smith provided FCB with financial statements that reflected, among other information, the monthly and annual sales of RAM, Amarillo, and Floydada. The financial statements Smith provided FirstCapital show that RAM had sales in 2016 of $154,711,951 and sales in 2017 of $172,091,742 (which reflects average monthly sales of about $14.3 million).  But in the nine months from November 1, 2017 to July 31, 2018, RAM's x3144 account had over $637,000,000 in deposits and credits (an average of over $70.7 million per month) and had over $637,000,000 in debits.  In other words, the average amount of money being deposited in RAM's FCB bank account each month was approximately five times as much as its average monthly sales in 2017.

24.     Moreover, much of these debits and credits were nothing more than transfers between Reagor-Dykes entities.  During that same November 2017-July 2018 time frame, over $383,000,000 was disbursed from the RAM x3144 account to other Reagor-Dykes debtors.  And, according to records kept by Mr. Smith, in June and July 2018 alone, there were over $88 million in deposits made into the RAM x3144 account that came from funds paid or transferred by other Reagor-Dykes entities.

25.     But FirstCapital did not need to look at each deposit and debit to see that Smith was just churning funds between Reagor-Dykes entities—Smith told FirstCapital that he was using intercompany transfers to cover the massive, ongoing, multiday overdrafts on the FCB Account Debtor Plaintiffs accounts.  For example, in a January 11, 2018 email to Burgess, Smith stated "Working with Ashley to get some collections in here from the group and outside the group to see if we can get these two accounts cleaned up for tomorrow."  Burgess, an experienced banker, would have understood that "from the group" meant that Smith intended to just move funds from one Reagor-Dykes entity to another to try and pay back the overdrafts on the FCB checking accounts.

26.     Similarly, on March 12, 2018, Burgess informed Smith that "Ram is ($305k) short after pending transactions.  RAM was ($915k) after Friday's transactions."  Smith responded to Burgess and told him "Let get with everyone on what they have for deposits today and see if we need to add some."  In other words, Smith's plan was to see what actual deposits they had available to make that day and, if it wasn't enough, Smith intended to find some other deposits.  Where would such deposits come from?  Apparently, other Reagor-Dykes checking accounts or sight drafts for cars purportedly being sold from one Reagor-Dykes entity to another.

27.     Based on the information available to FirstCapital through both the dealership's financial statements and bank statements generated by FirstCapital's own computer system, FirstCapital knew (1) the dealerships were making deposits into its checking account that were far in excess of their revenue generating capacity; (2) that these deposits were largely from other Reagor Dykes entities; (3) that notwithstanding these

massive deposits, the checking accounts were regularly overdrawn, sometimes by amounts aggregating in the millions of dollars, and; (4) that notwithstanding all of these facts, FirstCapital elected to permit Smith to use the FCB Account Debtor Plaintiffs' business checking accounts as lines of credit.

28.     Moreover, FirstCapital participated in Smith's schemes knowing that he was using his scheme to defraud the Ford Motor Credit Company and other floorplan lenders of the Plaintiffs.  Smith regularly informed Burgess and others at FirstCapital that the overdrafts were going to be larger than normal due to the quarterly audits of floor-plan lenders.

29.     For example, on March 13, 2017, Burgess emailed Smith to inform him of RAM's and Amarillo's negative balances.  In response, Smith told Burgess, "Getting it covered.  Bear with me this week, we are doing are [*sic*] quarterly floorplan and inventory cleansing."   In other words, Smith was telling Burgess he would need to overdraw the bank accounts at FCB more than usual to payoff out-of-trust floor plan loans.  Similarly, on June 15, 2018, in response to an email from Burgess's assistant letting Smith know that the RAM, Floydada, and Amarillo had a combined negative balance in excess of $2.6 million, Smith noted that they were "doing some early payoffs on our quarterly floorplan reconciliations so they [the balances] might be lower next week, but I am managing it daily!"

30.     But letting Smith use checking accounts like credit lines was only part of Smith's fraudulent scheme in which FirstCapital knowingly participated.  FirstCapital also let Smith create and control millions of dollars of "float" to fuel his financial schemes by

creating "sales" of vehicles between the various Reagor Dykes dealerships and using an

antiquated form of payment to support the transaction—the sight draft.

31.     A sight draft is a form of documentary draft, not unlike a letter of credit used

in international business transactions.  At its heart, it is payment against documents of title.

The drafting process was designed long ago and to facilitate transactions between <u>unrelated</u>

buyers and sellers so they could each mitigate the credit and performance risk of the other

by allowing their respective banks to act as intermediaries.

