Andrew S. Hicks
Texas Bar No. 24032419
Marc S. Tabolsky
Texas Bar No. 24037576
SCHIFFER HICKS JOHNSON PLLC
700 Louisiana Street, Suite 2650
Houston, Texas 77002
Tel: (713) 357-5150
Fax: (713) 357-5160
ahicks@shjlawfirm.com
mtabolsky@shjlawfirm.com

Dustin Burrows
Texas Bar No. 24048375
LIGGETT LAW GROUP
1001 Main Street, Suite 300
Lubbock, Texas 79401
Tel:    (806) 744-4878
Fax:    (806) 744-8479
dustin@liggettlawgroup.com

*Special Litigation Counsel to Debtors,*
*Reagor-Dykes Motors L.P., et al.*

IN THE UNITED STATES BANKRUPTCY COURT
FOR THE NORTHERN DISTRICT OF TEXAS
LUBBOCK DIVISION

| | | |
|---|---|---|
| IN RE: | § | |
| | § | |
| REAGOR-DYKES MOTORS, LP et al. | § | Case No. 18-50214-RLF-11 |
| | § | Jointly Administered |

| | | |
|---|---|---|
| | § | |
| REAGOR AUTO MALL LTD. ET AL; | § | |
| | § | |
| vs. | § | Adversary No. 20-05002-RLJ |
| | § | |
| FIRSTCAPITAL BANK OF TEXAS, N.A. | § | |

**REAGOR-DYKES PLAINTIFFS' OPPOSITION TO:**
**FIRST CAPITAL'S MOTION TO DISMISS UNDER RULE 12(B)(6)**
**AND BRIEF IN SUPPORT**

# TABLE OF CONTENTS

SUMMARY ................................................................................................................1

PLAINTIFFS' ALLEGATIONS IN THE ORIGINAL COMPLAINT.........................................3

I.      FirstCapital actively participated in the check-kiting scheme. ............................................3

II.     FirstCapital actively participated in the fraudulent sight draft scheme. ............................5

ARGUMENT ................................................................................................................7

I.      Plaintiffs exceed the pleading standards required under Rule12(b)(6)...............................7

II.     Plaintiffs state claims for preferential transfers, constructive fraudulent
        transfers, and "traditional" fraudulent transfers..................................................................7

        A.      FirstCapital is not a mere conduit. Plaintiffs are suing over
                FirstCapital's loans and its active participation in Smith's fraudulent
                schemes. ..........................................................................................................7

                1.      FirstCapital was not a mere conduit...........................................................7

                2.      The Fifth Circuit and other courts have recognized that a
                        bank is liable for its role in the financial fraud, and that
                        check-kiting gives rise to a debt that is subject to a preference
                        and fraudulent transfer claim. ...............................................................10

        B.      Plaintiffs plead sufficient facts to establish their transfer claims. .........................13

                1.      Plaintiffs state claims for preferential transfers. ....................................13

                2.      Plaintiffs state claims for "actual intent" fraudulent transfer....................14

        C.      Plaintiffs state claims under Bankruptcy Code §550 and §502. ............................17

III.    Plaintiffs state claims for equitable subordination...............................................................18

        A.      Plaintiffs have standing to assert equitable subordination. ....................................18

        B.      Plaintiffs plead the elements of equitable subordination. ......................................19

        C.      The *In Pari Delicto* defense does not apply to Plaintiffs' equitable
                subordination claims. ........................................................................................19

IV.     Reagor-Dykes' claim for violation of the automatic stay should not be
        dismissed..........................................................................................................23

V.      Plaintiffs state a claim for attorneys' fees under TUFTA and 11 U.S.C. § 105(a). ................................................................................................................... 24

VI.     In the alternative, Plaintiffs should be granted leave to amend their complaint. ....................................................................................................................... 24

CONCLUSION ........................................................................................................................... 25

# TABLE OF AUTHORITIES

Cases

*Alberts v. Tuft (In re Greater Se. Cmty. Hosp. Corp. I)*,
  353 B.R. 324 (Bankr. D.D.C. 2006) ................................................................... 21
*Bell Atlantic v. Twombly*,
  550 U.S. 544 (2007) ............................................................................................. 7
*Bonded Financial v. European American*,
  838 F.2d 890 (7th Cir. 1988) ................................................................. 12, 13, 14
*Bryan v. Citizens Nat'l Bank*,
  628 S.W.2d 761 (Tex. 1982) ................................................................................ 8
*Chrysler Credit Corp. v. Whitney Nat. Bank*,
  51 F.3d 553 (5th Cir. 1995) .......................................................................... 10, 21
*Citizens Bank v. Strumpf*,
  516 U.S. 16 (1995) .............................................................................................. 23
*Corzin v. Fordu (In re Fordu)*,
  209 B.R. 854 (6th Cir. BAP 1997) .................................................................. 20, 22
*Gecker v. Goldman Sachs & Co. (In re Auto. Professionals, Inc.)*,
  398 B.R. 256 (Bankr. N.D. Ill. 2008) ............................................................. 20, 21
*Granite Partners, L.P. v. Bear, Stearns & Co., Inc.*,
  17 F.Supp.2d 275 (S.D.N.Y. 1998) ................................................................... 20
*Hitt v. City of Pasadena*,
  561 F.2d 606 (5th Cir. 1977) ............................................................................. 24
*In re AgriProcessors, Inc.*,
  859 F.3d 599 (8th Cir. 2017) ............................................................................. 11
*In re AppliedTheory Corp.*,
  493 F.3d 82 (2d Cir. 2007) ................................................................................ 18
*In re Audre, Inc.*,
  210 B.R. 360 (Bankr. S.D. Cal. 1997) .............................................................. 18
*In re Bernard L. Madoff Inv. Sec. LLC*,
  557 B.R. 89 (Bankr. S.D.N.Y. 2016) ................................................................ 21
*In re Bunker Expl. Co.*,
  42 B.R. 297 (Bankr. W.D. Okla. 1984) ............................................................ 18
*In re Chase & Sanborn Corp.*,
  848 F.2d 1196 (11th Cir. 1988) ........................................................................ 8, 9
*In re Chau*,
  576 B.R. 821 (Bankr. E.D. La. 2017) ................................................................ 24
*In re Galaz*,
  850 F.3d 800 (5th Cir. 2017) ......................................................................... 15, 16
*In re Harwell*,
  628 F.3d 1312 (11th Cir. 2010) ........................................................................ 8, 10
*In re Isbell*,
  24 B.R. 234 (Bankr. W.D. Mo.1982) ................................................................ 11
*In re KDI Holdings, Inc.*,
  277 B.R. 493 (Bankr. S.D.N.Y. 1999) .............................................................. 18

*In re KZK Livestock*,
  190 B.R. 626 (Bankr. C.D. Ill. 1996) ................................................................. 17
*In re Lehman Brothers*,
  433 B.R. 101 (Bankr. S.D.N.Y. 2010) .............................................................. 23
*In re Mongelluzzi*,
  591 B.R. 480 (Bankr. M.D. Fla. 2018) ............................................................... 9
*In re Montgomery*,
  983 F.2d 1389 (6th Cir. 1993) .......................................................................... 12
*In re Personal and Bus. Ins. Agency*,
  334 F.3d 239 (3d Cir. 2003) ....................................................................... 20, 22
*In re Phillips*,
  443 B.R. 63 (Bankr. M.D.N.C. 2010) .............................................................. 23
*In re Prescott*,
  805 F.2d 719 (2d Cir. 1986) ........................................................................... 9, 12
*In re Richard Potasky Jeweler, Inc.*,
  222 B.R. 816 (S.D. Ohio 1998) ........................................................................ 24
*In re Rollaguard Sec. LLC*,
  591 B.R. 895 (Bankr. S.D. Fla. 2018) ................................................................ 9
*In re Smith*,
  966 F.2d 1527 (7th Cir. 1992) .......................................................................... 11
*In re Tonyan Const. Co., Inc.*,
  28 B.R. 714 (Bankr. N.D. Ill. 1983) ................................................................... 9
*In re Toy King Distributors, Inc.*,
  256 B.R. 1 (Bankr. M.D. Fla. 2000) .................................................................. 18
*In re Turner*,
  462 B.R. 214 (Bankr. S.D. Tex. 2011) ............................................................. 23
*In re Valley Media*,
  288 B.R. 189 (Bankr. D. Del. 2003) ................................................................. 14
*In re Waggoner Cattle, LLC*, 18-20126-RLJ-11,
  2019 WL 469367 (Bankr. N.D. Tex. Feb. 6, 2019) .......................................... 18
*Janvey v. GMAG, L.L.C.*,
  592 S.W.3d 125 (Tex. 2019) ...................................................................... 16, 17
*Katz v. First Nat. Bank of Glen Head*,
  568 F.2d 964 (2d Cir. 1977) ............................................................................... 9
*Kipperman v. Onex Corp.*,
  411 B.R. 805 (N.D.Ga. 2009) ........................................................................... 22
*Kmart Corp. v. Uniden Amer. Corp.* (*In re Kmart Corp.*),
  318 B.R. 409 (Bankr. N.D. Ill. 2004) ............................................................... 20
*LightSquared, LP, et al v. SP Special Opportunities, LLC* (*In re LightSquared Inc.*),
  511 B.R. 253 (Bankr. S.D.N.Y. 2014) ........................................................ 21, 22
*Lormand v. U.S. Unwired*,
  565 F.3d 228 (5th Cir. 2009) .............................................................................. 7
*Matter of Century Glove, Inc.*,
  151 B.R. 327 (Bankr. D. Del. 1993) ................................................................. 18
*Nisselson v. Lernout*,
  469 F.3d 143 (1st Cir. 2006) ............................................................................. 22

