

CLERK, U.S. BANKRUPTCY COURT
NORTHERN DISTRICT OF TEXAS

# ENTERED

THE DATE OF ENTRY IS ON
THE COURT'S DOCKET

**The following constitutes the ruling of the court and has the force and effect therein described.**

**Signed August 24, 2020**

**United States Bankruptcy Judge**

---

IN THE UNITED STATES BANKRUPTCY COURT
FOR THE NORTHERN DISTRICT OF TEXAS
LUBBOCK DIVISION

| | | |
|---|---|---|
| In re: | § | |
| | § | |
| REAGOR-DYKES MOTORS, LP,[1] | § | Case No.: 18-50214-RLJ-11 |
| | § | (Jointly Administered) |
| Debtors. | § | |
| | § | |
| REAGOR AUTO MALL, LTD., | § | |
| REAGOR-DYKES AMARILLO, LP, | § | |
| REAGOR-DYKES FLOYDADA, LP, | § | |
| REAGOR-DYKES IMPORTS, LP, | § | |
| REAGOR-DYKES PLAINVIEW, LP, | § | |
| REAGOR-DYKES MOTORS, LP, | § | |
| REAGOR-DYKES SNYDER, L.P., | § | |
| | § | |
| Plaintiffs, | § | |
| | § | |
| v. | § | Adversary No. 20-05002 |
| | § | |
| FIRSTCAPITAL BANK OF TEXAS, N.A. | § | |
| | § | |
| Defendant. | § | |

---

[1] The following chapter 11 cases are jointly administered in Case No. 18-50214: Reagor-Dykes Motors, LP, Reagor-Dykes Imports, LP (Case No. 18-50215), Reagor-Dykes Amarillo, LP (Case No. 18-50216), Reagor-Dykes Auto Company, LP (Case No. 18-50217), Reagor-Dykes Plainview, LP (Case No. 18-50218), Reagor-Dykes Floydada, LP (Case No. 18-50219), Reagor-Dykes Snyder, L.P. (18-50321), Reagor-Dykes III LLC (18-50322), Reagor-Dykes II LLC (18-50323), Reagor Auto Mall, Ltd. (18-50324), and Reagor Auto Mall I LLC (18-50325).

1

## MEMORANDUM OPINION

The defendant, FirstCapital Bank of Texas, N.A. (FirstCapital), filed its motion under Bankruptcy Rule 7012(b) and Federal Rule of Civil Procedure 12(b)(6) seeking dismissal of all counts of Plaintiffs' Original Complaint.[2]  The plaintiffs—collectively referred to as Reagor-Dykes or the Debtors—filed their response opposing dismissal; in the alternative, they request an opportunity to amend the complaint.  The Court has determined that Reagor-Dykes has not sufficiently pleaded the transfer element of its preference and fraudulent transfer counts and thus, if not amended, such causes, as well as Counts Three and Five, are subject to dismissal.  The Court denies the motion as to Counts Four, Six, and Seven.

## I.

## Rule 12(b)(6)

Rule 12(b)(6) of the Federal Rules of Civil Procedure allows dismissal of a case if a plaintiff fails "to state a claim upon which relief can be granted."  This rule applies in adversary proceedings as incorporated by Bankruptcy Rule 7012(b).  Rule 12(b)(6) must be read in conjunction with Rule 8(a), which requires "a short and plain statement of the claim showing that the pleader is entitled to relief."  Fed. R. Civ. P. 8(a)(2); *see Bell Atlantic Corp. v. Twombly*, 550 U.S. 544, 555 (2007); *Ashcroft v. Iqbal*, 556 U.S. 662 (2009).  To withstand a Rule 12(b)(6) motion, a complaint must contain "enough facts to state a claim to relief that is plausible on its face."  *Twombly*, 550 U.S. at 570.  A claim satisfies the plausibility test "when the plaintiff pleads factual content that allows the court to draw the reasonable inference that the defendant is liable for the misconduct alleged. [*Twombly*'s] plausibility standard is not akin to a 'probability requirement,' but it asks for more than a sheer possibility that a defendant has acted unlawfully."  *Iqbal*, 556 U.S. at 678 (internal citations omitted).  While a complaint need not contain detailed

---

[2] "Bankruptcy Rule" refers to a rule of the Federal Rules of Bankruptcy Procedure.

factual allegations, it must set forth "more than labels and conclusions, and a formulaic recitation of the elements of a cause of action will not do." *Twombly*, 550 U.S. at 555 (citation omitted).

In reviewing a Rule 12(b)(6) motion, the court must accept all well-pleaded facts in the complaint as true and view them in the light most favorable to the plaintiff. *Sonnier v. State Farm Mut. Auto. Ins. Co.*, 509 F.3d 673, 675 (5th Cir. 2007); *Martin K. Eby Constr. Co. v. Dallas Area Rapid Transit*, 369 F.3d 464, 467 (5th Cir. 2004). In ruling on such a motion, the court cannot look beyond the pleadings. *Spivey v. Robertson*, 197 F.3d 772, 774 (5th Cir. 1999). The court may also consider documents that are attached to the motion to dismiss if the documents are specifically referenced in the complaint and are "central" to the plaintiff's claim. *Sullivan v. Leor Energy, LLC*, 600 F.3d 542, 546 (5th Cir. 2010).

## II.

## The Complaint

## A.

The Debtors contend that their rogue CFO, Shane Smith, collaborated with FirstCapital to, in effect, defraud the Debtors and their creditors. This was done by the daily movement of funds among the Debtor-entities' bank accounts in amounts that far exceeded the Debtors' ability to honor. FirstCapital was in the middle of Smith's scheme by allowing the Debtors to maintain large overdrafts in the Debtors' accounts at FirstCapital and by accommodating the Debtors' "perverted" use of sight drafts to create immediate credit and several days' "float" that allowed the scheme to persist. Doc. No. 1 ¶ 33.[3]

The Debtors allege the scheme both generally and anecdotally. Smith, "no later than February 2017, . . . began collaborating with FirstCapital in fraudulent schemes to defraud the

---

[3] "Doc. No." refers to a docket entry in Adversary No. 20-05002 in the case file maintained by the Court on CM/ECF, unless otherwise stated.

Debtors and their creditors." *Id*. ¶ 16. For 2017 and 2018, RAM, with monthly sales of $14.3 million, had monthly deposits and credits of over $70 million.[4] From late 2017 through August 2018, $383 million was disbursed from a RAM account to other Reagor-Dykes accounts. In March 2017, the Amarillo account at FirstCapital was overdrawn by $611,000; in January 2018, RAM, Amarillo, and Floydada's accounts were each overdrawn by almost $1.4 million.[5] The complaint states that RAM's and Amarillo's average daily balances for February 2018 were a negative $3.95 million and a negative $1.328 million, respectively. And they each maintained a negative average balance every month from December 2016 through February 2018.

Smith and FirstCapital's representative communicated on an almost daily basis about Reagor-Dykes' abusive use of its accounts at FirstCapital. FirstCapital accommodated and took "active measures" to help Smith carry-out his "sales" and "meaningless churning of inventory between dealerships," so that Smith could obtain funds to deploy where needed at the moment. *Id*. ¶ 40. The allowed overdrawing of accounts and the float created by use of sight drafts constituted interest-bearing loans by FirstCapital to the Debtors. (FirstCapital did have certain Reagor-Dykes entities sign documents for an approximate $2.5 million revolving line of credit in June 2017—and renewed in 2018—as a way to formalize the immediate credit given on sight drafts presented by RAM, Amarillo, and Floydada. But this accounted for only a fraction of the "loans" made.)

FirstCapital benefitted by going along with Smith's electronic kiting scheme. The Debtors' deposit accounts were highly inflated and thus, as a result, so was the bank's perceived financial position. This was all happening at a time when the bank was looking to purchase another bank. It had the effect of reducing the cash needed for the purchase and avoided a

---

[4] "RAM" refers to Reagor Auto Mall Ltd.
[5] "Amarillo" refers to Reagor-Dykes Amarillo, LP; "Floydada" refers to Reagor-Dykes Floydada, LP.

"cascade of defaults" throughout the Reagor-Dykes enterprise, including a default on FirstCapital's floorplan financing of Reagor-Dykes. *Id.* ¶ 43.