32.     In a normal transaction involving a sight draft and between unrelated parties,

one dealership would "agree" to purchase a vehicle(s) from a third-party dealership.  The

selling dealership, or the "drawer", would deposit the draft together with the certificate of

title to the vehicle with its own bank.  The selling dealership's bank would thereafter

present the draft together with the certificate of title to the purchasing dealership's bank for

payment (the "drawee").  The draft would contain instructions for payment, usually upon

"sight" plus a certain number of days. Usually seven business days.  During this time

period, the purchaser's bank would inspect the certificate of title so as to insure its

authenticity.  Upon expiration of the time period and assuming the title was good, the

purchaser's bank would issue a cashier's check[1] by way of payment on the draft; cause the

same to be delivered to the seller's bank, and concurrently deduct an equal amount from

---

[1]     The use of the cashier's check is key to understanding the process.  A cashiers' check
constitutes immediately available funds, and because it is drawn on the bank instead of the
buyer account, the seller does not bear the credit risk of the buyer's insolvency.  It also
illustrates why using a sight draft between two related parties serves zero purpose unless it is
to create "float" under the perversion of the process implemented by Shane Smith and
FirstCapital.

the buyer's bank account.  Ostensibly, if the buyer lacked the funds to pay, the buyer's bank would return the draft, together with the documents of title to the seller's bank. When the seller's bank received the cashier's check from the buyer's bank—and not before—it would deposit a like amount of money into the seller's bank account.  Suffice it to say, the sheer complication of this process belies its antiquated nature, as it could have just as easily been used to buy and sell herds of cattle between far flung ranches in the 19th century, as it could for the buying and selling of vehicles here.

33.     As noted above, the entire purpose of the documentary sight draft process is to mitigate credit and performance risk between unrelated parties. It serves virtually no purpose in a transaction between related parties, such as the various Reagor-Dykes dealerships.  Moreover, the sheer volume of intercompany checks that were already being deposited between the dealerships would seem to moot any need for the use of this process at all.  That is until Shane Smith and FirstCapital devised a way to deploy a perverted version of the drafting process in order help create additional "float," which served as an unsecured lending facility that benefitted FirstCapital while avoiding FirstCapital's loan underwriting processes and review.

34.     Through their agreement, and once a selling Reagor Dykes dealership had deposited a draft, FirstCapital would give immediate credit to the selling dealership.  It would transmit the draft to the purchasing Reagor-Dykes dealership's bank which, in turn, would have anywhere between seven to fourteen business days to pay on the draft.   The "sale" of the vehicle would not officially be consummated until the buying dealership's bank paid the draft.  At which time, presumably Smith would cause the floorplan lender to

be paid—assuming he paid the floor plan lender at all.[2]  In receiving immediate credit for

the drafts, Smith was essentially given free money for a period of seven to fourteen business

days.

35.     FirstCapital knew of the enormous risks it was undertaking in giving

immediate credit on the drafts, as it did impose a backstop.  In that regard, it required RAM,

Amarillo, Floydada, RDAC, Plainview, and Lmitsu to jointly execute a promissory

revolving line of credit note in the amount of $2,480,789 in June 2017, which was renewed

in June 2018 (the "revolver").  FirstCapital would give immediate credit for any and all

drafts deposited by RAM, Amarillo, and Floydada up to the limit of the revolver and until

the revolver was paid back down.  FirstCapital presumably paid the line back down itself

and with the cashier's checks from the purchasing Reagor Dykes dealership's banks.

Nevertheless, if the purchasing dealership failed to cause payment to be made by its bank,

then RAM, Floydada, and Amarillo would still remain liable for the immediate credit

previously given on the deposited draft.

36.     After a time, FirstCapital gave up all pretense that this process was anything

other than a construct to create float when it ceased requiring that the selling dealerships

tender original certificates of title.  All-in-all, hundreds of thousands of dollars changed

hands between dealerships on a daily basis and through this process.  Moreover,

FirstCapital would regularly send Smith a list of incoming drafts, and ask Shane for

---

[2]     As stated above, Debtors allege, on information and belief, that FirstCapital knew that Smith
was regularly selling vehicles out of trust.

instructions on when the incoming drafts should be paid by FirstCapital. In other words, FirstCapital allowed Smith to control when and whether FirstCapital would honor an incoming draft. Often times, Smith would ask FirstCapital to delay honoring a draft because of how overdrawn the FCB checking accounts already were.

37.     While FirstCapital knew or should have known of how Smith was using drafts between Reagor-Dykes entities to create float to inflate their account balances from the drafts themselves, FirstCapital did not need to figure it out from the transactions themselves. Again, Smith told FirstCapital exactly what he was doing. For example, on April 18, 2017, Smith asked FirstCapital to pay by 4:00 P.M. approximately $183,000 in drafts that named RAM as payor and that had been given to another Reagor-Dykes debtor to present and receive credit. Smith told FirstCapital that if they did not pay the drafts in time, the other bank would return the drafts and debit the account of the other Reagor-Dykes debtor. Smith asked FirstCapital to pay the draft using FirstCapital's funds immediately, but not draw funds from RAM's account until the following day.

38.     Despite Smith telling FirstCapital exactly what he was doing with the drafts, FirstCapital continued to let the FCB Account Debtor Plaintiffs (primarily RAM) transfer millions of dollars to other Reagor-Dykes entities via sight draft and, which in turn, created millions of dollars of float (i.e., unsecured debt) for Smith to take advantage of as part of his scheme.