*Notinger v. Migliaccio (In re Fin. Res. Mortg., Inc.),*
   454 B.R. 6 (Bankr. D.N.H. 2011) ........................................................................... 22
*Perlman v. Bank of Am., N.A.,*
   561 F. App'x 810 (11th Cir. 2014) ........................................................................... 7
*Security First National Bank v. Brunson (In re Coutee),*
   984 F.2d 138 (5th Cir. 1993) ................................................................................... 12
*Stanziale v. Pepper Hamilton, LLP (In re Student Finance Corp.),*
   335 B.R. 539 (D. Del. 2005) .............................................................................. 20, 21
*U.S. ex rel. Bledsoe v. Cmty. Health Sys., Inc.,*
   501 F.3d 493 (6th Cir. 2007) ............................................................................ 7, 14
*Williams v. U.S.,*
   458 U.S. 279, 281 (1982)......................................................................................... 8
*World Capita Commun., Inc. v. Island Capital Management, (In re Skyway Commc'ns Holding Corp.),*
   389 B.R. 801 (Bankr. M.D. Fla. 2008) .................................................................. 22

## Statutes

11 U.S.C. §502(d) .................................................................................................... 22
11 U.S.C. §105(a) ......................................................................................... iii, 3, 24
Tex. Bus. & Comm. Code §24.006 ......................................................................... 17
Tex. Bus. & Comm. Code §24.013 ........................................................................... 3
11 U.S.C. §547(f)..................................................................................................... 14

## Other Authorities

Wright & Miller, 5A Fed. Prac. & Proc. Civ. §1298 (4th ed.).................................... 7

**SUMMARY**

FirstCapital engaged in a series of schemes with Reagor-Dykes' CFO Shane Smith to defraud Plaintiffs and their creditors of tens of millions of dollars.  In particular:

- FirstCapital, with the full knowledge and approval of its CEO, knowingly loaned tens of millions by allowing Smith to overdraft Plaintiffs' checking accounts and thus turning them into lines of credit as part of Smith's check-kiting—extensive loans that were far outside of FirstCapital's normal lending practices.

- Knowingly participated in Smith's use of "robbing Peter to pay Paul"—using funds from one company to pay off loans of another.  There were over ***$450 million*** in inter-company transactions at FirstCapital from November 2017 to July 2018 alone.

- Knowingly participated in Smith's use of "sight drafts"—an antiquated form of transaction that had no legitimate business application in this case—through which FirstCapital provided tens of millions of dollars in additional loans and extensions of credit and allowed Smith to further his fraudulent schemes.

Each of these schemes violated internal and generally accepted controls, more than sufficient to put FirstCapital on notice of the fraud.  But the facts are even worse.  FirstCapital had ***actual knowledge*** of the fraud and continued to participate in it.  Shane Smith, the former CFO of Reagor-Dykes, repeatedly told FirstCapital's CEO Brad Burgess what he was doing, and in response, Burgess elected to continue and increased the bank's role.  Burgess and Smith were in weekly, if not daily, communication on the overdrafts and other loans and extensions of credit, as detailed in the emails quoted in the complaint.

Plaintiffs have sued to recover the transfers made to FirstCapital in these fraudulent schemes and for related claims.  The dollars involved are truly staggering.  In the two years leading up to Debtors' bankruptcy, deposits of more than $1 billion were made into the checking accounts for RAM, Amarillo, and Floydada (far more than these dealership's revenues).  During that time, FirstCapital continually and repeatedly lent these debtors millions of dollars by allowing them to overdraw their accounts.  Based on information currently available, Debtors have identified approximately $29,302,000 in overdrafts that constitute loans and extensions of credit and the

payoffs of which are subject to avoidance as preference or fraudulent transfer. In addition, FirstCapital extended millions of additional dollars in credit to Plaintiffs by letting Reagor Dykes entities use "sight drafts" to pay for cars purportedly sold to one another. FirstCapital now tries to escape its role in this massive fraud, but its motion to dismiss should be denied.

*First,* Plaintiffs have stated claims for preferential and fraudulent transfers. FirstCapital was not a mere conduit to the banking transactions. FirstCapital loaned and extended credit to tens of millions of dollars and actively participated in Smith's financial fraud. Plaintiffs are entitled to recover the payments on these loans, and Plaintiffs have pleaded sufficient facts to identify the transfers.

*Second,* Plaintiffs have stated a claim for equitable subordination. Section 1107(a) confers on a debtor-in-possession all of the rights, powers, functions and duties of a trustee, including the right to investigate and prosecute claims. Courts have routinely held that under §1107(a) debtors-in-possession can assert an equitable subordination claim against a creditor of the estate.

*Third,* the *in pari delicto* affirmative defense does not bar Plaintiffs' equitable subordination claim. The majority of courts considering this issue have held that that defense does not apply to a statutory claim for equitable subordination brought pursuant to the bankruptcy code. Also, the conduct of the debtor is irrelevant for equitable insubordination. And in any event, First Capital's argument will become moot once a trustee is appointed, as anticipated in the Plan. Courts have held that it is inequitable to impute a debtor's alleged improper conduct to a trustee.

*Fourth,* Plaintiffs have stated a claim for willful violation of the automatic stay. The law precludes a lender from placing anything other than a temporary hold on a debtor's accounts for the purpose of investigating whether the lender has a valid setoff claim. That determination cannot be made on a motion to dismiss, as it turns on fact issues such as the timing of FirstCapital's freezes

on each account and the purposes of each freeze.

**Fifth,** Plaintiffs have stated a claim for attorneys' fees under TEX. BUS. & COMM. CODE

§24.013 and 11 U.S.C. §105(a).

## PLAINTIFFS' ALLEGATIONS IN THE ORIGINAL COMPLAINT

### I.    FirstCapital actively participated in the check-kiting scheme.

Check-kiting is a fraudulent scheme where checks are deposited into two or more checking

accounts to artificially inflate the bank account balances and take advantage of the "float" time

between banks.   Once the bank accounts are artificially inflated, checks that would normally be

returned for insufficient funds are honored by the issuing bank.   Typically, the entity's accounts

become continually overdrawn—a flagrant red flag—and the bank puts an end to it.   The exact

opposite occurred here.

Shane Smith, the Plaintiffs' former CFO, engaged in an extensive check-kiting scheme

with FirstCapital—and pleaded guilty to it.   Complaint, ¶16.   As a result of this check-kiting,

Plaintiffs' accounts at FirstCapital were continually overdrawn for hundreds of thousands—and

then millions—of dollars on a *daily* basis.  *Id.,* ¶17-22.  Smith worked directly FirstCapital's CEO,

Brad Burgess, on the fraudulent schemes.  *Id.*, ¶16; *see also* ¶41-46 (benefits to FirstCapital from

the fraud).   The full details are set forth in the complaint, but to summarize:

**Initially,** FirstCapital knowingly allowed Plaintiffs' accounts to be continually and

systematically withdrawn—by very large amounts over long periods of time.  For example:

- FirstCapital's statements show that Plaintiffs ***RAM and Amarillo had a negative average ledger balance and a negative balance for every single month from December 2016 through February 2018*** (at least).  Complaint, ¶22.

- In February 2018, RAM's account x3144 had an average daily ledger balance of negative $1,414,770.82 and an average float of $2,535,736.33, which resulted in an average daily available balance of ***negative $3,950,507.15***.  *Id.*, ¶21.