By the complaint, the Debtors allege that the bank is an insider as to the Debtors under both the Bankruptcy Code—because Rick Dykes was one of two ultimate owners of Reagor-Dykes and a director of FirstCapital—and common law.

Last, the Debtors allege that upon the August 2018 bankruptcy filings, FirstCapital agreed, upon Rick Dykes's pledge of over $7 million of additional collateral, to provide an additional $2.1 million of floorplan financing to Reagor-Dykes. FirstCapital never provided the loan.

## B.

The Debtors assert seven grounds for recovery:

- Count One for Preferential Transfers under § 547;

- Count Two for Actual Fraudulent Transfers under §§ 544, 548(a)(1)(A), 550, and 551;

- Count Three for Recovery of Avoided Transfers under § 550;

- Count Four for Equitable Subordination;

- Count Five for Objection to and Disallowance of Claims;

- Count Six for Willful Violation of the Automatic Stay; and

- Count Seven for Attorneys' Fees and Costs.[6]

For the preference action, the Debtors allege that FirstCapital extended immediate credit to Debtors RAM, Amarillo, or Floydada under one of three scenarios: (1) whenever each presented a sight draft for payment (presumably as sellers of vehicles to another Reagor-Dykes entity); (2) whenever FirstCapital paid on a draft with a cashier's check drawn on FirstCapital's

---

[6] All § references refer to 11 U.S.C. unless otherwise stated.

funds without simultaneously debiting the appropriate RAM, Amarillo, or Floydada account (presumably as buyers of vehicles); and (3) by routinely allowing multi-day overdrafts from RAM, Amarillo, and Floydada accounts at the bank. These many extensions of credit created antecedent debt. And when these Debtors subsequently paid down the "loans," such payments are voidable "transfers" under § 547 as made on account of antecedent debt. (The Debtors allege the remaining preference elements.) The suspect transfers go back a year prior to the filing of the bankruptcy cases, given FirstCapital's insider status.

The Debtors assert that RAM, Amarillo, and Floydada "made other [voidable] transfers of funds" to FirstCapital for fees and to pay conventional loans, such as floorplan loans made to RAM. *Id*. ¶ 82. FirstCapital's liens on these loans should, they say, be "transferred to RAM pursuant to 11 U.S.C. § 510." *Id*.

The Debtors label the preferential transfers as the Deposited Sight Transfers, the Paid Sight Transfers, the True Overdraft Transfers, and the Bank Transfers. *Id*. ¶¶ 58, 67, 76, 83.

The Debtors' fraudulent transfer claims also concern Debtors RAM, Amarillo, and Floydada. They each had accounts at FirstCapital that routinely carried negative balances which, as with the preference claims, constituted unsecured credit extensions by the bank. Deposits made by these Debtors to pay down the negative balances were made to hinder, delay, and defraud their other creditors. FirstCapital is a transferee in this scheme and thus liable under § 548(a)(1)(A) and under Texas law, Texas Business and Commerce Code § 24.005.

Under Count Three, the Debtors seek, as one of their remedies for the avoided transfers of Counts One and Two, the value of such transfers. This recovery is based on § 550(a). They also ask, per § 551, that the avoided transfers be preserved for the benefit of the bankruptcy estates.

For their Count Four claim, the Debtors assert that FirstCapital's acquiescence to Smith's scheme injured other creditors and thus it should be equitably subordinated to other creditors under §§ 510(c) and 105(a) of the Bankruptcy Code.

Count Five is the Debtors' objection to FirstCapital's claim. Two grounds support their claim objection. First, under § 502(d), until FirstCapital pays the Debtors the amount equal to any avoided transfers, plus interest and costs, its claim must be disallowed. Second, also under § 502(d), FirstCapital's claim must be denied to the extent FirstCapital's liability to the Debtors exceeds its claim. FirstCapital would have no enforceable right to payment, no debt, and thus no "claim" under § 101(5). And if it has no claim, any security interests are extinguished.

For its cause under Count Six, the Debtors submit that FirstCapital willfully violated the automatic stay, § 362(a)(3), by refusing to turnover any funds it received from the post-petition collections or deposits from Debtors' receivables. The receivables and their proceeds are estate property which thereby implicates the protections of the automatic stay. The Debtors seek damages, including fees and costs, for FirstCapital's stay violation.

Last, the Debtors seek, at Count Seven, recovery of attorneys' fees and costs for filing and prosecuting this action.

### III.

### The Motion to Dismiss

FirstCapital says by its motion that it was, at most, a mere conduit on the Debtors' movement of funds in-and-out of their accounts at FirstCapital. But to the extent the movement of funds constitutes *transfers* to FirstCapital, the Debtors have failed to plead the transfer-based causes—Counts One, Two, Three, and Five—with sufficient particularity. FirstCapital says it is impossible to identify the transfers and sticking a label on a type of transfer is inadequate to provide notice. *Each* transfer must be identified by date, the transferor, the transferee, and

amount.  These counts must therefore be dismissed, FirstCapital argues.  And if the underlying

preference and fraudulent transfer claims are dismissed, so too must Count Three for recovery of

avoided transfers and Count Five for disallowance of FirstCapital's claim (there would be no

avoidable transfer to repay or offset).

FirstCapital raises purely legal grounds for dismissal of the Debtors' claims of equitable

subordination, for willful stay violation, and attorneys' fees.  FirstCapital contends that the

Debtors do not have standing to bring an equitable subordination claim; that its administrative

freeze of accounts is not, as a matter of law, a stay violation; and that attorneys' fees are simply

not recoverable on the Debtors' claims.

## A.

To begin, the Court addresses one basic problem with the complaint.  Reagor-Dykes

refers to the "perverted" use of sight drafts to create float and thus the needed liquidity for its

(Smith's) scheme.  FirstCapital accommodated the use of sight drafts by allowing immediate

credit upon presentment.  At paragraphs 32–34, Reagor-Dykes describes the proper or intended

use of sight drafts.  Doc. No. 1.  At paragraph 37, it provides an example of an improper use of a

sight draft that occurred on April 18, 2017.  *Id*.  At paragraph 38, it describes Smith's and

FirstCapital's cooperation.  *Id*.  The problem, however, is that the transaction described at

paragraph 37, coupled with the additional conclusory description at paragraph 38 of the parties'

cooperation is, when compared to the proper use of sight drafts described at paragraphs 32–34,

simply incomprehensible.  Who was the "seller"?  Who was the "buyer"?  Who had an account

at FirstCapital?  The pleaded facts, regardless how extensive, must be understandable.

## 1.

FirstCapital's mere-conduit argument is an affirmative defense that is not appropriately

considered on a motion to dismiss.  *See, e.g.*, *Mukamal v. BMO Harris Bank N.A. (In re Palm*

*Beach Fin. Partners, L.P.)*, 488 B.R. 758, 769 (Bankr. S.D. Fla. 2013) ("Ordinarily, it is not appropriate for the Court to determine the applicability of the mere conduit defense at the motion to dismiss stage. The mere conduit rule is an affirmative defense."); *see also Isaiah v. JPMorgan Chase Bank*, 960 F.3d 1296, 1304 (11th Cir. 2020) ("First, the mere conduit defense is an affirmative defense that must be proved by the defendant seeking its protection. A complaint need not anticipate and negate affirmative defenses and should not ordinarily be dismissed based on an affirmative defense unless the defense is apparent on the face of the complaint."); *In re Petters Co.*, 557 B.R. 711, 731–32 (Bankr. D. Minn. 2016) (stating that defendant's affirmative defense of mere conduit was not obvious from the face of the complaint and would not dismiss the complaint on those grounds); *Buckley v. Merrill Lynch & Co. (In re DVI, Inc.)*, No. 08-50248, 2008 WL 4239120, at *3 (Bankr. D. Del. Sept. 16, 2008) ("[A]n affirmative defense cannot form the basis of a motion to dismiss" and "[t]he 'mere conduit' defense is such an affirmative defense."); *AstroPower Liquidating Tr. v Xantrex Tech., Inc. (In re AstroPower Liquidating Tr.)*, 335 B.R. 309, 334 (Bankr. D. Del. 2005) (holding that the mere conduit defense involved "questions of fact which are not properly resolved" via a motion to dismiss).