39.     Not only did FirstCapital knowingly and intentionally participate in Smith's fraudulent scheme to create days of float by using drafts to transfer funds between Reagor-Dykes entities for cars that were purportedly being sold from one Reagor-Dykes dealer to

another but they even allowed Smith to use drafts to transfer funds from between Reagor-Dykes entities that both had their bank accounts at FirstCapital.  For example, Smith could deposit a draft in Floydada's FCB account that reflected a purported car sold by RAM to Floydada and then get 7 to 14 days of float before FirstCapital would pay the draft to itself and then debit RAM's FirstCapital account.  There is no legitimate business or financial purpose for related entities to use drafts to transfer funds between checking accounts at the same bank.  But FirstCapital routinely allowed Smith to do exactly that.

40.    As set forth above, FirstCapital knew the nature and extent of Shane's fraudulent schemes.  Far from stopping them, they took active measures to help Smith carry out his schemes.  Nowhere is this assistance more evident that in the "float" created by the sham draft process that FirstCapital helped Smith carry out.  The "sales" were nothing more than the meaningless churning of inventory between dealerships.  And the elaborate and antiquated method deployed to pay for these sales was utterly without purpose—save for giving Smith free money to deploy elsewhere

**D.    FirstCapital's Financial and Business Reasons for Participating in Smith's Schemes.**

41.    Smith's schemes, in which FirstCapital knowingly and willingly participated inflated the financial position of the FCB Account Debtor Plaintiffs and the RD Debtor Plaintiffs.  This resulted in masking Plaintiffs' true insolvent financial condition from their officers and directors as well as their creditors until the Smith's schemes collapsed in late July 2018, which triggered Plaintiffs' bankruptcy.

42.    FirstCapital, however, did not participate in Smith's schemes out of

benevolence.  Rather, it benefited from this scheme.  FirstCapital leveraged its insider knowledge of Plaintiffs to game the system to allow the bank to continue to collect on fraudulently-transferred deposits, delay declaring defaults on its loans to Debtors, and avoid the financial impact to its own books, which would have consequently adversely impacted the cash price portion of a major acquisition of another bank.

43.     Indeed, FirstCapital benefited from the scheme and the appearance that Plaintiffs were solvent.  A disruption to Smith's fraudulent scheme could have caused a cascade of defaults on the Debtors' various loans and other debts owed to FirstCapital.  If RAM were to default on its multi-million dollar floor-plan financing with FirstCapital, the bank would record a loss on the loan.

44.     But in 2018, such losses would be particularly problematic for FirstCapital because it was in the process of acquiring Fidelity Bank.  Losses on FirstCapital's loans to Reagor-Dykes would have negatively affected FirstCapital stock value and would have required FirstCapital to significantly increase the cash it would have to pay as part of the acquisition.  And while consummating the Fidelity acquisition itself was important on its own terms, on information and belief, it was also part of FirstCapital Bank's longer-term plans to become a publicly traded bank.  So, FirstCapital needed the acquisition to go through at the lower cash price.

45.     But FirstCapital was not just another commercial bank for the Debtors.  It was an insider for each of the Debtors through Rick Dykes.

46.     Mr. Dykes owned 50% of the LLCs that owned the Reagor-Dykes Debtors, making him an insider of the Plaintiffs.  But he was also a member of FirstCapital's Board

of Advisors until just before Reagor-Dykes filed bankruptcy. His title at FirstCapital had been Director on FirstCapital's board of directors, but FirstCapital changed his title from Director to Member of its Board of Advisors to avoid regulatory scrutiny and to potentially increase the amount FirstCapital could lend Reagor-Dykes. Defendant told Dykes that his title was changing because of Federal Banking Regulation O. But his authority, role, and responsibilities at FirstCapital remained the same after they changed his title from director to member. He continued to attend and participate at meetings of FirstCapital's Board of Directors without change. Additionally, Mr. Dykes is a large FirstCapital shareholder, holding, on information and belief, approximately 375,000 of FirstCapital's shares.

47.     In late July 2018, Ford Motor Credit Company, LLC ("Ford"), Reagor-Dykes's largest inventory lender, began a surprise audit of the Debtors. During the audit, Ford discovered Smith's massive fraud and Reagor-Dykes; insolvency. Ford terminated the funding it provided to various Debtors, declared default, and threatened immediate legal action to seize Reagor-Dykes' assets, among other actions.

48.     On August 1, 2018, the RD Debtor Plaintiffs filed voluntary petitions for relief under Chapter 11 of the Bankruptcy Code.

49.     Between August 2 and August 7, 2018, in a series of three pledge agreements, Dykes pledged an additional $7.5 million in collateral to FirstCapital, approximately $2.75 million in cash and $4.7 million in FirstCapital stock (260,302 shares), and Reagor pledged currently unknown amounts in mutual funds to FirstCapital. In return, FirstCapital agreed to provide an additional $2.1 million in floorplan financing for RAM.