- In February 2018, Amarillo's account x9488 had an ***average daily ledger balance of***

*negative $295,586.39* and *an average float of $1,030,948.46*, which resulted in *an average daily balance of negative $1,328,534.85*.  *Id.*

- In January 2018, Burgess emailed Smith and noted that RAM, Amarillo, and Floydada each had overdrawn checking accounts totaling nearly *$1.4 million.  Id.*, ¶19.  While Burgess told Smith that "[t]his is really past my comfort zone," Burgess continued to let Smith proceed and build his scheme even larger and incur greater debts.  *Id.* ¶¶19-25.  Smith told Burgess exactly what he was doing and FirstCapital, with that full knowledge, continued to participate in the scheme. *Id.* ¶¶25-30.

- By the end of May 2018, RAM's checking accounts were consistently *overdrawn by more than $2 million per day.  Id.*, ¶20.

FirstCapital's Brad Burgess and Smith were in weekly, if not daily, communication about these overdrafts.  *Id.*, ¶17-19.  Needless to say, allowing such extensive and continual overdrafts was far outside the bank's normal lending practices.  *Id.*, ¶21, 74.  Despite these facts, FirstCapital elected not to terminate the accounts—and in fact, allowed the overdrafts to increase from hundreds of thousands to millions of dollars.  *Id.*, ¶17-22.

*Second,* FirstCapital issued cashier's checks on Plaintiffs' accounts, even though there were grossly insufficient funds to cover the checks.  *Id.*, ¶65.  These unfunded cashier's checks constituted loans and, by definition, grossly deviated from normal banking practices.  *Id.*, ¶66.  They turn the whole purpose of a cashier's check on its head.

*Third,* the volume, frequency, and amount of funds being transferred into and out of Plaintiffs' accounts at FirstCapital made it abundantly clear that Smith was engaged in massive fraud.  *Id.*, ¶23.  Plaintiffs' own financial statements—provided to FirstCapital—showed that the average deposits greatly exceeded the dealerships' sales.  *Id*.  As just one example, the average amount of money being deposited in RAM's bank account each month from November 1, 2017 to July 31, 2018 was *five times* as much as its average monthly sales in 2017.  *Id.*

*Fourth,* much of the debits and credits to Plaintiffs' accounts were nothing more than transfers between Reagor-Dykes entities.  *Id.*, ¶24.  From November 2017 to July 2018, over *$383*

*million* was disbursed from the RAM x3144 account to other Reagor-Dykes debtors. *Id.*  In June and July 2018 alone, there were over ***$88 million*** in deposits made into the RAM x3144 account from other Reagor-Dykes entities. *Id.*  Because these deposits were credited against the overdrafts, funds from one company were used to pay the debts of another.

The above blatant red flags were more than sufficient to give FirstCapital constructive knowledge of the fraud. But the facts are even clearer than that. Smith and Burgess communicated several times per week about the ever-increasing overdrafts. *Id.*, ¶17-19. Indeed, FirstCapital itself treated the overdrafts as loans. It charged Plaintiffs RAM and Amarillo 6.25% interest on the negative available balance, in addition to other fees. *Id.*, ¶21. Smith also repeatedly told FirstCapital that he was using intercompany transfers to cover the massive, ongoing, multiday overdrafts on the Plaintiffs' accounts, as set forth in the emails between Smith and FirstCapital. *Id.*, ¶25-26, 28-29 (setting forth emails in detail). The bank was also provided with Plaintiffs' financial statements, showing that the deposits greatly exceeded the dealership's sale's. *Id.*, ¶23.

Despite these known facts, FirstCapital continued to lend increasing amounts of money to Plaintiffs, becoming more and more involved in the check kiting scheme. *Id.*, ¶17-22, 27.

## II.     FirstCapital actively participated in the fraudulent sight draft scheme.

FirstCapital's fraud did not stop there. FirstCapital also knowingly participated in Smith's schemes to defraud Reagor Dykes' creditors. *Id.*, ¶28-40. FirstCapital allowed Smith to create millions of dollars more in float by creating "sales" between the Reagor-Dykes dealerships, using an antiquated form of transaction called a sight draft. *Id.*, ¶30-40. In reality, the "sales" were a fiction used to defraud other creditors. The sight drafts were replete with obvious fraud:

- FirstCapital was providing extensive additional financing to Plaintiffs—at a time when the accounts were already severely overdrawn. Hundreds of thousands of dollars changed hands on a daily basis between dealerships through the sight drafts. *Id.*, ¶36.

- The sight drafts had no legitimate business purpose. It is an antiquated form of

transaction, used between unaffiliated parties, for transactions involving long distances—the exact opposite of Plaintiffs' situation.  *See id.*, ¶¶31-33, 40.

- The sheer volume of intercompany transactions alone—*$450 million in just 8 months*—shows there was no legitimate business need to use sight drafts for the affiliate sales.  *Id.*, ¶¶24, 33, 39.

These red flags were more than sufficient to put FirstCapital on notice of the fraud.  But again, FirstCapital had *actual* knowledge of the fraud.  Smith regularly informed Burgess and others at FirstCapital that the overdrafts were going to be larger than normal due to the quarterly audits of floor-plan lenders.  *See id.*, ¶¶28-29 (setting forth emails).

Smith also specifically told FirstCapital that the sight drafts were being used to create float, not for a legitimate purpose.  For example, on April 18, 2017, Smith asked FirstCapital to pay by 4:00 p.m. approximately $183,000 in drafts that named RAM as payor and that had been given to another Reagor-Dykes debtor to present and receive credit at another bank.  *Id.*, ¶37.  Smith told FirstCapital that if they did not pay the drafts in time, the other bank would return the drafts and debit the account of the other Reagor-Dykes debtor.  *Id.* Smith asked FirstCapital to pay the draft using FirstCapital's funds immediately, but not draw funds from RAM's account until the following day.  *Id.*

And FirstCapital soon dropped any pretense that the sight drafts were a legitimate form of financing.  After a certain time, FirstCapital did not even bother following the required steps for a sight draft.  It stopped requiring that the selling dealerships tender the original certificates of title—an essential step for a sight draft.  *Id.*, ¶36; *see also id.*, ¶32.  FirstCapital also regularly sent Smith a list of incoming drafts and asked him for instructions on which ones to pay—so that Smith (not FirstCapital, as under a legitimate sight draft) would decide when and whether the sight draft should be honored.  *Id.*, ¶36.  At times Smith would also ask FirstCapital to delay honoring a draft because of how overdrawn the accounts were—contrary to the requirements of a sight draft.  *Id.*

And these are only the facts that Plaintiffs know about so far. These pleaded facts are more than sufficient to establish Plaintiffs' causes of action.

## ARGUMENT

### I.    Plaintiffs exceed the pleading standards required under Rule12(b)(6).

Under Rule 12(b)(6), a court must accept the complaint's factual allegations as true, with "all reasonable inferences in the plaintiff's favor." *Lormand v. U.S. Unwired,* 565 F.3d 228, 232 (5th Cir. 2009). The complaint "does not need detailed factual allegations," only "enough to raise a right to relief above the speculative level". *Bell Atlantic v. Twombly*, 550 U.S. 544, 555 (2007). The standard is whether the complaint contains "enough facts to state a claim for relief that is plausible on its face"—to "[] cross the line from conceivable to plausible." *Id*. at 570.

Plaintiffs need not plead every detail of the fraud—particularly as FirstCapital participated in a complex fraudulent scheme, involving thousands of individual transactions, and has full knowledge of its role. *See* Wright & Miller, 5A FED. PRAC. & PROC. CIV. §1298 (4th ed.); *U.S. ex rel. Bledsoe v. Cmty. Health Sys., Inc.,* 501 F.3d 493, 509 (6th Cir. 2007) ("Where the allegations in a relator's complaint are complex and far-reaching, pleading every instance of fraud would be extremely ungainly, if not impossible.") (collecting cases; cleaned up).

### II.    Plaintiffs state claims for preferential transfers, constructive fraudulent transfers, and "traditional" fraudulent transfers.

#### A.    FirstCapital is not a mere conduit. Plaintiffs are suing over FirstCapital's loans and its active participation in Smith's fraudulent schemes.

FirstCapital's contentions on pages 4-10 should be rejected.

##### 1.    FirstCapital was not a mere conduit.

FirstCapital's mere conduit argument is an affirmative defense, not appropriately decided on a motion to dismiss. *Perlman v. Bank of Am., N.A.,* 561 F. App'x 810, 813 (11th Cir. 2014). FirstCapital's argument should be rejected for this reason alone.