"Courts have held that deposits into a debtor's bank account that are used by the bank to cover overdrafts are transfers that may be avoided as preferences under 11 U.S.C. § 547." *Welch v. Regions Bank (In re Mongelluzzi)*, 591 B.R. 480, 494 (Bankr. M.D. Fla. 2018). The Florida court also stated that "[t]he same rationale applies to the avoidance of a fraudulent transfer" as to a preferential action. *Id.*; *see also In re Montgomery*, 983 F.2d 1389 (6th Cir. 1993) (holding that the debtor had sufficient control over funds that he transferred between banks as part of a check-kiting scheme so that his deposits, which reduced overdrafts at one bank from over $2 million to zero within the 90 days prior to the debtor's bankruptcy petition, could be recovered by the trustee as a preferential transfer); *In re Prescott*, 805 F.2d 719, 729–30 (7th Cir. 1986)

(repayment of overdraft balances with subsequent deposits was the repayment of an antecedent debt); *but see Laws v. United Mo. Bank of Kansas City, N.A.*, 98 F.3d 1047, 1051 (8th Cir. 1996) (routine overdrafts are not transfers under the Bankruptcy Code where interest was not being charged on that overdraft amount).

Deposits that cover intraday overdrafts, however, are likely not transfers under the Bankruptcy Code. *See Sarachek v. Luana Sav. Bank (In re Agriprocessors, Inc.)*, 490 B.R. 852, 878 (Bankr. N.D. Iowa 2013). The complaint alleges that the Reagor-Dykes' bank accounts at FirstCapital had multi-day overdrafts that were being charged interest. This scenario, when viewed in the light most favorable to Reagor-Dykes, pleads a transfer as defined under the Bankruptcy Code. *See* § 101(54).

## 2.

Even if its mere-conduit argument fails, FirstCapital argues that Reagor Dykes' preference claims fail to adequately identify the specifics of the alleged transfers. (The same argument applies to Reagor-Dykes' fraudulent transfer claims, which are addressed below.) Federal Rule of Civil Procedure 8(a) applies to preference actions, though what is required to meet the pleading standard of Rule 8(a) is unsettled.

FirstCapital argues that the Court should apply the high pleading standard for preferential transfers as set in *In re Valley Media*. Doc. No. 16 ¶¶ 22–24 (citing to *Valley Media, Inc. v. Borders, Inc. (In re Valley Media, Inc.)*, 288 B.R. 189, 191 (Bankr. D. Del. 2003)). The *Valley Media* standard requires that a plaintiff plead each transfer by date, amount, transferor, and transferee. *In re Valley Media*, 288 B.R. at 192. *See also Solmonese v. Shyamsundar (In re AmCad Holdings, LLC)*, No. 15-51979, 2017 WL 1316922, at *3 (Bankr. D. Del. Apr. 7, 2017) (following *Valley Media*, complaint must identify with particularity which transfer is sought to be avoided, identify the nature and amount of each antecedent debt, identify each alleged

10

preferential transfer by date of the transfer, the name of the debtor/transferor, the name of the

transferee, and the amount of the transfer to survive motion to dismiss); *Stanziale v. DMJ Gas-*

*Mktg. Consultants, LLC (In re Tri-Valley Corp.)*, No. 14-50446, 2015 WL 110074, at *3 (Bankr.

D. Del. Jan. 7, 2015) (applying *Valley Media*, a preference claim was sufficient where complaint

stated that between "May 9, 2012 to August 6, 2012, the Debtors made transfers to Defendant in

the amount of $43,338.59" in addition to an attached exhibit that identified the account number

from which the transfers were made, with the amounts, issue date, and dates of each payment).

The *Valley Media* opinion states that the pleading standard for a preference action is Rule 8 and

that the specifics of each transfer are required to give the defendant fair notice as contemplated

under Rule 8. *See generally In re Valley Media*, 288 B.R. 189.

    A few courts outside of Delaware have adopted *Valley Media*'s specific pleading

standard for preferential transfers; at least one Delaware court has rejected it. *See, e.g.*, *Beaman*

*v. Barth (In re AmeriLink, Ltd.)*, No. 10-00164, 2011 WL 864953, at *2 (Bankr. E.D.N.C. Mar.

11, 2011) ("To comply with the heightened pleading standards for § 547 claims, the complaint

must include (a) an identification of the nature and amount of each antecedent debt and (b) an

identification of each alleged preferential transfer by (i) date, (ii) name of debtor/transferor, (iii)

name of transferee and (iv) amount of the transfer."); *Schnelling v. Crawford (In re James River*

*Coal Co.)*, 360 B.R. 139, 168 (Bankr. E.D. Va. 2007) ("To state a cause of action to avoid a

preferential transfer pursuant to 11 U.S.C. § 547(b), the Trustee must (1) identify the nature and

amount of each antecedent debt and each alleged preferential transfer by date, name of

debtor/transferor, name of transferee, and amount of the transfer . . . ."); *but see In re The IT*

*Grp., Inc.*, 313 B.R. 370, 373 (Bankr. D. Del. 2004) ("The fact that Bankruptcy Rule 7008,

which contains special pleading requirements in certain adversary cases before bankruptcy

judges, fails to provide any such additional requirements for preference actions indicates it was

intended that the adequacy of pleadings in such actions be judged under the notice pleading standard of Civil Rule 8(a)(2), which requires only a 'short and plain statement of the claim showing that the pleader is entitled to relief.'").

While FirstCapital declares that *Valley Media* is "the seminal case addressing the pleading standard" for a preferential transfer,[7] some courts have rejected the *Valley Media* standard as too harsh. *In re The IT Grp., Inc.*, 313 B.R. at 373 ("While plaintiffs should be encouraged to provide specific information in support of their claims whenever possible, to require them to do so in their initial pleading in all cases, particularly with the specificity demanded by *Valley Media*, is in this court's view inappropriate and unnecessarily harsh."); *Butler v. Anderson (In re C.R. Stone Concrete Contractors, Inc.)*, 434 B.R. 208, 221 (Bankr. D. Mass. 2010) (refusing to apply *Valley Media*'s ultra-specific pleading standard).

Most courts have held, like *Valley Media*, that the notice pleading standard of Rule 8 of the Federal Rules of Civil Procedure is sufficient for claims under § 547. One court has stated that Rule 8 only requires alleged preferential transfers to be identified by: "1) the name of each debtor/transferor; 2) the name of each defendant/transferee; 3) the form of transfers (checks); and 4) the total amount of the alleged preferential transfers made by a particular debtor/transferor to each defendant/transferee." *In re El Comandante Mgmt. Co., LLC*, 388 B.R. 469, 473 (Bankr. D.P.R. 2008) (citing *In re NM Holdings Co., LLC*, 376 B.R. 194, 204 (Bankr. E.D. Mich. 2007)) (finding that where complaint provided exact dates, precise dollar amounts, and check numbers for each transfer and who received that transfer was sufficient). Another court, while rejecting *Valley Media*, determined that "so long as the complaint makes clear who transferred what to whom and when," a preference claim is sufficient because that information provides the defendant enough notice "to mount whatever defenses may be available." *Tousa Homes, Inc. v.*

---

[7] Doc. No. 16 ¶ 22.

*Palm Beach Newspapers, Inc. (In re TOUSA, Inc.)*, 442 B.R. 852, 855–56 (Bankr. S.D. Fla. 2010) (emphasizing that when there are multiple debtors, the complaint must distinguish who paid the transfer, otherwise the imprecise pleading would lead to the "amorphous payor problem").

Most courts effectively require the specific-pleading standard of *Valley Media*, without expressly adopting it. For example, in *In re TransVantage Solutions, Inc.*, No. 15-1882, 2016 WL 5854197, at *4 (Bankr. D.N.J. Oct. 6, 2016), the court stated that the Rule 8 pleading standard was partially met where the elements of a preference action were pleaded in the complaint and all payments were itemized as exhibits to each preference complaint. This was a complex case, where the trustee filed hundreds of preference and fraudulent transfer complaints against various defendants. The complaint against defendant FedEx not only stated a limited range of time for the transfers, it also alleged that the debtor paid invoices in the amount of at least $24,719,305.24 USD and identified each transaction in an attached Exhibit A. Exhibit A had three parts: part one was 2,088 pages, part two was 2,051 pages, and part 3 was 1,132 pages.