50.     On August 6, 2018, a letter from Mr. John Massouh, an attorney for

FirstCapital, was sent to Mr. David Langston, then-counsel for various Reagor-Dykes entities, to set forth a proposed pledge on additional assets for Messrs. Reagor and Dykes in exchange for $2.1 million in additional floorplan financing. Messrs. Reagor and Dykes and their spouses signed the pledge agreement. However, FirstCapital stopped floorplan financing Reagor-Dykes on Monday, July 30.

51.    FirstCapital did not advance any Reagor-Dykes entity any of the additional $2.1 million in floorplan financing to RAM, despite the additional pledges of collateral, by fraudulently taking this additional collateral and promises to do so. By doing so, FirstCapital sealed the demise of the Reagor-Dykes Auto Group and ensured that hundreds of its employees would lose their jobs. This also deprived other creditors of the ability to recover for the damages they suffered. This is another example of FirstCapital using its insider status to the detriment of others, as FirstCapital pursued its quest to become a publicly traded bank.

52.    On November 1, 2018, RAM, Amarillo, and Floydada filed voluntary petitions for relief under Chapter 11 of the Bankruptcy Code.

**E.    FirstCapital's Purported Claims Should Be Disallowed.**

53.    To the extent Defendant's liability exceeds the balance of Defendant's purported claims against Plaintiffs' bankruptcy Estates, Defendant will not hold an enforceable right to payment against the Estates under 11 U.S.C. § 502(d). Without an enforceable right to payment, no debt would exist and Defendant cannot hold a "claim" as defined under 11 U.S.C. § 101(5). Without a claim against Plaintiffs, any and all security interests pledged to secure such nonexistent debt will also cease to exist.

54.     Through this adversary proceeding and pursuant to Rule 3007(b) of the Bankruptcy Rules, Plaintiffs object to and seek to disallow any and all portions of Defendant's secured and unsecured claims against the Estates, both secured and unsecured, during the ongoing investigation of FirstCapital's involvement and potential liability for its fraudulent conduct.

IV.   **CLAIMS FOR RELIEF.**

**COUNT 1:  Avoidance of Preferential Transfers—11 U.S.C.  § 547**

55.     Plaintiffs hereby incorporate all preceding paragraphs as if fully set forth herein.

56.     Defendant extended immediate credit to RAM, Amarillo, and Floydada any time they presented a sight draft for payment.  By doing so, Defendant created a short-term credit facility outside of its standard underwriting and credit procedures and practices.

57.     By providing immediate credit to RAM, Amarillo, and Floydada upon presentment of a sight draft for payment, Defendant had a right to payment on account of an obligation owed to Defendant by the Debtor.

58.     RAM, Amarillo, and Floydada transferred funds to Defendant to pay the obligations (the "Deposited Sight Transfers").  The Deposited Sight Transfers were to or for the benefit of a creditor within the meaning of section 547(b)(1).

59.     The Deposited Sight Transfers either reduced or fully satisfied a debt then owed by a Plaintiff to Defendant.

60.     The Deposited Sight Transfers were for, or on account of, antecedent debts owed by the Plaintiff before the Deposited Sight Transfers were made within the meaning

of section 547(b)(2).

61.     Defendant was a creditor of the Debtor at the time of the Deposited Sight Transfers within the meaning of 11 U.S.C. § 101(10)(A).

62.     Plaintiffs were insolvent at all times during the 90 days prior to the Petition Date within the meaning of section 547(b)(3) and (4).  Plaintiffs were also insolvent during the one year prior to the Petition Date.

63.     Pursuant to section 547(b)(5), the Deposited Sight Transfers enabled the Defendant to receive more than it would have received if: (i) the Debtor's case was under chapter 7 of the Bankruptcy Code; (ii) the Deposited Sight Transfers had not been made; and (iii) Defendant received payment of its debt under the provisions of the Bankruptcy Code.

64.     By reason of the foregoing, the Deposited Sight Transfers to the Defendant are avoidable pursuant to 11 U.S.C. § 547(b).  As a result, the Plaintiff may recover the amount or value of the Deposited Sight Transfers from the Defendant pursuant to 11 U.S.C. § 550.

65.     Defendant also extended credit to RAM, Amarillo, and Floydada any time Defendant paid with a cashier's check drawn on FirstCapital funds a draft that named RAM, Amarillo, or Floydada before they had debited the account of RAM, Amarillo, or Floydada.  By doing so, Defendant created a short-term credit facility outside of its standard underwriting and credit procedures and practices.

66.     By paying the draft before it debited the account of RAM, Floydada, or Amarillo, Defendant had a right to payment on account of an obligation owed to Defendant

by the Debtor.

67.     RAM, Amarillo, and Floydada transferred funds to Defendant to pay the obligations (the "Paid Sight Transfers").  The Paid Sight Transfers were to or for the benefit of a creditor within the meaning of section 547(b)(1).