Should the Court look further, it should still reject FirstCapital's argument.  To qualify as a mere conduit, a defendant "must establish (1) that [it] did not have control over the assets received, i.e., that [it] merely served as a conduit for the assets that were under the actual control of the debtor-transferor *and* (2) that [it] acted in good faith and as an innocent participant in the fraudulent transfer." *In re Harwell,* 628 F.3d 1312, 1323 (11th Cir. 2010) (emphasis in original).

FirstCapital cannot meet either element of this test.  Initially, it was not a mere conduit, and FirstCapital misinterprets the complaint.  Plaintiffs are not suing over routine deposits, over which FirstCapital had no control, as it contends.  Plaintiffs are suing over the overdrafts and other loans.  The preferential and fraudulent transfers are the payments to FirstCapital for its loans to Plaintiffs, including: (1) Plaintiffs' repayment of the overdrafts by depositing funds into their accounts, (2) the deposits made to FirstCapital to repay the unfunded cashier's checks; (3) the payments to satisfy Plaintiffs' obligations under the sight drafts, including by depositing funds in their accounts; (4) the payments to FirstCapital on the revolving line of credit, other loans, and the fees and interest paid; (5) the payments to repay the credit extended by FirstCapital to a plaintiff when FirstCapital gave immediate credit to a Plaintiff for a sight draft that would not be paid until weeks later; and (6) the transfers between Plaintiffs' accounts, using one company's funds to pay off another's overdrafts, sight drafts, and other loans and charges at FirstCapital.

An overdraft constitutes a loan. *Williams v. U.S.*, 458 U.S. 279, 281 n.1 (1982) (A check-kiting scheme uses a bank's credit system to create "an interest-free loan for an extended period of time."); *Bryan v. Citizens Nat'l Bank,* 628 S.W.2d 761, 763 n.2 (Tex. 1982) ("Where a bank voluntarily pays a check as an overdraft, it makes a loan to its customer.").  Payments to lenders are subject to preferential and fraudulent transfer claims, and lenders do not qualify as mere conduits.  *E.g.*, *In re Chase & Sanborn Corp.*, 848 F.2d 1196, 1200 (11th Cir. 1988) ("[W]here a

bank receives money from a debtor to pay off a debt owed to the bank, courts have found that the bank gained control of the funds and have allowed recovery against the bank.") (collecting cases); *In re Mongelluzzi*, 591 B.R. 480, 500 (Bankr. M.D. Fla. 2018) (holding that deposits that were applied to overdrafts constitute transfers and that the bank is the initial transferee).

Notably, many of the cases FirstCapital relies on expressly note that if a deposit is used to pay off a loan or overdraft, it is a transfer subject to avoidance.[1]  For example, at page 17, FirstCapital quotes *In re Rollaguard Sec. LLC,* 591 B.R. 895 (Bankr. S.D. Fla. 2018), for the proposition that a bank is not tainted with fraudulent intent simply because a fraudster makes use of the bank.  But what FirstCapital ignores is that Rollaguard expressly noted that that was true only when the bank was unaware of the fraud.  *Id.* at 920.  Here FirstCapital knew.  Moreover, *Rollaguard* expressly notes that deposits made to pay off overdraft are transfers subject to avoidance. *Id.* at 910 ("The Debtors' deposits into their own unrestricted bank accounts, ***other than those relating to satisfaction of overdrafts***, are not 'transfers' that may be subject to avoidance as fraudulent transfers.") (emphasis added).

Nor can FirstCapital meet the mere conduit test's second element:  it cannot establish that

---

[1] FirstCapital's other cases simply repeat the general legal standard or address routine deposits, not deposits that constitute loan payments to the bank.  The deposits here are not in the ordinary course of business—the extensive overdrafts and loans were far outside the bank's normal procedures.  Complaint ¶74.

Also, many of FirstCapital's cases actually support Plaintiffs; as  they provide that if a deposit is used to pay off a loan, it can constitute a transfer.  *E.g., In re Prescott*, 805 F.2d 719 (2d Cir. 1986) (deposits to cover overdrafts are transfers); *Katz v. First Nat. Bank of Glen Head,* 568 F.2d 964, 971 (2d Cir. 1977) (transfer exists if the deposit "serve[d] as payment of his company's indebtedness to the bank" and the bank does not act in good faith); *In re Tonyan Const. Co., Inc.,* 28 B.R. 714, 729 (Bankr. N.D. Ill. 1983) ("[I]f the deposit . . . is made or accepted for the purpose of effecting payment to the bank, then the deposit and subsequent setoff may constitute a transfer within the purview of § 547").

Further, *In re Chase & Sandborne*, 848 F.2d 1196 (11th Cir. 1988), is not on point. That court found that no real overdraft debt was created; the defendant bank only honored the debtor's check after it confirmed that another bank had wired funds to cover the check—the transactions were "simultaneous."  *Id.* at 1201. There were also no allegations that the bank had participated in any fraud.

it acted in good faith, as an innocent participant in the transaction.  On the contrary, FirstCapital was a knowing and active participant in the fraud, as summarized above.  Not only did FirstCapital ignore blatant red flags that Smith was engaged in check kiting, but its CEO Brad Burgess (among others at FirstCapital) had actual knowledge of the fraud.  *See Harwell,* 628 F.3d at 1322-23.

FirstCapital thus qualifies as an initial transferee, and Plaintiffs are entitled to recover the transfers to pay off the loans and other charges, including the deposits credited against the debts.

> **2.     The Fifth Circuit and other courts have recognized that a bank is liable for its role in the financial fraud, and that check-kiting gives rise to a debt that is subject to a preference and fraudulent transfer claim.**

The Fifth Circuit has recognized that a bank is liable for its role in financial fraud—under facts strikingly similar to the instant case.  In *Chrysler Credit Corp. v. Whitney Nat. Bank,* 51 F.3d 553 (5th Cir. 1995), a car dealership and its owners committed fraud on its floorplan lender, Chrysler Credit. Chrysler sued the dealership's bank, Whitney National Bank.  The district court entered judgment on the conversion and conspiracy to convert the dealership's car sale proceeds, in violation of the floorplan loan, and the Fifth Circuit affirmed.  In that case:

- The dealership was constantly overdrawn; at one point it owed the bank $1.6 million—less than Plaintiffs owed FirstCapital in the instant case.

- The bank had an established practice of covering the dealership's checks when there were insufficient funds.  The bank used subsequent deposits to offset the overdrafts.

- The bank's vice president, in charge of the dealership's account, had a close relationship with the dealership and was in constant contact with the dealership about the overdrafts and how they would be paid.

- The dealership was constantly giving the bank information about its accounts receivable and other anticipated income to cover the overdrafts.

- The bank's relationship with the dealership and its owner "was beyond the boundaries of normal and ordinary banking practices"—as evidenced by the large amount and frequency of the overdrafts.  *Id.* at 559-60.  The bank also knew of Chrysler's interest.

- The amount of the overdrafts and the financial statements would put any experienced banker on notice of the floorplan fraud and that it was assisting in the fraud.  Dealership

employees also testified that they told the bank about the floorplan fraud.

- The bank had a strong financial incentive to continue. If the bank refused to honor the checks and the dealership went out of business, the bank would have no means to collect its loans.

Like the bank in *Chrysler Credit*, FirstCapital cannot avoid its participation in Smith's scheme.

Moreover, courts have consistently held that a check-kiting scheme gives rise to a debt that is subject to preference and fraudulent transfer claims. For example, in *In re AgriProcessors, Inc.*, 859 F.3d 599, 605 (8th Cir. 2017), the debtor was engaged in a check-kiting scheme, and the trustee sought to recover the deposits used to cover the overdrafts. The Eighth Circuit held that the deposits were debts, subject to a preference claim:

> "The test for when a debt is incurred is whether the debtor is legally obligated to pay." *Laws*, 98 F.3d at 1051. When Luana [Bank] allowed provisional settlements of checks to become final, even though those settlements contributed to a true overdraft, Luana paid overdrafts for Agriprocessors. Luana thus made an unsecured loan and/or extension of credit to Agriprocessors. As a result, Agriprocessors was legally obligated to Luana for the amount of the overdrafts. The true overdrafts were debt.