In *Owens v. LaForce (In re Raymond & Assocs., LLC)*, No. 17-117, 2018 WL 2143304, at *2 (Bankr. S.D. Ala. May 9, 2018), the court stated that a preference action was subject to the Rule 8 notice pleading standard but that the claim was not sufficiently pleaded where the trustee failed to identify specific transactions. This was despite the trustee's description of the nature of the transfers, a 628-page attached exhibit that consisted of the debtor's general ledger and copies of checks issued by the debtor's affiliate companies, and describing the type of avoidable transfers as labeled on the bookkeeping as "payments on a loan, suspicious payments for 'reimbursement,' and unclassified or misclassified payments." Adversary Complaint, *In re Raymond & Assocs., LLC*, No. 17-117 (Bankr. S.D. Ala. Dec. 13, 2017), ECF No. 1 ¶ 10. The court determined that this was insufficient because neither the complaint nor the exhibit

identified which of the transactions were actionable.  This case was complex—in the reply brief to the defendant's motion to dismiss this action, the trustee stated that "[t]he sheer volume of avoidable transactions is, without a doubt, overwhelming."  Trustee's Response to Motion to Dismiss, *In re Raymond & Assocs., LLC*, No. 17-117 (Bankr. S.D. Ala. Apr. 9, 2018), ECF No. 16 ¶ 5.  The court allowed the trustee 90 days to amend the complaint and ordered the trustee to conduct "preliminary discovery sufficient to uncover the facts and information necessary to identify and amend her Complaint to include the transfers to be avoided," or the complaint would be dismissed.  *In re Raymond & Assocs.*, 2018 WL 2143304, at *3.  The amended complaint included an exhibit that listed 204 transfers identified by entity paid from, the account number, the check date, the check number, and the amount.  Amended Adversary Complaint, *In re Raymond & Assocs., LLC*, No. 17-117 (Bankr. S.D. Ala. Aug. 2, 2018), ECF No. 34, Ex. D.  The amended complaint also stated that "[b]y listing these transactions, Trustee does not intend to limit the transfers recoverable to just these transactions. Rather, Trustee's investigation is ongoing and she fully expects to find additional fraudulent or preference payment transactions." *Id*. at 1.

It is not uncommon for a preference suit that is based on a large, complicated check-kiting or Ponzi-like scheme to identify transfers with painstaking specificity.  *See, e.g.*, *In re Montgomery*, 123 B.R. 801, 806 (Bankr. M.D. Tenn. 1991).  In *Montgomery*, the trustee calculated the total transfer amount to be $2,254,935, which was derived from a hired CPA's "analysis of more than 60,000 checking transactions and 6,000 real estate closings" that demonstrated the debtors were involved in a "colossal check kiting scheme" involving the defendant.  *In re Montgomery*, 136 B.R. 727, 729 (M.D. Tenn. 1992).  The complaint, per the Sixth Circuit's opinion of the case on appeal, alleged who transferred what, to whom, and when:

> The complaint alleged, among other things, that on March 14, 1988, Southland
> Escrow had a combined negative balance of $1,971,978.75 in all its Third National

accounts; that Montgomery and Southland Escrow subsequently made several hundred deposits and withdrawals, with the total deposits exceeding the total withdrawals to such an extent that on May 25, 1988, Southland Escrow had a combined positive balance of $1,179.20 in its Third National accounts; that the aggregate of all the transfers from Southland Escrow to Third National caused the bank to recover all its losses to the prejudice of Southland Escrow's other creditors; that the transfers would enable the bank to recover more than it would otherwise be able to receive as a creditor; and that the aggregate of the transfers constituted a preferential transfer within the meaning of 11 U.S.C. § 547.

*In re Montgomery*, 983 F.2d at 1391–92.

Other courts have similarly required specificity in identifying the transfer element of a preference action. *See, e.g.*, *The State Bank & Tr. Co. v. Spaeth (In re Motorwerks, Inc.)*, 371 B.R. 281, 292–94 (Bankr. S.D. Ohio 2007) (applying Rule 8 to preference action, concluded that the trustee's preferential and fraudulent transfer claims failed to adequately identify the transfers to be avoided because the trustee did not "identify, by date or amount, even one actual transfer from the Debtor to State Bank that is to be avoided" where the trustee alleged that the debtor's sole shareholder engaged in fraudulent schemes, including check-kiting, and the alleged transfers were made to State Bank during the statutorily relevant periods); *In re Agriprocessors, Inc.*, 490 B.R. 852 (alleging a check kiting scheme and seeking to avoid bank deposits that paid-off a large overdraft balance as preferential transfers; trustee explained the nature of the transfers in the complaint and included bank records to support claim; no motion to dismiss was filed, but the complaint said who paid what and that transfers were in the form of checks; the complaint was amended several times, eventually alleging the total amount of the preferential transfers).

Reagor-Dykes argues that, because the facts here are complex, hyper-specific pleadings are not required. In support of this more relaxed standard, Reagor-Dykes cites to a Federal Claims Act case. *U.S. ex rel. Bledsoe v. Cmty. Health Sys., Inc.*, 501 F.3d 493, 509–10 (6th Cir. 2007). "Where the allegations in a relator's complaint are 'complex and far-reaching, pleading every instance of fraud would be extremely ungainly, if not impossible.'" *Id*. But this rule has

15

generally been used only for claims alleging violations of the False Claims Act and not for suits arising under the Bankruptcy Code. Even so, where a fraudulent scheme is alleged, the plaintiff must still provide examples of specific false claims (under the False Claims Act) made in furtherance of the fraudulent scheme before he can, at least, proceed to discovery on the entire scheme. *Id*. at 510. This leniency is based on the outsider status of the plaintiff; the plaintiff can then fill-in necessary gaps through discovery.

Some bankruptcy cases mimic the False Claims Act's relaxed-pleading standard and thus do not require a strict identification of transfers. One line of cases notes the complexity of the underlying transactions and requires that if the plaintiff lumps transfers together, the aggregate sum must be pleaded, along with the amount received by the defendant. *See, e.g.*, *Picard v. Madoff (In re Bernard L. Madoff Inv. Sec. LLC)*, 458 B.R. 87, 113 (Bankr. S.D.N.Y. 2011) ("Indeed, courts have found that allegations aggregating transfers into lump sums over several years without identifying the number of transfers, the dates of the transfers, or the amount of any specific transfer will satisfy Rule 8(a) pleading requirements.") (citing *The Unencumbered Assets, Tr. v. JP Morgan Chase Bank (In re Nat'l Century Fin. Enters., Inc. Inv. Litig.)*, 617 F. Supp. 2d 700, 722 (S.D. Ohio 2009) ("Though the complaint fails to specify the exact dates and amounts of the dividend payments, this claim is subject to Rule 8's liberal pleading standard….")); *Fed. Nat'l Mortg. Ass'n v. Olympia Mortg. Corp.*, No. 04-cv-4971, 2006 WL 2802092, at *9 (E.D.N.Y. Sept. 28, 2006) (finding complaint alleged constructively fraudulent transfers despite aggregating "the transfers into lump sums over three to five year time periods" without identifying the mechanism of the transfer). But, if the plaintiff does not allege each transfer by a specific date and amount, the plaintiff must still "provide some factual guideposts to give a transferee-defendant 'fair notice' of the claim itself." *Katz v. Anderson (In re Anderson)*, No. 17-3008, 2018 WL 3197746, at *6 (Bankr. D. Conn. June 26, 2018) (analyzing the *Madoff*

case where allegations of withdrawals totaling at least $7.3 million from investment accounts after April of 2004 to pay for personal expenses on defendants' credit cards was sufficient but recovery of salaries and bonuses paid between 2001 and 2008 was not sufficient).