68.     The Paid Sight Transfers either reduced or fully satisfied a debt then owed by a Plaintiff to Defendant.

69.     The Paid Sight Transfers were for, or on account of, antecedent debts owed by the Plaintiff before the Paid Sight Transfers were made within the meaning of section 547(b)(2).

70.     Defendant was a creditor of the Debtor at the time of the Paid Sight Transfers within the meaning of 11 U.S.C. § 101(10)(A).

71.     Plaintiffs were insolvent at all times during the 90 days prior to the Petition Date within the meaning of section 547(b)(3) and (4).  Plaintiffs were also insolvent during the one year prior to the Petition Date.

72.     Pursuant to section 547(b)(5), the Paid Sight Transfers enabled the Defendant to receive more than it would have received if: (i) the Debtor's case was under chapter 7 of the Bankruptcy Code; (ii) the Paid Sight Transfers had not been made; and (iii) Defendant received payment of its debt under the provisions of the Bankruptcy Code.

73.     By reason of the foregoing, the Deposited Sight Transfers to the Defendant are avoidable pursuant to 11 U.S.C. § 547(b).  As a result, the Plaintiff may recover the amount or value of the Deposited Sight Transfers from the Defendant pursuant to 11 U.S.C. § 550.

74.     Defendant also extended credit to RAM, Amarillo, and Floydada by allowing "True Overdrafts" that were not intraday overdrafts but lasted two or more days and that served as short-term loans made outside of FirstCapital's normal loan review or loan committee processes. By doing so, Defendant unlawfully created a short-term credit facility outside of its standard underwriting and credit procedures and practices.

75.     By providing these short-term loans to RAM, Amarillo, and Floydada, Defendant had a right to payment on account of an obligation owed to Defendant by the Debtor.

76.     RAM, Amarillo, and Floydada transferred funds to Defendant to pay the amounts it owed for True Overdrafts (the "True Overdraft Transfers"). The True Overdraft Transfers were to or for the benefit of a creditor within the meaning of section 547(b)(1).

77.     The True Overdraft Transfers either reduced or fully satisfied a debt then owed by the Debtor to Defendant.

78.     The True Overdraft Transfers were for, or on account of, antecedent debts owed by the Debtor before the True Overdraft Transfers were made within the meaning of section 547(b)(2).

79.     Defendant was a creditor of the Debtor at the time of the True Overdraft Transfers within the meaning of 11 U.S.C. § 101(10)(A).

80.     Pursuant to section 547(b)(5), the True Overdraft Transfers to the Defendant enabled the Defendant to receive more than it would have received if: (i) the Debtor's case was under chapter 7 of the Bankruptcy Code; (ii) the True Overdraft Transfers had not been made; and (iii) Defendant received payment of its debt under the provisions of the

Bankruptcy Code.

81.    By reason of the foregoing, the True Overdraft Transfers to the Defendant are avoidable pursuant to 11 U.S.C. § 547(b).  As a result, the RAM, Amarillo, and Floydada may recover the amount or value of the True Overdraft Transfers from the Defendant pursuant to 11 U.S.C. § 550.

82.    In addition to the Sight Transfers and True Overdraft Transfers, RAM, Floydada, and Amarillo also made other transfers of funds to Defendant to pay various fees owed to FirstCapital as well as principal and interest on existing loans and credit facilities. These payments include principal and interest on the floor plan loans FirstCapital provided to RAM.  Any lien or perfected security interest FirstCapital may purport to have under the floorplan loan should be transferred to RAM pursuant to 11 U.S.C. § 510.

83.    The transfers in paragraphs 90 shall be referred to as "Bank Transfers."

84.    The Bank Transfers were to or for the benefit of a creditor within the meaning of section 547(b)(1).

85.    The Bank Transfers either reduced or fully satisfied a debt then owed by the Debtor to Defendant.

86.    The Bank Transfers were for, or on account of, antecedent debts owed by the Debtor before the Bank Transfers were made within the meaning of section 547(b)(2).

87.    Defendant was a creditor of the Debtor at the time of the Bank Transfers within the meaning of 11 U.S.C. § 101(10)(A).

88.    Pursuant to section 547(b)(5), the Bank Transfers to the Defendant enabled the Defendant to receive more than it would have received if: (i) the Debtor's case was

under chapter 7 of the Bankruptcy Code; (ii) the Bank Transfers had not been made; and

(iii) Defendant received payment of its debt under the provisions of the Bankruptcy Code.

89.     By reason of the foregoing, the Bank Transfers to the Defendant are

avoidable pursuant to 11 U.S.C. § 547(b).  As a result, the Plaintiff may recover the amount

or value of the Bank Transfers from the Defendant pursuant to 11 U.S.C. § 550.

90.     Defendant was an insider at the time of the Transfers that occurred between

90 days and one year before the Petition Date.  Defendant was a statutory insider of the

Debtors under § 101(31)(E).  Defendant was an insider with respect to Mr. Dykes because

he was a director of Defendant.  11 U.S.C. § 101(31)(A)(iv).  Mr. Dykes, in turn, was an

affiliate of the Debtors because he owned more than 20% of their voting securities.  11

U.S.C. § 101(2)(A).  Because Defendant was an insider of an affiliate (Mr. Dykes) of the

Debtors, Defendant was an insider of the Debtors, too.  11 U.S.C. § 101(31)(E).