*Id.* at 605 (internal citations omitted). The Eighth Circuit also rejected the bank's claim that it was a mere conduit, not an initial transferee:

> The district court correctly found Luana had both dominion and control. When Luana allowed a true-overdraft-causing provisional settlement to become final, Luana irrevocably paid a third party in the amount of the true overdraft. ***Luana was not a "conduit" between Agriprocessors and the third party: Luana itself paid the third party. In exchange for Luana paying the overdraft, Agriprocessors owed Luana a debt. Therefore, when Agriprocessors made deposits covering true overdrafts, Agriprocessors made payments on debt to Luana.*** Luana had full control over the true-overdraft-covering deposits and could use the funds for any purpose.

*Id.* at 605–06 (emphasis added). Other appellate courts have reached the same conclusion:[2]

---

[2] *In re Smith*, 966 F.2d 1527, 1532 (7th Cir. 1992) ("Analysis of a check-kiting scheme as a loan transaction is not a novel approach. . . . In effect, the Debtor here obtained a loan from the Bank (through the check-kiting scheme) and used the loan proceeds to pay his debt to Baker & Schultz. We might say that the loan was unauthorized or obtained by fraud, but it was nevertheless in economic reality a loan."); *In re Isbell*, 24 B.R. 234, 238 (Bankr. W.D. Mo.1982) ("[S]ome $23,918.38, was paid over to [Bank of Carthage] to cover the deficit created in the account in that bank by the check-kiting scheme. Therefore, for the reasons stated above, that transfer must be regarded as avoidable by the plaintiff trustee in bankruptcy....").

- *Matter of Prescott*, 805 F.2d 719, 729 (7th Cir. 1986) ("Here, to the extent the deposits compensated for overdrafts, they were payments on an obligation. Prescott had no right to keep using the money deposited. . . . Therefore the trustee could avoid deposits that were applied against Prescott's March 16 overdrafts insofar as they preferred Marine [Bank] and indirectly preferred Gateway over other creditors.").

- *In re Montgomery*, 983 F.2d 1389, 1389 (6th Cir. 1993) (holding that funds used to pay off overdrafts were preferences and that the debtors "operated a massive check kiting scheme through which they obtained what amounted to unauthorized loans from a number of different banks.").

The cases cited by FirstCapital do not undermine this caselaw; they do not even support FirstCapital's position. FirstCapital's cases are also overwhelmingly decided on summary judgment or after a trial—not on a motion to dismiss as FirstCapital seeks here.

The Fifth Circuit case cited by FirstCapital actually supports Plaintiffs. In *Security First National Bank v. Brunson (In re Coutee)*, 984 F.2d 138 (5th Cir. 1993), a bank loaned money to personal injury plaintiffs, and the plaintiffs' law firm paid off the loan out of settlement proceeds that were paid into its client trust account.

The Fifth Circuit held that the bank constituted an initial transferee. The bank could not escape the fact that it was the party that loaned the money to the plaintiffs, and the payment of the loan constituted a preferential transfer: "The bank's position ignores the obvious . . . it was still the bank that loaned them the money." *Id.* at 141. By contrast, the law firm was a mere conduit; it held the funds in its client trust account, as a fiduciary for its clients, and had no legal right to put those funds to its own use. *Id.* Of course here, FirstCapital is the lender, and Plaintiffs are seeking to recoup the payments made on FirstCapital's loans—just like in *Security First*.

Further, FirstCapital's reliance on *Bonded Financial v. European American*, 838 F.2d 890 (7th Cir. 1988), is misplaced. There, an individual, Ryan, borrowed over $600,000 from a bank. Non-party Bonded Financial issued a $200,000 check payable to the bank and instructed the bank to deposit the check in Ryan's account. Ten days later, Ryan instructed the bank to debit his

account by the $200,000 and apply that amount to his loan at the bank.

The Seventh Circuit ruled that under these specific facts, the bank was a mere conduit.   It explained that at the time Bonded issued the $200,000 check, Ryan's loan was fully secured and not in default, and the bank had no right to offset the loan against the funds in Ryan's account. The court also emphasized that the bank acted in good faith—it did not know and could not have known about the debtor's impending collapse.

In the instant case, the facts are the exact opposite.  FirstCapital's loans were unsecured; the accounts were consistently overdrawn, giving FirstCapital a right to apply the deposits against the overdrafts; and FirstCapital had actual knowledge of and participated in the fraud.  Given these facts, FirstCapital cannot show that it is mere conduit.

### B.    Plaintiffs plead sufficient facts to establish their transfer claims.

### 1.    Plaintiffs state claims for preferential transfers.

Next, FirstCapital contends that Plaintiffs have not pleaded sufficient facts to support their preference claims.  Plaintiffs more than meet Rule 8's standard:

- *Plaintiffs have identified the transfers at issue*:  the deposits into Plaintiffs' accounts and other payments to FirstCapital to pay off the overdrafts, sight drafts, unfunded cashier's checks, and FirstCapital's other loans, fees, and interest.

- *These transfers were on account of an antecedent debt*: the overdrafts, sight drafts, unfunded cashier's checks, and other FirstCapital loans and charges.

- *Plaintiffs were insolvent at the time of the transfers.*   Plaintiffs have set forth facts showing that their accounts were continually overdrawn on an ever-increasing basis— beginning with hundreds of thousands and then over a million dollars on a daily basis through their respective petition dates. Original Complaint, ¶17-23.  Two of the debtors had negative account balances continually from December 2016 to February 2018. *Id.*, ¶ 22. It can be reasonably inferred that Plaintiffs were insolvent at the time of the transfers—otherwise Plaintiffs would not have been continually in debt by substantial and ever-increasing amounts. Smith even told Burgess that he was "really trying to get it [an account] back to positive" balances. *Id.*, ¶17.  Additionally, there would be no need to use sight drafts to create additional float if Plaintiffs had indeed been solvent.

- *The transfers to FirstCapital were made within the preference period.*   Plaintiffs have

pleaded that they made substantial deposits into their accounts to cover overdrafts, loans, and other charges from at least August 2017 forward. *Id.*, ¶16-26, 29, 35-37.[3]

- *FirstCapital received more than it would have in Chapter 7.*  Plaintiffs deposited multiples of its gross annual sales into FirstCapital's accounts. *Id.*, ¶23.  It can reasonably be inferred that these deposits were more than FirstCapital would receive if the fraudulent schemes were stopped and Plaintiffs were liquidated.

FirstCapital suggests *In re Valley Media*, 288 B.R. 189 (Bankr. D. Del. 2003), requires Plaintiffs to itemize every transaction.  But *Valley Media* appears to address a preference claim involving a handful of transfers, and the plaintiff could reasonably identify all the transfers at issue. In this case, there are literally thousands of transactions at issue—that Plaintiff have identified so far. *See* Exh. 1.  And FirstCapital is fully aware of the deposits into its accounts and other payments and charges on its loans.  Plaintiffs' detailed descriptions of the loan schemes are more than sufficient to provide fair notice to FirstCapital.  Indeed, in situations like this, courts do not require what FirstCapital is seeking under Rule 9(b). *See Bledsoe*, 501 F.3d at 509 (collecting cases).

### 2.    Plaintiffs state claims for "actual intent" fraudulent transfer.

Plaintiffs plead claims for traditional, "actual intent" fraudulent transfer and for constructive fraudulent transfer over the millions—and in some cases, hundreds of millions of dollars—transferred between Plaintiffs' accounts.  At the direction of Smith, funds were taken from one plaintiff account and used to pay another plaintiff's overdrafts, sight drafts, and other loans, fees, and interest charges from FirstCapital.  Complaint, ¶24, 35-36.

FirstCapital addresses only the "actual intent" fraudulent transfer claims, under bankruptcy code §548 and TUFTA § 24.005.   FirstCapital contends that these claims should be dismissed because Plaintiffs have allegedly not pleaded any badges of fraud.  FirstCapital misses the point.

---

[3] Plaintiffs have pleaded that FirstCapital was an insider under 11 U.S.C. §547(f). *Id*. ¶90-92.  FirstCapital has not disputed that contention in their motion.

As an overriding matter, even if Rule 9(b) applies to the fraudulent transfer claims—an open issue, not ruled on by the Fifth Circuit—the rule does not require that intent be pled with particularity. Rule 9(b) provides that "intent, knowledge, and other conditions of a person's mind may be alleged generally." Also, "whether the transfer was made with the actual intent to defraud creditors is a fact question," and cannot be decided on a motion to dismiss. *See In re Galaz*, 850 F.3d 800, 804 (5th Cir. 2017).