Other courts relax the pleading standard where the plaintiff is a trustee, rather than the debtor, bringing the claims. *See Family Golf Ctrs., Inc. v. Acushnet Co. (In re Randall's Island Family Golf Ctrs., Inc.)*, 290 B.R. 55, 64–65 (Bankr. S.D.N.Y. 2003). The *Randall's Island* court, disagreeing with the *Valley Media* standard, expressed the need for a more lenient standard, especially where a trustee brings the action and is not privy to all the information required by *Valley Media*. *Id.; see also Birdsell v. U.S. W. Newvector Grp., Inc. (In re Cellular Exp. of Ariz., Inc.)*, 275 B.R. 357, 363 (Bankr. D. Ariz. 2002) ("It may not be necessary for an initial complaint to identify each transfer by check number, date and amount, but at minimum there must be some description of the *types* of transfers sought to be avoided, such as transfers by cash or check, transfers of real or personal property, transfers by covering an employee's personal obligations, transfers by a release of obligations owed to the debtor . . . .") (emphasis in original).

The Debtors' complaint does not provide the specificity needed for the alleged preferential transfers.

The complaint here fails to give FirstCapital fair notice of the transfers made that are alleged to be preferential. The courts all agree that Rule 8 sets the basic standard. But in doing so, they differ on what is needed to provide fair notice to the defendant. Some courts require that not only the details of each transfer be provided—the date, the amount, the transferor, and transferee—but also the nature and amount of the antecedent debt. Other courts have adopted a more relaxed standard, particularly in large, complicated cases that concern hundreds or thousands of alleged preferential or fraudulent transfers. The problem here, however, is that

17

Reagor-Dykes' complaint fails to satisfy even the most-forgiving view of the standard.  It does not match-up transfers with antecedent debt.  The transfers are identified as having been made over a range of time.  And the *transferor* is not identified—there are multiple Reagor-Dykes entities.  The complaint does not state the *amount* of the transfers, either by transfer or in the aggregate.

## B.

### 1.

For the actual-fraudulent transfer action, FirstCapital argues that Reagor-Dykes insufficiently pleads the intent-to-defraud element and, like the cause for preferential transfers, fails to identify the alleged transfers with the required specificity.

The majority of courts in the Fifth Circuit, and in other circuits, have applied Federal Rule of Civil Procedure 9(b) to § 548(a)(1)(A) claims.[8]  In a recent case, the court imposed the heightened pleading standard under Rule 9(b) for an actual fraudulent transfer claim under § 548(a)(1)(A), as well as for Texas Uniform Fraudulent Transfer Act § 24.005.  *Katchadurian v. NGP Energy Capital Mgmt. (In re Northstar Offshore Grp., LLC)*, No. 18-03079, 2020 WL 1930148, at *26 (Bankr. S.D. Tex. Apr. 20, 2020).  The Fifth Circuit has yet to rule on this issue for § 548(a)(1) purposes but has determined that the heightened pleading standard of "Rule 9 applies whenever fraud is an essential part of the claim. In an *actual* fraudulent transfer case, fraud is an essential element. The Fifth Circuit has applied this reasoning in the § 523 fraud context."  *Id.* (emphasis in original) (citing *AT&T Universal Card Servs. v. Mercer (In re*

---

[8] *See, e.g.*, *Kravitz v. Summersett (In re Great Lakes Comnet, Inc.)*, 588 B.R. 1, 21 (Bankr. W.D. Mich. 2018) (stating a majority of courts adopt Rule 9(b) pleading standard for claims under §§ 548 and 544(b)); *Spradling v. Pryor Cashman LLP (In re Licking River Mining, LLC)*, 565 B.R. 794, 807 (Bankr. E.D. Ky. 2017); *Kelley v. JPMorgan Chase & Co. (In re Petters Co.)*, 557 B.R. 711, 721 (Bankr. D. Minn. 2016); *Wagner v. Cunningham (In re The Vaughan Co., Realtors)*, 481 B.R. 752, 757–58 (Bankr. D.N.M. 2012).

*Mercer)*, 246 F.3d 391, 401–02 (5th Cir. 2001)).[9]  The majority of courts apply the heightened

pleading standard of Rule 9(b) to § 548(a)(1)(A) claims.  This standard requires that the debtors

(or trustee) "plead the who, what, when, where, and why [of] the fraudulent conduct."  *In re Life*

*Partners Holdings, Inc.*, 926 F.3d 103, 117 (5th Cir. 2019).

## 2.

For a fraudulent transfer action under § 548(a)(1)(A), when a Ponzi scheme has been

sufficiently pleaded, the intent-to-defraud element does not need to be pleaded.  A properly

pleaded Ponzi scheme creates "a presumption of actual intent to defraud on the part of the

transferor" because transfers were "made in the course of a Ponzi scheme [and] could have been

made for no purpose other than to hinder, delay or defraud creditors."  *Gowan v. The Patriot*

*Grp., LLC (In re Dreier LLP)*, 452 B.R. 391, 424 (Bankr. S.D.N.Y. 2011) (quoting *Bear Stearns*

*Sec. Corp. v. Gredd (In re Manhattan Inv. Fund Ltd.)*, 397 B.R. 1, 8 (S.D.N.Y. 2007)).  This

presumption, though, does not assume all the other elements of § 548 have been met.  The

plaintiff must still meet the appropriate pleading standard for all the other elements of § 548.

The question, then, is whether this same presumption applies to a check-kiting scheme.

Courts have generally found that while a check-kiting scheme may be afforded the same

presumption, the presumption may not be made as a matter of law because the check kiter may

intend on paying back the balance, while a Ponzi scheme is fraudulent from the beginning.  *See*

*Colonial Bank v. Freeman (In re Pac. Forest Prods. Corp.)*, No. 05-cv-23268, 2006 WL

8433477, at *8–9 (S.D. Fla. May 24, 2006) (overturning the bankruptcy court's presumption of

fraudulent intent in all cases involving check kites because "an individual who kites checks may

---

[9] *See also Airport Boulevard Apartments, Ltd. v. NE 40 Partners (In re NE 40 Partners, Ltd. P'ship)*, 440 B.R. 124, 127 n.2 (Bankr. S.D. Tex. 2010) ("Rule 9(b) is made applicable to adversary proceedings by Bankruptcy Rule 7009 and causes of action under 11 U.S.C. §§ 544 & 548 are subject to the requirements of Rule 9(b).") (citing *Haber Oil Co. v. Swinehart (In re Haber Oil Co.)*, 12 F.3d 426, 439 (5th Cir. 1994); *Kaye v. DuPree (In re Avado Brands, Inc.)*, 358 B.R. 868 (Bankr. N.D. Tex. 2006)).

not act with the requisite intent to defraud if, for example, he remains financially able to promptly cover overdrafts" and therefore "the mere possibility that a check kiter may not intend to defraud its creditors" precludes the automatic extension of the presumption of fraudulent intent); *Barber v. Union Nat'l Bank of Macomb (In re KZK Livestock, Inc.)*, 190 B.R. 626, 630 (Bankr. C.D. Ill. 1996) ("The rule that a Ponzi scheme evidences an intent to defraud, does not necessarily apply to a check kite."). But "[c]heck kiting is a form of Ponzi scheme." *In re Montgomery*, 123 B.R. at 815.

Here, fraudulent intent is adequately pleaded; the kiting scheme has been buttressed with facts that support the implication of intent. The complaint says that Shane Smith, with the bank's knowledge and assistance, purposefully overdrafted accounts and used sight drafts to create float to pay-down the Debtors' floorplan loan and thus hide that inventory (acquired under the floorplan) had been sold out-of-trust. The sheer volume of alleged transactions and the stated amounts relative to actual revenues from operations further support an inference of wrongdoing.

**3.**

The allegations of the avoidable preference transfers lack the required specificity under Rule 8. For actual fraudulent transfer claims under § 548(a)(1)(A), the heightened pleading standard of Rule 9(b) applies. Rule 8 imposes a lower standard of pleading than Rule 9(b); transfer allegations that do not meet Rule 8's standard would thus be inadequate under Rule 9(b).