91.     Additionally, Defendant was a nonstatutory insider of the Debtors.  The

closeness of the relationship between the Debtors and Defendant was so great that the

advantage the Defendant gained is attributable to affinity rather than the course of business

dealings and the Transfers were no longer conducted at arms' length.  Moreover, the credit

Defendant extended through Mr. Smith's check-kiting scheme was not documented

through the usual instruments, such as promissory notes.  Defendant extended the credit on

an unsecured basis while not even questioning whether the Debtors had the ability to repay.

On information and belief, the Defendant knew or should have known that the Debtors

were insolvent.  There were numerous transfers, each amounting to an extension of

unsecured credit.  Defendant placed no restrictions on how Mr. Smith could use the

proceeds from the scheme.  Defendant did not extend the credit through the check-kiting scheme for commercial purposes.  Mr. Smith treated Defendant differently from the Debtors' other unsecured creditors.

92.     Because Defendant was an insider of the Debtors, any Deposited Sight Transfers, Paid Sight Transfers, True Overdraft Transfers, and Bank Transfers within one year of the Petition Date that meet the other necessary requirements of 11 U.S.C. §547 are avoidable preferences and should be avoided.

**COUNT 2:  Avoidance, Preservation, and Return of Actual Fraudulent Transfers under—-11 U.S.C. § 544, 548(a)(1)(A), 550, and 551**.

93.     Plaintiffs hereby incorporate all preceding paragraphs as if fully set forth herein.

94.     During the two years prior to November 1, 2018 (for Plaintiffs who had a Petition Date of November 1, 2018) and prior to August 1, 2018 (for Plaintiffs who had sought bankruptcy relief on August 1, 2018), each FCB Account Debtor Plaintiff who had a demand deposit or checking account with FirstCapital routinely and repeatedly carried negative balances on their respective accounts for multiple days at a time. Each such multi-day negative balance constituted an unsecured loan or extension of credit or debt.  Deposits made into each Plaintiff's demand deposit or checking accounts that served to pay off such multi-day negative balances were made from the property of a FCB Account Debtor Debtor.

95.     Each such transfer was made with the intent to hinder, delay, or defraud creditors of the FCB Account Debtor Debtor because the transfer was made in connection

with and in furtherance of Smith's fraudulent scheme

96.     Each such transfer was in violation of 11 U.S.C. §548(a)(1)(A).

97.     Defendant is either the initial transferee or the immediate or mediate transferee of such initial transferee.

98.     As of the date hereof, Defendant has not returned any such transfer to the FCB Account Debtor Plaintiffs,

99.     The Defendant did not receive such transfers in good faith and without knowledge of the voidability of such transfers.

100.     As a result of the foregoing, pursuant to 11 U.S.C. §§544, 548(a)(l)(A), 550, and 551 and Texas Business and Commerce Code §24.005, FCB Account Debtor Plaintiffs are entitled to a judgment (a) avoiding and preserving the transfers; (b) directing that the transfers be set aside; and (c) recovering the transfers, or the value thereof, from the Defendant.

101.     As set forth in paragraph 94 above, the checks and transfers from RD Debtor Plaintiffs that were deposited into the FCB Account Debtor Plaintiffs' accounts described in paragraph 94 were also transfers made with the intent to hinder, delay, or defraud creditors of the Debtor because the transfer was made in connection with and in furtherance of Smith's fraudulent scheme.

102.     The checks and transfers from RD Debtor Plaintiffs that were deposited into the FCB Account Debtor Plaintiffs' accounts described in paragraph 94 were also fraudulent transfers under Section 24.006(a) of the Texas Fraudulent Transfer Act because

RD Account Debtor did not receive reasonable equivalent value for the funds it transferred and because it was insolvent at the time of such transfer.

103.   Each such transfer was in violation of 11 U.S.C. §548(a)(1)(A).

104.   Defendant is either the initial transferee or the immediate or mediate transferee of such initial transferee.

105.   As of the date hereof, Defendant has not returned any such transfer to the RD Debtor Plaintiffs.

106.   The Defendant did not receive such transfers in good faith and without knowledge of the voidability of such transfers.

107.   As a result of the foregoing, pursuant to 11 U.S.C. §§544, 548(a)(l)(A), 550, and 551 and Texas Business and Commerce Code §24.005 and 24.006, the RD Debtor Plaintiffs are entitled to a judgment (a) avoiding and preserving the transfers; (b) directing that the transfers be set aside; and (c) recovering the transfers, or the value thereof, from the Defendant.