Further, Plaintiffs have set forth more than sufficient facts to plead fraudulent intent.[4] Plaintiffs have pleaded facts showing that FirstCapital had *actual knowledge* of the fraudulent transfers. The Complaint provides, for example:

> 25.    . . . Smith told FirstCapital that he was using intercompany transfers to cover the massive, ongoing, multiday overdrafts on the FCB Account Debtor Plaintiffs accounts. For example, in a January 11, 2018 email to Burgess, Smith stated "Working with Ashley to get some collections in here from the group and outside the group to see if we can get these two accounts cleaned up for tomorrow." Burgess, an experienced banker, would have understood that "from the group" meant that Smith intended to just move funds from one Reagor-Dykes entity to another to try and pay back the overdrafts on the FCB checking accounts.

> 26.    Similarly, on March 12, 2018, Burgess informed Smith that "Ram is ($305k) short after pending transactions. RAM was ($915k) after Friday's transactions." Smith responded to Burgess and told him "Let get with everyone on what they have for deposits today and see if we need to add some." In other words, Smith's plan was to see what actual deposits they had available to make that day and, if it wasn't enough, Smith intended to find some other deposits. Where would such deposits come from? Apparently, other Reagor-Dykes checking accounts or sight drafts for cars purportedly being sold from one Reagor-Dykes entity to another.

Plaintiffs have also pleaded facts strongly suggesting that the transfers were fraudulent— blatant red flags that FirstCapital chose to ignore:

- From November 1, 2017 to July 31, 2018 alone, the average amount of money being

---

[4] FirstCapital contends that Plaintiffs are caught in a dilemma between Smith's fraudulent intent and Plaintiffs' intent (Motion, p. 17). This is a red herring. Smith, Reagor-Dykes' CFO, acted with fraudulent intent in causing the transfers from Plaintiffs to FirstCapital, and Plaintiffs are entitled to sue the transferee to recover those funds.

deposited in RAM's x3144 account was five times as much as its average monthly sales in 2017.  Complaint, ¶23.

- Much of the debits and credits in Plaintiffs' accounts were nothing more than transfers between Reagor-Dykes entities.   From November 2017 to July 2018, over $383,000,000 was disbursed from the RAM x3144 account to other Reagor-Dykes debtors.  In June and July 2018 alone, there were over $88 million in deposits made into the RAM x3144 account that came from funds paid or transferred by other Reagor-Dykes entities.  *Id.*, ¶24.  And this was at a time when Plaintiffs account were continually overdrawn by substantial amounts.

- Smith used sight draft transactions for affiliate sales—even though sight drafts had no legitimate business purpose for those transactions.  *Id.*, ¶¶30-35, 38-40.  That in itself was a blatant tipoff.  Indeed, FirstCapital subsequently did not even bother following the required steps for the sight drafts, an admission that the sight drafts were not a legitimate form of financing for the affiliate sales.  *Id.*, ¶¶36-37.

- FirstCapital recognized the enormous risks it was taking in granting yet more financing to Plaintiffs for the affiliate sales—a red flag that the transfers were not legitimate.  It required five of the Plaintiffs to execute a $2.4 million promissory revolving line of credit note.  *Id.*, ¶35.

*See In re Janvey v. GMAG, L.L.C.*, 592 S.W.3d 125, 130 (Tex. 2019) ("A transferee on inquiry notice knows facts that are, or should be, suspicious: red flags that a reasonable person would have investigated prior to engaging in the transfer. . . . If a diligent inquiry could have uncovered facts showing fraudulent intent, Texas common law imputes knowledge of those additional facts to the transferee as well.") (applying the common law standard to TUFTA claims).

On top of that, Plaintiffs have pleaded facts showing several of the badges of fraud.  The transferee shared a close relationship with the debtors.  The Reagor-Dykes parties on both sides of the fraudulent transactions were obviously corporate affiliates.  *Id.*, ¶¶24, 39.  A close relationship also existed with FirstCapital.  Rick Dykes—who owned 50% of the LLCs that owned the Reagor-Dykes debtors—was a major bank shareholder and sat on its board of directors.  *Id.*, ¶46.[5]  The

---

[5] Rick Dykes' title was later changed to a member of the bank's advisory board, though that was a change in title only—his role at the bank remained the same.  *Id.*, ¶46.

debtor Plaintiffs in the transaction received no consideration for the transfer.  One company's funds were just to pay off the debts of another.  *See id.,* ¶¶24-26.

It is also is reasonable to assume that the initial debtor was or became insolvent at the time of the transfers, and the transfers occurred shortly before or shortly after a substantial debt was incurred."  *See* TEX. BUS. & COMM. CODE § 24.005(b) (listing 11 badges of fraud under TUFTA).  These transfers were for no small amounts—individual transactions were often for hundreds of thousands or millions of dollars.  In the aggregate, hundreds of millions of dollars were transferred between the affiliates.  *Id.*, ¶¶17-24.  And during these times, Plaintiffs' accounts were continually overdrawn by ever-increasing, substantial sums.  *Id.* [6]

Further, FirstCapital repeats its argument that it is a mere conduit.  That has already been addressed above.  Finally, in addition to the traditional fraudulent transfer claims, Plaintiffs have pleaded claims for constructive fraudulent transfer under the Texas Uniform Fraudulent Transfer Act—which does not require actual intent.   TEX. BUS. & COMM. CODE § 24.006 (setting forth elements of that claim).  FirstCapital's motion never even mentions this claim.

### C.    Plaintiffs state claims under Bankruptcy Code §550 and §502.

FirstCapital's only argument is that the section 550 and 502 claims should be dismissed because (supposedly), Plaintiffs have not stated claims for preferential or fraudulent transfers.  But as set forth above, Plaintiffs have indeed pleaded those transfer claims.

In sum, Plaintiffs should be allowed to proceed against FirstCapital on all of their

---

[6]  FirstCapital contends that Plaintiffs must establish actual intent transaction by transaction, citing *In re KZK Livestock*, 190 B.R. 626 (Bankr. C.D. Ill. 1996).  But that case merely holds that a principal's guilty plea to check-kiting does not establish as a matter of law that all payments the debtor made with kited funds to legitimate trade creditors were made with an actual intent to defraud.

The court recognized that "[t]he check kiting, like a Ponzi scheme, comes to a point of no return where the check kiter could never find a way out. At that point, every transfer might be made with an intent to defraud creditors, for the check kiter would not be able to pay them all"—precisely the instant case.  *Id.* at 630.

preferential and fraudulent transfer claims, and the related claims under sections 550 and 502.

## III.    Plaintiffs state claims for equitable subordination.

### A.    Plaintiffs have standing to assert equitable subordination.

FirstCapital contends that Reagor-Dykes lacks standing to pursue its equitable

subordination claims because "the proper party to seek equitable subordination is the creditor or

the trustee acting as representative of the creditor, not the debtor." Motion at 20. FirstCapital cites,

without discussion, only two cases, both of which are from the early 1980's (and neither of which

are from Texas).[7]  However, there are numerous subsequent decisions—including a ruling from

the same Oklahoma federal court that issued the earlier decision on which FirstCapital relied—

that hold that a debtor-in-possession has standing to bring an equitable subordination claim.

While courts are conflicted regarding whether an unsecured creditor has standing to assert

an equitable subordination claim against another creditor, *see In re Waggoner Cattle, LLC*, 18-

20126-RLJ-11, 2019 WL 469367 (Bankr. N.D. Tex. Feb. 6, 2019), courts are nearly unanimous in

concluding that a debtor-in-possession can bring such claims.[8]

---

[7]  *See* Motion at 20, footnotes 75 and 76. The other cases cited in this section of Defendant's brief merely hold that a creditor has standing to sue for equitable subordination; they do not hold that a debtor-in-possession lacks standing. Moreover, one of the cited cases actually supports Plaintiffs' position, to the detriment of FirstCapital's:  *In In re AppliedTheory Corp.*, 493 F.3d 82, 85–86 (2d Cir. 2007), the court held that an unsecured creditors' committee may only bring an equitable subordination claim if the trustee or debtor-in-possession unjustifiably refuses to pursue the claim. Thus, the court assumed that the debtor-in-possession had standing to bring such a claim in the first place.