Many of the cases discussed above for preferential transfer pleading standards also addressed fraudulent transfer claims. In those cases, more specific information was needed to meet the pleading standard of Rule 9(b) for fraudulent transfers. *See, e.g.*, *Crescent Res. Litig. Tr. v. Nexen Pruet, LLC (In re Crescent Res., LLC)*, No. 11-01082, 2012 WL 195528, at *9 (Bankr. W.D. Tex. Jan. 23, 2012) (trust failed to sufficiently allege claims under §§ 547 and 548); *In re James River Coal Co.*, 360 B.R. at 162 ("If a fraudulent transfer claim details the

20

transfers alleged to be fraudulent, the reasons the transfers are fraudulent, and the roles of the defendants in the transfers, it has been pled with sufficient particularity to satisfy Federal Rule of Civil Procedure 9(b).”); *In re TransVantage Sols., Inc.*, 2016 WL 5854197, at *5 (pleading fraudulent intent for fraudulent transfer had to meet Rule 9(b)); *In re Raymond & Assocs., LLC*, 2018 WL 2143304, at *2 (fraudulent transfers had to meet Rule 9(b) heightened pleading standard, and the trustee’s complaint failed to allege the who, what, when, where, and how to meet that standard); *In re Anderson*, 2018 WL 3197746, at *4 (“In order to survive a motion to dismiss a claim for an intentionally fraudulent transfer, a plaintiff must satisfy the pleading requirements of Fed. R. Civ. P. 9(b).”).

Like Rule 8, there is not a clear checklist on how a plaintiff meets the Rule 9(b) pleading standard.  Although the Fifth Circuit has acknowledged that “‘Rule 9(b)’s ultimate meaning is context-specific,’ and thus there is no single construction of Rule 9(b) that applies in all contexts,” *Grubbs v. Kanneganti*, 565 F.3d 180, 188–89 (5th Cir. 2009), the Fifth Circuit also “interprets Rule 9(b) strictly,” requiring the plaintiff to specify the who, what, where, when, and why of the “fraud.”  *Flaherty & Crumrine Preferred Income Fund, Inc. v. TXU Corp.*, 565 F.3d 200, 207 (5th Cir. 2009).

Some courts have stated that for a § 548(a)(1)(A) claim to meet the heightened Rule 9(b) pleading standard, the complaint must allege specific information about each transfer, “including date and amount of the transfer, the identity of the transferor and initial transferor and initial transferee, and the consideration paid, if any.”  *In re Great Lakes Comnet, Inc.*, 588 B.R. at 21.  Courts that follow *Valley Media* for preferential transfers would no doubt require the same specifics for each transfer alleged to be actually fraudulent.

As with preferential transfers, courts will sometimes impose a relaxed pleading standard when a *trustee* brings a fraudulent transfer case.  As one court observed, “when a fraudulent

21

transfer claim is asserted by the bankruptcy trustee, courts often apply a less stringent standard when weighing the sufficiency of the complaint, reasoning that a trustee is an outsider to the transaction who must plead fraud from second-hand knowledge." *In re Vaughan Co., Realtors*, 481 B.R. at 758 (citations and quotation marks omitted). This lowered standard was specifically applied where a trustee was "charged with unraveling and pleading transactions between 500 investors, the [d]ebtor, and the [d]ebtor's seventy-seven affiliates, with incomplete records, multiple fraudulent schemes, and fact-specific transactions, all without the benefit of discovery." *In re NJ Affordable Homes Corp.*, No. 05-60442, 2013 WL 6048836, at *13 (Bankr. D.N.J. Nov. 8, 2013).

Even in light of this "lesser" pleading standard for trustees, trustees often times include more information for fraudulent transfers than the Debtors have here. For example, in *Welch v. Synovus Bank*, 517 B.R. 269, 277 (M.D. Fla. 2014), the trustee had sufficiently pleaded a check kiting scheme and included many paragraphs detailing the factual circumstances of the debtor's use of the defendant's bank accounts and "attached to the [complaint] a number of illustrations analyzing the alleged check kiting activity as well as several documents detailing [debtor's] deposits and overdraft activity." In another case, the trustee met the relaxed 9(b) pleading standard where the trustee attached an exhibit to the complaint that listed the date and amount of each transfer, as well as the type of transfer made (i.e., wire transfers) in a Ponzi scheme alleging over $10 million in avoidable transactions. *O'Connell v. Penson Fin. Servs. (In re Arbco Capital Mgmt., LLP)*, 498 B.R. 32, 40–41 (Bankr. S.D.N.Y. 2013).

Specifically, in the Fifth Circuit, one court pointed out the context-specific flexibility of Rule 9(b) where it was the trustee who brought an actual fraudulent transfer action. The court determined that the complaint satisfied Rule 9(b) where the complaint alleged that the debtor "transferred approximately 836,170 gallons of recycled oil and, as of yet, an undetermined

number of gallons of nonrecycled oil" and that the transfer occurred "during the period of October 11, 2010 through March 31, 2013," in addition to pleading the other elements of § 548(a)(1)(A). *In re JCC Envtl., Inc.*, 575 B.R. 692, 698–99 (E.D. La. 2017). Additionally, the trustee attached an exhibit to his complaint that listed each transaction by the amount of gallons of oil per transfer and the total value for each transfer. Although the exhibit did not include specific dates, the allegations identified who transferred the property (there was only one debtor entity) and who received the property (one defendant) and alleged specific transfers by value and volume of oil transferred.

The Debtors here, as plaintiffs, presumably have the advantage of access to relevant records of the transactions sought to be avoided. The Debtors are, however, very different from the pre-filing entities. The Debtors suffered massive layoffs upon filing and have been operated by a court-appointed restructuring officer with but a handful of employees. This no doubt limits the in-house knowledge of the Debtors' personnel. But were the Court to entertain a more relaxed standard, "allegations that a debtor made an aggregate amount or series of cash or other transfers over a period of time, without further particularization, are insufficient to state an intentional fraudulent transfer claim." *Official Comm. Of Unsecured Creditors v. JP Morgan Chase Bank, N.A. (In re M. Fabrikant & Sons, Inc.)*, 394 B.R. 721, 733–34 (Bankr. S.D.N.Y. 2008) (applying Rule 9(b) heightened pleading standard to § 548(a)(1)(A) claims, faulting the complaint for "not identify[ing] any specific transfer, transferor, transferee, or date of transfer"). *See also Olympia Mortg. Corp.*, 2006 WL 2802092, at *9 (dismissing intentional fraudulent transfer claims that aggregated and lumped a series of cash transfers made over a three to five year period and failed to identify how many transfers were being challenged or the specific dates or amounts of those transfers).

23

As determined before, without more than general allegations that deposits were made into overdrawn FirstCapital bank accounts of multiple Debtor-plaintiffs over the past two years, the complaint fails to meet the pleading standard of Rule 9(b) in identifying the alleged transfers. No *other* information is alleged that is enough to meet the precision and substantiation required under Rule 9(b). *See In re DVI, Inc.*, 2008 WL 4239120, at *7–8 (stating that the Third Circuit has recognized that while allegations of date, place, or time fulfill the heightened pleading standard of 9(b), it is not required, and plaintiffs may use alternative means to meet the particularity requirements of 9(b)).

## C.

The fate of Reagor-Dykes' claims for recovery under §§ 550(a) and 502(d) of the Bankruptcy Code follow that of the preferential transfer and fraudulent transfer claims. Section 550, on which Count Three is based, allows for recovery of an *avoided* transfer; and if there is no viable avoidable transfer action, there is no recovery. FirstCapital's claim under § 502(d), the basis of Count Five, also depends on the viability of the voidable-transfer causes. *See* § 502.

## D.

FirstCapital argues that the Debtors' claim for equitable subordination should be dismissed for three different reasons—the Debtors lack standing to bring an equitable subordination claim, the Debtors have not sufficiently pleaded the elements of equitable subordination, and the Debtors are barred from bringing this claim under FirstCapital's *in pari delicto* defense.

## 1.

The majority, though few in number, of courts have found that a chapter 11 debtor-in-possession has standing to bring an equitable subordination claim. *See ALT Hotel, LLC v. DiamondRock Allerton Owner, LLC (In re ALT Hotel, LLC)*, 479 B.R. 781, 800 & n.12 (Bankr.