## C.   COUNT 3:  Recovery of Avoided Transfers—11 U.S.C. § 550.

107.   Plaintiffs re-allege and incorporate by reference the preceding paragraphs of the Complaint.

108.   All transfers referred to in Counts 1 to 2 are collectively referred to as "All Avoided Transfers."

109.   Defendant was the initial transferee of the All Avoided Transfers or the immediate or mediate transferee of such initial transferee or the person for whose benefit

All Avoided Transfers were made.

110.    Pursuant to § 550(a), Plaintiff is entitled to recover from Defendant an amount not less than the total aggregate balance of all the All Avoided Transfers, plus interest thereon to the date of payment and the costs of this action.

111.    Pursuant to 11 U.S.C. § 551, all of the Avoidable Transfers are preserved for the benefit of Plaintiffs' bankruptcy Estates.

112.    All conditions precedent to the bringing of this action have been performed or have occurred.

**D.    COUNT 4:   Equitable Subordination of Defendant's Claim(s) Against the Estate.**

113.    Plaintiffs re-allege and incorporate by reference the preceding paragraphs of the Complaint.

114.    Subject to proof, any claim asserted by Defendant against Plaintiffs' bankruptcy Estates arises from inequitable conduct, including conduct described in this Complaint, which has resulted in injury to creditors or the conferring of an unfair advantage on Defendant. This inequitable conduct has resulted in hardship to Plaintiffs' bankruptcy Estates and the entire creditor body. Accordingly, pursuant to §§ 510(c)(1) and 105(a), Defendant's claims against Plaintiffs' bankruptcy Estates should be equitably subordinated to the allowed claims of legitimate general unsecured creditors for distribution purposes.

115.    All conditions precedent to the bringing of this action have been performed or have occurred.

**E.    COUNT 5:   Objection to and Disallowance of all Claims—11 U.S.C. § 502(d) and (j).**

116.    Plaintiffs re-allege and incorporate by reference the preceding paragraphs of the Complaint.

117.    Pursuant to Rule 3007(b) of the Bankruptcy Rules, a party in interest shall not include a demand for relief of a kind specified in Rule 7001 of the Bankruptcy Rules in an objection to the allowance of a claim but may include such objection in an adversary proceeding.   Rule 7001(8) specifies that an "adversary proceeding" includes any proceeding to subordinate any claim or interest.   Because Plaintiffs' objections to Defendant's claims include a request to equitably subordinate such claims, Plaintiffs' objection to any and all claims of Defendant against Plaintiffs' bankruptcy Estates should be merged into and included within this Adversary Proceeding.

118.    Defendant is a transferee of transfers avoidable under § 549 of the Bankruptcy Code, which property is recoverable and preserved under §§ 550 and 551 of the Bankruptcy Code.

119.    Defendant has not paid the amount of the Avoidable Transfers, or turned over such property, for which Defendant is liable under 11 U.S.C. § 550.

120.    Pursuant to 11 U.S.C. § 502(d), any and all claims of Defendant or its assignees, against Plaintiffs' bankruptcy Estates must be disallowed until such time as Defendant pays to Plaintiffs an amount equal to the aggregate amount of the Avoidable Transfers, plus interest thereon and costs.

121.    In addition, Plaintiffs' investigation of the fraud allegations raised in the Ford Litigation is ongoing. Included within Plaintiffs' investigation is the extent of Defendant's involvement in the fraudulent activities alleged by Ford. The extent of Defendant's

potential involvement and liability remains undetermined at this time. To the extent Defendant's liability exceeds the balance of Defendant's claims against Plaintiffs' bankruptcy Estates, Defendant will not hold an enforceable right to payment against the Estates under 11 U.S.C. § 502(d). Without an enforceable right to payment, no debt would exist and Defendant cannot hold a "claim" as defined under 11 U.S.C. § 101(5).  Without a "claim" against Plaintiffs, any and all security interests pledged to secure such nonexistent debt will also cease to exist.

122.   Through this adversary proceeding and pursuant to Rule 3007(b) of the Bankruptcy Rules, Plaintiffs object to, seek to disallow, and seek to withhold any distributions to Defendant and seek to prevent Defendant from enforcing any and all portions of Defendant's alleged claims against the Estates, both secured and unsecured, until such time as (i) Plaintiffs' investigation against Defendant is concluded, and (ii) Defendant pays to Plaintiffs an amount equal to the aggregate amount of the Avoidable Transfers, plus interest thereon and costs.

123.   Pursuant to 11 U.S.C. § 502(j), any and all claims of Defendant or its assignee(s) against Plaintiffs' bankruptcy Estates previously allowed, if any, must be reconsidered and disallowed until such time as (i) Plaintiffs' investigation against Defendant is concluded, and (ii) Defendant pays to Plaintiffs an amount equal to the aggregate amount of the Avoidable Transfers, plus interest thereon and costs.