[8]  *See Matter of Century Glove, Inc.*, 151 B.R. 327, 332 (Bankr. D. Del. 1993) ("[A] trustee has standing to seek equitable subordination. Here, no trustee has been appointed, and 'a debtor in possession [has] all of the rights ... and powers, and shall perform all the functions and duties of a trustee....' [Thus,] Century [the DIP] has standing.");  *In re KDI Holdings, Inc.*, 277 B.R. 493, 507 (Bankr. S.D.N.Y. 1999)("Ordinarily, only the trustee or debtor-in-possession has standing to assert an equitable subordination [claim]…."); *In re Audre, Inc.*, 210 B.R. 360, 363–64 (Bankr. S.D. Cal. 1997)("Under § 1107, a debtor-in-possession assumes almost all the rights and powers of a trustee. Thus, the chapter 11 debtor-in-possession has standing to bring an equitable subordination action.")(citation omitted) *In re Toy King Distributors, Inc.*, 256 B.R. 1, 194 (Bankr. M.D. Fla. 2000)(A "chapter 11 debtor-in-possession has standing to bring an equitable subordination action."); *In re Bunker Expl. Co.*, 42 B.R. 297, 300 (Bankr. W.D. Okla. 1984)(holding debtor-

Consistent with the above authorities and Bankruptcy Code Section 1107(a), Reagor-Dykes as the debtor-in-possession has standing to pursue its equitable subordination claim. Indeed, as the Court is well aware, debtors-in-possession routinely object to claims on a variety of grounds, and investigate and prosecute equitable subordination claims where actual or constructive fraud has been alleged. This case is no different. Further, if the Court confirms the Plan as presently constructed, which includes provision for a Liquidating Trust and the appointment of a Trustee, FirstCapital's standing argument will become moot.

**B.    Plaintiffs plead the elements of equitable subordination.**

Plaintiffs have pleaded extensive facts supporting the three elements of their equitable subordination claim. One, FirstCapital has engaged in inequitable conduct, as detailed above. Two, FirstCapital's fraud harmed Ford Motor Company, other floorplan lenders, and the victims of Smith's check-kiting. It masked Plaintiffs' true insolvency from the companies' officers, directors, and creditors. Complaint, ¶28, 41. Three, equitable subordination of FirstCapital's claims would not be inconsistent any provision of the bankruptcy code. FirstCapital cites no such provision in its response. And equitably subordinating FirstCapital's claim is wholly consistent with the overriding principle of the bankruptcy code: to achieve equity and fairness.

**C.    The *In Pari Delicto* defense does not apply to Plaintiffs' equitable subordination claims.**

At page 22 of its Motion, FirstCapital argues that Reagor-Dykes' equitable subordination claim is precluded by the *in pari delicto* doctrine. FirstCapital's Motion is devoid of authority. The only decision FirstCapital cites is a decades-old non-bankruptcy case, when there are plenty of recent cases that discuss this issue in the context of bankruptcy law. The majority of these cases

---

in-possession's amended complaint sufficiently alleged inequitable conduct by defendants to state cause of action to subordinate defendants' claims to those of debtor's other creditors).

holds that an equitable subordination claim is not subject to the *in pari delicto* doctrine.

In *Stanziale v. Pepper Hamilton, LLP* (*In re Student Finance Corp.),* 335 B.R. 539 (D. Del. 2005), the court held that the unclean-hands doctrine did not bar a claim for equitable subordination under Section 510(c) of the Bankruptcy Code. The court recognized a debtor's inequitable conduct was not relevant when seeking to equitably subordinate a claim. *Id.* at 555. Although an earlier decision from the Southern District of New York had reached the opposite result (*Granite Partners, L.P. v. Bear, Stearns & Co., Inc.*, 17 F.Supp.2d 275 (S.D.N.Y. 1998)), the first bankruptcy court to decide the issue rejected *Granite Partners* as "unsupported and unpersuasive."

Specifically, *Gecker v. Goldman Sachs & Co.* (*In re Auto. Professionals, Inc.*), 398 B.R. 256 (Bankr. N.D. Ill. 2008), concluded that common-law defenses such as in pari delicto do not apply to causes of action under the Bankruptcy Code.  *Gecker* explained: "The court [in *Granite Partners*] failed to recognize the important difference between a trustee suing on behalf of a debtor based on <u>non-bankruptcy law</u> and a trustee asserting causes of action created under the Bankruptcy Code." *Id*. at 261.  *Gecker* further stated "Courts generally have not applied common law equitable defenses to causes of action created under Chapter 5 of the Bankruptcy Code. For example, courts do not recognize state law equitable defenses to actions to avoid preferential transfers under § 547 and fraudulent transfers under § 548." *Id*. (citing cases).[9]   The court then held that:

> There is no justification for applying the common law defense of unclean hands to a claim for equitable subordination under § 510(c). To the contrary, as noted above, permitting this defense would be inconsistent with the traditional test for equitable subordination, the

---

[9] *In re Personal and Bus. Ins. Agency*, 334 F.3d 239, 245–47 (3d Cir. 2003)(holding that the doctrine of *in pari delicto* does not apply to a trustee bringing an action under § 548)….; *Corzin v. Fordu* (*In re Fordu*), 209 B.R. 854, 863 (6th Cir. BAP 1997)(noting that "courts have consistently recognized that the Trustee may pursue fraudulent or preferential transfers despite the fact that the debtor was a knowing and willing participant to such conveyances"); *Kmart Corp. v. Uniden Amer. Corp.* (*In re Kmart Corp.*), 318 B.R. 409 (Bankr. N.D. Ill. 2004) (holding that unclean hands is not a valid defense to a preference action under § 547(c) of the Bankruptcy Code because the list of exceptions enumerated in that section is exclusive).

substantial case law allowing subordination despite debtors' participation in wrongdoing, and the purpose of equitable subordination. . . .

Goldman has failed to present any persuasive authority or rationale for permitting the unclean hands of the debtor to bar the subordination of a debt owed to a creditor who has improved his position against other innocent creditors through inequitable conduct. The court concludes that unclean hands is not a viable defense to an action for equitable subordination as a matter of law. *Id.* at 561-562.

Courts across the country have applied this principle in holding that in pari delicto does not

bar an equitable subordination claim asserted in a bankruptcy case. *See, e.g., LightSquared, LP, et*

*al v. SP Special Opportunities, LLC (In re LightSquared Inc.)*, 511 B.R. 253, 345 n. 151 (Bankr.

S.D.N.Y. 2014)("'With respect to 'equitable subordination, [the test] focuses only on the actions

of guilty creditors and the resulting impact on innocent creditors…. Inequitable conduct by the

debtor is noticeably absent from the list of relevant considerations.' … Thus, consideration of the

debtor's conduct, as opposed to the guilty creditor, and allowing the unclean hands defense 'would

be inconsistent with the traditional test for equitable subordination, the substantial case law

allowing subordination despite debtors' participation in wrongdoing, and the purpose of equitable

subordination.'")(emphasis added)(quoting *In re Auto. Professionals, Inc.,* 398 B.R. at 260 and

262); *In re Student Fin. Corp.*, 335 B.R. at 539 (claim for equitable subordination under federal

bankruptcy law held not subject to unclean hands defense).[10]

Because the above principles regarding equitable subordination "focus solely on the actions

of guilty creditors and the resulting impact on innocent creditors" as opposed to a debtor's

---

[10] *See also Alberts v. Tuft (In re Greater Se. Cmty. Hosp. Corp. I)*, 353 B.R. 324, 361 n. 58 (Bankr. D.D.C. 2006)("[C]ourts have held that causes of action arising under § 544 or § 548 of the Bankruptcy Code are not subject to the in pari delicto defense because these causes of action are created in the first instance by federal bankruptcy law…. The defense is inapplicable to Alberts' request for equitable subordination of the Law Firm Defendants' claims for the same reason…."); *In re Bernard L. Madoff Inv. Sec. LLC*, 557 B.R. 89 (Bankr. S.D.N.Y. 2016)(Limitations, such as in pari delicto doctrine, on what causes of action a trustee may assert as successor to debtor's prepetition causes of action did not apply to equitable subordination claim that SIPA trustee asserted pursuant to bankruptcy statute, rather than under non-bankruptcy law).

improper conduct, *In re LightSquared Inc.,* 511 B.R. at 345 n. 151, they should apply with equal force to a debtor-in-possession, who stands in the same position as a trustee in pursuing claims of the estate.  B.R. Code § 1107.

Even if this were not the case, FirstCapital's argument regarding in pari delicto is a red herring, because it will become moot as soon as the Plan is confirmed or even if the cases are converted to Chapter 7 proceedings (which Debtors do not believe they will).[11]   In either case, a trustee will be appointed to prosecute these claims.  As the Court is aware, the Plan provides for the appointment of a Liquidation Trust and Trustee to administer the assets of the bankruptcy estate. "Courts have reasoned that it is inequitable to impute a debtor's bad conduct to a trustee who comes to the court with clean hands to pursue claims on behalf of innocent creditors." *Notinger v. Migliaccio (In re Fin. Res. Mortg., Inc.)*, 454 B.R. 6, 24 (Bankr. D.N.H. 2011), citing *McNamara v. PFS a/k/a Prem. Fin. Specs. (In re Pers. and Bus. Ins. Agen.)*, 334 F.3d 239, 246– 47 (3d Cir. 2003)(fraudulent conduct of owner of corporate debtor was not imputed to the bankruptcy trustee in § 548 action); *Kipperman v. Onex Corp.*, 411 B.R. 805, 881 (N.D.Ga. 2009)(concluding in pari delicto should not be applied against trustee in fraudulent transfer actions).[12]  The appointment of a trustee to collect assets for the benefit of Reagor-Dykes' innocent creditors will dispose entirely of FirstCapital's objections.