N.D. Ill. 2012) (stating that the debtor has standing to bring an equitable subordination claim because, although courts have differed on the ability of a debtor to bring such a claim, § 1107(a) gives a debtor-in-possession in a chapter 11 case the same powers of a trustee); *In re Colfor, Inc.*, No. 96-60306, 1998 WL 70718, at *1 (Bankr. N.D. Ohio Jan. 5, 1998) (stating that "[n]ormally, only the trustee or debtor-in-possession has standing to pursue [an equitable subordination claim]"); *Audre Recognition Sys., Inc. v. Casey (In re Audre, Inc.)*, 210 B.R. 360, 363 (Bankr. S.D. Cal. 1997) ("The present case is a chapter 11 and the debtors-in-possession are bringing this action. Under § 1107, a debtor-in-possession assumes almost all the rights and powers of a trustee. Thus, the chapter 11 debtor-in-possession has standing to bring an equitable subordination action."); *9281 Shore Rd. Owners Corp. v. Seminole Realty Co. (In re 9281 Shore Rd. Owners Corp.)*, 187 B.R. 837, 852 (E.D.N.Y. 1995) ("As to standing, 'as a general rule, a proceeding to subordinate a claim may be initiated only by a trustee or a debtor-in-possession, unless a bankruptcy court authorizes another party in interest to initiate such a proceeding.'") (quoting *In re Mayo*, 112 B.R. 607, 651 (Bankr. D. Vt. 1990)); *Century Glove, Inc. v. Iselin (In re Century Glove, Inc.)*, 151 B.R. 327, 332 (Bankr. D. Del. 1993) (finding a debtor-in-possession has standing to seek equitable subordination because, under § 1107(a), "a debtor-in-possession [has] all of the rights . . . and powers, and shall perform all the functions and duties of a trustee"); *Bunker Expl. Co. v. Clarke (In re Bunker Expl. Co.)*, 42 B.R. 297, 302 (Bankr. W.D. Okla. 1984) (finding that "in the situation where a chapter 11 debtor-in-possession is present, it has the standing to bring suit seeking equitable subordination").

Courts have held that a debtor does not have standing to bring an equitable subordination claim, but such cases involve a debtor in chapter 7, chapter 9, chapter 12, and chapter 13. *See Riccitelli v. Sensenwich (In re Riccitelli)*, 14 Fed. App'x 57, 58 (2d Cir. 2001) (unpublished) (chapter 13 debtor lacked standing to bring equitable subordination claim); *Colvin v. Amegy*

*Mortg. Co., LLC (In re Colvin)*, No. 12-05106, 2015 WL 128036, at *8 (Bankr. W.D. Tex. Jan.

8, 2015) (chapter 12 debtor); *Wilkinson v. EMC Mortg. (In re Wilkinson)*, No. 11-05056, 2012

WL 112945, at *7 (Bankr. W.D. Tex. Jan. 12, 2012) (chapter 7 debtors); *In re Cnty. of Orange*,

219 B.R. 543, 557 (Bankr. C.D. Cal. 1997) (chapter 9 debtor).

Because a debtor in possession assumes almost all the rights and powers of a trustee

under § 1107(a), the Debtors have standing to pursue an equitable subordination claim.

**2.**

Next, FirstCapital says that Debtors failed to adequately plead their equitable

subordination claim. FirstCapital accurately recites the applicable law and standards for

assessing an equitable subordination claim. While equitable subordination is an unusual remedy

that is not penal and should only be awarded in rare instances, such policy considerations should

not be invoked to support dismissal on a motion to dismiss. They are best reserved for summary

judgment or trial. *Mohammad Hilmi Nassif & Partners v. Republic of Iraq*, No. 17-cv-2193,

2020 WL 1444918, at *18 n.10 (D.D.C. Mar. 25, 2020) ("Defendants' public policy arguments

are best addressed on a motion for summary judgment after further briefing and development of

the record."). FirstCapital refers to the three-prong test for equitable subordination, as articulated

by the Fifth Circuit, requiring allegations that (i) the defendant engaged in some type of

inequitable conduct, (ii) such misconduct caused injury to creditors or conferred an unfair

advantage on the defendant, and (iii) equitable subordination of the claim is consistent with

bankruptcy law. *Benjamin v. Diamond (In re Mobile Steel Co.)*, 563 F.2d 692, 700 (5th Cir.

1977).

Equitable subordination is a fact-intensive cause of action that is not normally determined

on a motion to dismiss. *Autobacs Strauss, Inc. v. Autobacs Seven Co. (In re Autobacs Strauss,*

*Inc.)*, 473 B.R. 525, 583 (Bankr. D. Del. 2012) ("It is also of note that courts recognize that

determining whether a creditor's claim should be subordinated is a fact-intensive inquiry which should not necessarily be determined on a motion to dismiss.").  Nevertheless, a plaintiff must usually allege conduct that falls into one of three categories: "(1) fraud, illegality or breach of fiduciary duty, (2) undercapitalization, or (3) control or use of the debtor as an alter ego for the benefit of the claimant," and not merely allege "that the defendant engaged in 'inequitable conduct.'"  *ABF Capital Mgmt. v. Kidder Peabody & Co. (In re Granite Partners, L.P.)*, 210 B.R. 508, 514–15 (Bankr. S.D.N.Y. 1997) (citations omitted).

Reagor-Dykes pleaded a check-kiting scheme that FirstCapital was aware of and assisted. The complaint also alleges the execution of pledge agreements between Messrs. Reagor and Dykes and FirstCapital for floorplan financing for $2.1 million that FirstCapital never issued; and FirstCapital kept the collateral after reneging on the floorplan financing.  Additionally, the complaint alleges that FirstCapital refused to turn over funds in the Debtors' FirstCapital bank accounts that were deposited post-petition.  These allegations sufficiently allege misconduct by FirstCapital.  The complaint also alleges injury to creditors, specifically, that by not supplying the floorplan financing but instead taking the collateral, FirstCapital "also deprived other creditors of the ability to recover for the damages they suffered."  Doc. No. 1 ¶ 51.  Equitable subordination of FirstCapital's claim would not be contrary to the Bankruptcy Code.  The defenses that FirstCapital raises are more appropriately considered at a later stage in this litigation, when the burden shifts to them to "demonstrate the fairness of its conduct."  *United States v. State St. Bank & Tr. Co.*, 520 B.R. 29, 80 (Bankr. D. Del. 2014) ("The party seeking to subordinate a claim has the initial burden of coming forward with material evidence to overcome the prima facie validity accorded to proofs of claim. Then, the burden shifts to the claimant to demonstrate the fairness of its conduct.") (internal citations omitted).  As such, the Court denies FirstCapital's motion as to the Debtors' equitable subordination claim for inadequate pleading.

### 3.

Last, FirstCapital asks the Court to dismiss the Debtors' equitable subordination claim based on its *in pari delicto* defense. *In pari delicto* is "an equitable defense that bars a plaintiff's recovery where the plaintiff itself bears responsibility for the violations he seeks to redress and preclusion of the suit would not impede public policy concerns." *Smith v. Woodforest Nat'l Bank (In re IFS Fin. Corp.)*, No. 04-3841, 2007 WL 1308321, at *3 (Bankr. S.D. Tex. May 3, 2007). Application of the *in pari delicto* defense is governed by Texas law, *Hill v. Day (In re Today's Destiny, Inc.)*, 388 B.R. 737, 748 (Bankr. S.D. Tex. 2008), and means "in equal fault." *Howard v. Fidelity & Deposit Co. of Md. (In re Royal Airlines, Inc.)*, 98 F.3d 852, 855 (5th Cir. 1996). Texas courts determine a party to be *in pari delicto* if the plaintiff must rely on his own illegal acts to establish his case. *Plumlee v. Paddock*, 832 S.W.2d 757, 759 (Tex. App.—Fort Worth 1992, writ denied); *Lewis v. Davis*, 199 S.W.2d 146, 151 (Tex. 1947). Although a plaintiff may be deemed *in pari delicto*, the requested relief may still be granted if public policy demands it. *Lewis*, 199 S.W.2d at 151.