124.   All conditions precedent to the bringing of this action have been performed or have occurred.

**F.     COUNT 6:  Compensatory Damages for Willful Violation of Automatic**

**Stay.**

125.   Plaintiffs re-allege and incorporate by reference the preceding paragraphs of the Complaint.

126.   The Post-Petition Deposits represent the cash proceeds of receivables and other property interests owned by Plaintiffs. Plaintiffs' receivables were property of the Estates pursuant to 11 U.S.C. §§ 541(a)(1), (7). Plaintiffs' property interests in the credits deposited into the Pre-Petition Accounts are property of the Estates pursuant to 11 U.S.C. §§ 541(a)(1), (7). As such, the Post-Petition Deposits are property of the Estates under 11 U.S.C. §§ 541(a)(6), (7).

127.   Plaintiffs have demanded that Defendant transfer all funds deposited, specifically including the Post-Petition Deposits, into the Pre-Petition Accounts on and after the Petition Date into Plaintiffs' DIP Accounts.

128.   Defendant has failed and refused, and continues to fail and refuse, to transfer the Post-Petition Deposits to Plaintiffs' DIP Accounts.

129.   Defendant has not released any of the Post-Petition Deposits to Plaintiffs.

130.   Under 11 U.S.C. § 362(a)(3), Defendant has willfully violated the automatic stay by knowingly retaining possession of, and intentionally exercising control over, property of Plaintiffs' bankruptcy Estates.

131.   Plaintiffs have sustained actual damages as a result of Defendant's willful stay violations, including, without limitation, attorneys' fees and costs.

132.   Plaintiffs have not had access to their cash proceeds in Defendant's possession, which has damaged Plaintiffs' ability to maximize business operations during

the pendency of these Bankruptcy Cases.

133.    Defendant is liable to Plaintiffs for compensatory damages arising from Defendant's unlawful control over the Post-Petition Deposits and corresponding restriction of Plaintiffs' post-Petition Date cash flow.

134.    All conditions precedent to the bringing of this action have been performed or have occurred.

### G. COUNT 7:  Demand for Attorneys' Fees and Recovery of Costs.

135.    Plaintiffs re-allege and incorporate by reference the preceding paragraphs of the Complaint.

136.    Plaintiffs had to retain attorneys to prepare, file, and prosecute this action and have incurred fees and expenses in connection therewith.

137.    Based on the facts and circumstances surrounding Defendant's willful and intentional acts described herein, it is equitable and just that Plaintiffs recover their costs and reasonable legal fees. Accordingly, Plaintiffs seek recovery of costs, including reasonable attorneys' fees and legal expenses incurred by Plaintiffs in connection with the preparation and filing of all pleadings in this case and in prosecuting the same.

138.    All conditions precedent to the bringing of this action have been performed or have occurred..

## V.    RESERVATION OF RIGHTS.

139.    During this Adversary Proceeding, Plaintiffs may learn through discovery (or otherwise) additional facts and circumstances regarding the relationships among Plaintiffs, any other Debtor parties or their affiliates, Defendant, and other third parties that

were unknown to Plaintiffs as of the date of this Complaint. The allegations in this Complaint are formed on Plaintiffs' ongoing investigation to date regarding the transactions evidenced by Plaintiffs' books and records.

140. Plaintiffs reserve all rights to supplement and amend this Complaint, including, without limitation, the right to (a) further state, allege, or aver information regarding the Ford Litigation; (b) seek to avoid additional obligations, transfers, or conveyances; (c) seek to recover additional transfers; (d) modify, add, subtract, revise, or otherwise amend the parties; (e) allege additional defendant parties; or (f) allege additional causes of action that may become known to Plaintiffs at any time during this Adversary Proceeding through discovery or otherwise, and for the all such amendments to this Complaint to relate back to the same.

## VI.   CONCLUSION AND REQUEST FOR RELIEF.

For the foregoing reasons, Plaintiffs ask the Court to grant them all of the relief requested in this Complaint.  Plaintiffs further requests all other relief to which it may be justly entitled.

Respectfully submitted,

By:    */s/ Andrew S. Hicks*
       Andrew S. Hicks
       Texas Bar No. 24032419
       Marc S. Tabolsky
       Texas Bar No. 24037576
       Daniel E. Hinde
       Texas Bar No. 24002289
       SCHIFFER HICKS JOHNSON PLLC
       700 Louisiana Street, Suite 2650
       Houston, Texas 77002
       Tel:    (713) 357-5150
       Fax:    (713) 357-5160
       ahicks@shjlawfirm.com
       mtabolsky@shjlawfirm.com
       dhinde@shjlawfirm.com

       Dustin Burrows
       Texas Bar No. 24048375
       LIGGETT LAW GROUP, P.C.
       1001 Main Street, Suite #300
       Lubbock, Texas 79401
       Tel:    (806) 744-8478
       Fax:    (806) 744-8479
       dustin@liggettlawgroup.com

***ATTORNEYS FOR PLAINTIFFS***

### CERTIFICATE OF SERVICE

I hereby certify that on this 12th day of February, 2020, the foregoing was filed in the papers of this case with those parties receiving electronic notices herein presumptively receiving a copy of same.

       */s/ Andrew S. Hicks*
       By:  Andrew S. Hicks