---

[11] FirstCapital's argument is also misplaced because, under Section 502(d), its claim is disallowed unless and until it pays the estate what it owes on the fraudulent transfer claim. 11 U.S.C. §502(d).

[12] *See also World Capita Commun., Inc. v. Island Capital Management, (In re Skyway Commc'ns Holding Corp.)*, 389 B.R. 801, 809 (Bankr. M.D. Fla. 2008)(in pari delicto does not apply when a trustee brings an action pursuant to § 544).  *Accord In re Fordu*, 209 B.R. at 863 ("[C]ourts have consistently recognized that the Trustee may pursue fraudulent or preferential transfers despite the fact that the debtor was a knowing and willing participant to such conveyances."); *Nisselson v. Lernout*, 469 F.3d 143, 157 (1st Cir. 2006)(noting trustee was "not bringing claims on behalf of an innocent target of the fraud but, rather, on behalf of a complicit party").

**IV.    Reagor-Dykes' claim for violation of the automatic stay should not be dismissed.**

In Count 6 of its Complaint, Reagor-Dykes alleges FirstCapital violated the automatic stay by freezing Reagor-Dykes' accounts and not releasing those funds to the bankruptcy estate. FirstCapital argues in its motion that this claim should be dismissed, because "an administrative freeze on debtor accounts does not constitute a violation of the automatic stay as a matter of law." Motion at 23. Such argument misunderstands the relevant authority.

*Citizens Bank v. Strumpf*, 516 U.S. 16, 21 (1995), does not hold that administrative freezes on debtor accounts can <u>never</u> violate the automatic stay. It simply holds that a bank's decision to temporarily withhold funds pending an investigation of its right to setoff does not violate the automatic stay, so long as the bank promptly moves to lift the stay and files a timely claim. *Id.*

"[C]ourts … attempt[ing] to delineate the reach of *Strumpf*'s holding beyond its specific set of facts have emphasized the importance of the temporary nature of the administrative freeze and the need to seek immediate relief or direction." *In re Phillips*, 443 B.R. 63, 66 (Bankr. M.D.N.C. 2010). These courts have held that the automatic stay was violated when a lender imposed an administrative freeze on the debtor's accounts without promptly seeking stay relief. *See, e.g.*, *In re Turner*, 462 B.R. 214 (Bankr. S.D. Tex. 2011), *aff'd*, 2012 WL 12535013 (S.D. Tex. 2012). Courts have also determined that an indefinite administrative freeze on an account violates the automatic stay, even if the lender has a right to setoff. *See, e.g.*, *In re Lehman Brothers*, 433 B.R. 101 (Bankr. S.D.N.Y. 2010)(also holding lender must seek immediate relief from the court to avoid running afoul of the stay), *aff'd*, 445 B.R. 130 (S.D.N.Y. 2011).

Thus, *Strumpf* does not require dismissal of Reagor-Dykes' claim for violation of the automatic stay as a matter of law. Indeed, consistent with the authorities interpreting *Strumpf*, the Court cannot assess whether a violation of the stay has occurred without considering evidence regarding FirstCapital's actions—*i.e.,* whether FirstCapital froze Reagor-Dykes' accounts longer

than was necessary to evaluate its setoff claim, and whether FirstCapital promptly sought relief

from the Court after freezing FirstCapital's funds.  This assessment must be done, at the soonest,

at the summary judgment stage, not on a 12(b)(6) motion to dismiss.  *See, e.g.*, *In re Chau*, 576

B.R. 821 (Bankr. E.D. La. 2017)(genuine issues of material fact precluding summary judgment

existed as to whether bank, after placing administrative freeze on Chapter 11 debtor-in-

possession's account because it suspected debtor of check kiting, had made any attempt to notify

debtor or her counsel of the freeze or request instruction from bankruptcy court, in suit brought by

debtor alleging bank had willfully violated the automatic stay).  In this case, FirstCapital did not

obtain orders lifting the stay as to certain RAM inventory vehicles until February 15, 2019 and as

to a certain $2.4 million certificate of deposit until April 10, 2019. Dkt Nos. 982 and 1173.  Neither

order purports to lift the stay as to amounts in post-petition deposits into Debtors' pre-petition bank

accounts at FirstCapital.  FirstCapital's motion to dismiss Count 6 should be denied.

## V.     Plaintiffs state a claim for attorneys' fees under TUFTA and 11 U.S.C. § 105(a).

Plaintiffs have pleaded two grounds to recover attorneys' fees.  Plaintiffs plead claims

under TUFTA, which authorizes the Court to award "reasonable attorney's fees as are equitable

and just."  TEX. BUS. & COMM. CODE § 24.013. Plaintiffs also state a claim for attorney's fees

based on FirstCapital's willful violation of the automatic stay.  *See In re Richard Potasky Jeweler,*

*Inc.*, 222 B.R. 816, 829–30 (S.D. Ohio 1998) ("[E]very court that has considered the issue has

found that § 105(a) provides the bankruptcy court with the power to award attorney's fees as a

means of enforcing the automatic stay.").

## VI.    In the alternative, Plaintiffs should be granted leave to amend their complaint.

Assuming for the sake of argument the Court finds the Complaint insufficient, Plaintiffs

request leave to amend.  Courts have recognized that a plaintiff is entitled to one opportunity, at

least, to amend the complaint.  *Hitt v. City of Pasadena*, 561 F.2d 606, 608 (5th Cir. 1977).

Plaintiff's amended complaint would provide additional facts on such topics as:

- Details on the individual preferential and fraudulent transfers made to FirstCapital.  So far, Plaintiffs have identified thousands of potential transactions.

- Additional details on the individual affiliate transfers at FirstCapital.   Again, Plaintiffs have identified literally thousands of these transactions so far.

- Additional details in its causes of action sections, that incorporate additional facts from the fact section.

Attached as Exhibit 1 are schedules that identify all of the deposits that were made into FirstCapital checking accounts of RAM, Amarillo, and Floydada on days when there were True Overdrafts as well as the business day after the accounts returned to a positive balance.  There are 3,924 deposits from one Reagor-Dykes entity to another totaling over $841 million (out of more than 13,000 deposits totaling over $1.2 billion) on those days.  Discovery from FirstCapital (which has already been requested) will allow Plaintiffs to identify which of these deposits paid off the more than $29 million in overdrafts, plus millions of dollars of other loans and debts that Plaintiffs owed to FirstCapital.[13]

## **CONCLUSION**

The Court should deny First Capital Bank of Texas, N.A.'s Motion to Dismiss.

---

[13] These tables are based on information currently available.  Plaintiffs expect that discovery will identify additional transactions subject to avoidance or transactions that may be removed from the tables, and Plaintiffs have already served documents requests for that information.

Respectfully submitted,

By:    */s/ Andrew S. Hicks*
    Andrew S. Hicks
    Texas Bar No. 24032419
    Marc S. Tabolsky
    Texas Bar No. 24037576
    Daniel E. Hinde
    Texas Bar No. 24002289
    SCHIFFER HICKS JOHNSON PLLC
    700 Louisiana Street, Suite 2650
    Houston, Texas 77002
    Tel:   (713) 357-5150
    Fax:   (713) 357-5160
    ahicks@shjlawfirm.com
    mtabolsky@shjlawfirm.com
    dhinde@shjlawfirm.com

    Dustin Burrows
    Texas Bar No. 24048375
    LIGGETT LAW GROUP, P.C.
    1001 Main Street, Suite #300
    Lubbock, Texas 79401
    Tel:   (806) 744-8478
    Fax:   (806) 744-8479
    dustin@liggettlawgroup.com

**SPECIAL LITIGATION COUNSEL TO DEBTORS, REAGOR-DYKES MOTORS, LP *et al.***

## CERTIFICATE OF SERVICE

I hereby certify that on April 27, 2020, copies of this filing have been served on opposing counsel through ECF notice.

    */s/ Andrew S. Hicks*
    By:  Andrew S. Hicks