Like the mere-conduit defense, "*in pari delicto* is an affirmative defense." *Rogers v. McDorman*, 521 F.3d 381, 386 (5th Cir. 2008). "Although dismissal under rule 12(b)(6) may be appropriate based on a successful affirmative defense, that defense must appear on the face of the complaint." *EPCO Carbon Dioxide Prods., Inc. v. JP Morgan Chase Bank, NA*, 467 F.3d 466, 470 (5th Cir. 2006). "In the usual case, [a] court is unable to grant dismissal under Rule 12(b)(6) based on an affirmative defense because it rarely appears on the face of the complaint." *Simon v. Telsco Indus. Emp. Benefit Plan*, No. 01-cv-1148, 2002 WL 628656, at *1 (N.D. Tex. Apr. 17, 2002). Specifically, as defined in Texas courts, the applicability of *in pari delicto* "in any specific circumstance depends on the facts and circumstances and considerations of public policy. These facts cannot be decided on a motion to dismiss." *Picard v. Avellino (In re Bernard*

*L. Madoff Inv. Sec. LLC)*, 557 B.R. 89, 123–24 (Bankr. S.D.N.Y. 2016) (applying Florida law where Florida *in pari delicto* requires essentially the same considerations as Texas law); *see also In re Today's Destiny, Inc.*, 388 B.R. at 749 (indicating that when courts are presented with the *in pari delicto* defense, courts should "consider how the facts and equities of the individual case interact with the policy *in pari delicto* was designed to serve"). Here, *in pari delicto* does not arise from the face of the complaint; it requires a fact-intensive inquiry of its applicability.

Further, bankruptcy courts disagree on whether an *in pari delicto* defense would even apply to an equitable subordination claim. For example, a line of cases finds it inappropriate to apply a state common law defense to a federal law cause. *See, e.g.*, *In re Bernard L. Madoff Inv. Sec. LLC*, 557 B.R. at 127 (stating that because equitable subordination arises under § 510(c) of the Bankruptcy Code and not under non-bankruptcy law, "the limitations on the causes of action that become property of the estate under 11 U.S.C. § 541(a), such as *in pari delicto*, do not apply"); *Gecker v. Goldman Sachs & Co. (In re Auto. Prof'ls, Inc.)*, 398 B.R. 256, 262 (Bankr. N.D. Ill. 2008) (stating that *in pari delicto* is a state common law defense that does not apply to causes of action created under Chapter 5 of the Bankruptcy Code). Other cases have looked to the language surrounding equitable subordination and have found that the unclean hands doctrine (a close relative to *in pari delicto*) "is not a defense to an equitable subordination claim because the claim focuses on the inequitable conduct of the *creditor*, not the debtor." *In re Bernard L. Madoff Inv. Secs. LLC*, No. 09-01161, 2015 WL 4734749, at *17 (Bankr. S.D.N.Y. Aug. 11, 2015) (emphasis in original).

The Court denies FirstCapital's request to dismiss the Debtors' equitable subordination claim.

**E.**

FirstCapital seeks to have Reagor-Dykes' cause for willful violation of the automatic stay dismissed because it did nothing more than place an administrative freeze on the Debtors' bank accounts.

The Supreme Court, in *Citizens Bank of Maryland v. Strumpf*, 516 U.S. 16, 21 (1995), held that a bank's temporary administrative freeze of a debtor's bank accounts does not constitute an offset or violate the automatic stay.  In *Strumpf*, the defendant bank placed an administrative freeze on the debtor's account almost seven months after the debtor filed bankruptcy; then, five days later, it filed a motion for relief from automatic stay and for setoff. *Id.* at 17–18.

Courts following *Strumpf* have stressed the temporary nature of the freeze.  For example, in *Town of Hempstead Employees Federal Credit Union v. Wicks*, the court found that the credit union violated the stay when it froze the debtors' accounts for over four months before seeking stay relief.  215 B.R. 316, 319 (E.D.N.Y. 1997) (determining that the length of the freeze, the credit union's refusal to release the funds on request, and the fact that the credit union took no action until the debtors brought matters to a head, indicated that the administrative freeze was not a temporary measure within the scope of *Strumpf*, "but rather constituted forbidden self-help in violation of the automatic bankruptcy stay"); *see also P.R. Elec. Power Auth. v. Maxon Eng'g Servs., Inc.,* No. 06-cv-1538, 2007 WL 9770106, at *3 (D.P.R. Oct. 3, 2007) (finding that a freeze that lasted almost six months violated the automatic stay); *In re Cullen*, 329 B.R. 52, 58 (Bankr. N.D. Iowa 2005) (finding that credit union's freeze on account for 40 days without seeking relief from the bankruptcy court until the debtors complained that the freeze violated the automatic stay was in violation of the automatic stay); *In re Schafer*, 315 B.R. 765, 770, 774 (Bankr. D. Colo. 2004) (finding a debtor's payroll check deposited post-petition prevented the

credit union from setting-off funds from post-petition deposits under § 553 and found that there was a willful violation of the automatic stay where the credit union froze post-petition funds for more than six weeks in addition to repeated requests for reaffirmation of a debt); *Holden v. United States (In re Holden)*, 236 B.R. 156, 167 (Bankr. D. Vt. 1999) (finding that indefinite administrative freeze violated § 362(a)); *In re Orr*, 234 B.R. 249, 255 (Bankr. N.D.N.Y. 1999) (finding stay violation where credit union imposed a freeze for almost two months before seeking relief from stay).

Reagor-Dykes alleges that post-petition deposits were made into accounts at FirstCapital and that, upon demand that FirstCapital transfer such deposits into the debtor-in-possession accounts, FirstCapital refused to do so. FirstCapital raises an additional fact—that it administratively froze the accounts—that absolves it of the charge. But no mention is made of the bank seeking stay relief to offset funds. The complaint sufficiently raises a stay violation. FirstCapital's request to dismiss this cause will be denied.

## F.

FirstCapital moves to dismiss the Debtors' demand for attorneys' fees. The Debtors have pleaded claims under the Texas Uniform Fraudulent Transfer Act (TUFTA), which FirstCapital has not moved to dismiss. Under TUFTA, a court may award attorneys' fees "based on the evidence the trial court heard." *Janvey v. Dillon Gage, Inc. of Dall.*, 856 F.3d 377, 392 (5th Cir. 2017) (quoting *Walker v. Anderson*, 232 S.W.3d 899, 919 (Tex. App.—Dallas 2007, no pet.)) (discussing Tex. Bus. & Commerce Code § 24.013). A sufficiently pleaded claim under TUFTA may likewise support a claim for attorneys' fees under TUFTA.

Reagor-Dykes may also recover attorneys' fees if they prove a willful stay violation. Though a corporation-plaintiff may not recover attorneys' fees under § 362(k) of the Code, *In re San Angelo Pro Hockey Club, Inc.*, 292 B.R. 118, 124 (Bankr. N.D. Tex. 2003), "[t]he court

may, however, award damages to a corporate debtor in enforcement of the court's civil contempt power or pursuant to its equitable powers under section 105 of the Code." *Id.* For now, the Court denies FirstCapital's motion to dismiss the Debtors' claim for attorneys' fees.

## IV.

### Request to Amend

Federal Rule of Civil Procedure "15(a) provides that leave to amend pleadings 'shall be freely given when justice so requires.'" *In re NE 40 Partners, Ltd. P'ship*, 440 B.R. at 129–30 (quoting *Addington v. Farmer's Elevator Mut. Ins. Co.*, 650 F.2d 663, 667 (5th Cir. 1981)). The rule "evinces a bias in favor of granting leave to amend," and the trial court will not withhold such leave without a "substantial reason." *Smith v. EMC Corp.*, 393 F.3d 590, 595 (5th Cir. 2004) (internal quotations and citations omitted). Courts consider five factors to determine whether to grant leave to amend: "(1) undue delay, (2) bad faith or dilatory motive, (3) repeated failure to cure deficiencies by previous amendments, (4) undue prejudice to the opposing party, and (5) futility of the amendment." *Id.*

No substantial reason to withhold leave to amend the pleading is presented here. There has not been undue delay or any bad faith indicated in the filing of this adversary proceeding. There have not been previous amendments to the pleading or undue prejudice to FirstCapital, and, while amending the complaint here may be burdensome, it is not futile. The Court grants the Debtors' request to amend the complaint.

## V.

### Conclusion

The Court concludes that, without curative amendments, Counts One and Two of Reagor-Dykes' complaint must be dismissed for failure to adequately plead the *transfers* that support both the preferential and fraudulent transfer claims under §§ 547 and 548, respectively. If such

claims fail, so too must the causes at Count Three and Count Five.  The Court denies FirstCapital's motion to dismiss Counts Four, Six, and Seven.  The Court grants the Debtors fifteen days to amend the complaint; upon motion and cause shown, the Court will consider an additional fifteen days.

### End of Memorandum Opinion ###