IN THE UNITED STATES BANKRUPTCY COURT
FOR THE NORTHERN DISTRICT OF TEXAS
LUBBOCK DIVISION

| | | |
|---|---|---|
| IN RE: | § | |
| | § | |
| REAGOR-DYKES MOTORS, LP et al. | § | Case No. 18-50214-rlj-11 |
| | § | Jointly Administered |

| | | |
|---|---|---|
| DENNIS FAULKNER, TRUSTEE | § | |
| OF REAGOR-DYKES AUTO GROUP | § | |
| CREDITORS LIQUIDATING TRUST | § | |
| | § | |
| V. | § | Adversary No. 20-05002-rlj |
| | § | |
| FIRSTCAPITAL BANK OF | § | |
| TEXAS, N.A. | § | |

## **<u>PLAINTIFF'S SECOND AMENDED COMPLAINT</u>**

TO THE HONORABLE UNITED STATES BANKRUPTCY JUDGE:

In accordance with Rule 7001, *et seq.* of the Federal Rules of Bankruptcy Procedure, Dennis Faulkner, as trustee of the Reagor-Dykes Auto Group Creditors Liquidating Trust[1] ("Trustee" or "Plaintiff") files this complaint (the "Complaint") to turn over property of the estate, avoid certain obligations and recover certain transfers against FirstCapital Bank of Texas, N.A. ("FirstCapital" or "Defendant"), to disallow any claims held by Defendant, and to recover compensatory damages.

## I.    PARTIES

### A.    PLAINTIFF

1.    Plaintiff Dennis Faulkner is the duly appointed Creditors Trustee of the

---

[1]    Faulkner was substituted as Plaintiff for the original plaintiffs in this case by order of this Court entered on September 17, 2020 [Dkt. No. 44].

Creditor Trust established by the Third Amended Chapter 11 Plan of Liquidation for Reagor-Dykes Auto Group, As Modified [Dkt. No. 1897] (the "Plan") confirmed by this Court's Order Confirming Debtors' Third Amended Chapter 11 Plan of Liquidation for Reagor-Dykes Auto Group, as Modified [Dkt. No. 1907] (the "Confirmation Order") on July 10, 2020.

**B.     DEBTORS**

2.     Reagor Auto Mall Ltd. ("RAM") is the Debtor in Case No. 18-50324 pending in this Court.

3.     Reagor-Dykes Amarillo, LP ("Amarillo") is the Debtor in Case No. 18-50216 pending in this Court.

4.     Reagor-Dykes Floydada, LP ("Floydada") is the Debtor in Case No. 18-50219 pending in this Court.

5.     RAM, Amarillo, and Floydada are sometimes collectively referred to herein as the "FCB Account Debtors."

6.     Reagor-Dykes Imports, LP ("Lmitsu") is the Debtor in Case No. 18-50215 pending in this Court.

7.     Reagor Dykes Auto Company, LP ("RDAC") is the Debtor in Case No. 18-50217 pending in this Court.

8.     Reagor-Dykes Plainview, LP ("RDT") is the Debtor in Case No. 18-50218 pending in this Court.

9.     Reagor Dykes Motors, LP ("Lamesa", "Spike Dykes", or "Spike Dykes Ford") is the Debtor in Chapter 11 Case No. 18-50214 pending in this Court.

10.     Reagor Dykes Snyder, LP ("Snyder") is the Debtor in Chapter 11 Case No.18-50218 pending in this Court.

11.     Lmitsu, RDAC, RDT, Reagor Dykes Motors, Reagor Dykes Snyder are sometimes collectively referred to herein as the "RD Debtors."

12.     The FCB Account Debtors and the RD Debtors are collectively referred to herein as "Debtors."

### C.     DEFENDANT

13.     Defendant FirstCapital Bank of Texas, N.A. ("FirstCapital" or "Defendant") is a depository banking and lending institution domiciled in the State of Texas. Defendant operates as an insured financial depository institution with its principal place of business in the State of Texas. FirstCapital has been previously served with process in this adversary proceeding. By the nature of Plaintiffs' claims against Defendant, the Court has personal jurisdiction over Defendant in this adversary proceeding. Defendant is named as a party in this action in the proper capacity as a member of the Federal Reserve System registered with the Federal Deposit Insurance Corporation as an insured financial depository institution.

## II.     JURISDICTION AND VENUE

14.     This Court has subject-matter jurisdiction over this action under 28 U.S.C. §§ 157 and 1334(b) because it arises under Title 11 and arises in and relates to those certain cases under Title 11 currently pending in the United States Bankruptcy Court for the Northern District of Texas, Lubbock Division (the "Court"), captioned *In re Reagor-Dykes Motors, LP, et al.,* Jointly Administered under Case No. 18-50214-rlj-11.

15.     The legal predicates for the relief requested in this adversary proceeding are §§ 105, 362, 363, 502, 541, 544, 547, 548, 549, 550, and 551 of Title 11 of the United States Code, 11 U.S.C. §§ 101 *et seq*. (the "Bankruptcy Code"); Rules 3007, 7001(1), and 7003 of the Federal Rules of Bankruptcy Procedure (the "Bankruptcy Rules"); and the Local Bankruptcy Rules for the United States Bankruptcy Court for the Northern District of Texas (the "Local Rules").

16.     This adversary proceeding is a "core" proceeding to be heard and determined by the Court pursuant to 28 U.S.C. § 157(b)(2), and the Court may enter final orders for matters contained herein.

17.     Venue is proper in this District pursuant to 28 U.S.C. §§ 1408 or 1409 because the Debtors' above-captioned bankruptcy cases are pending in this Court.

## III.     TRUSTEE'S AUTHORITY TO FILE SUIT.

18.     On July 10, 2020, the Court entered its Confirmation Order confirming the Debtors' Plan. On July 14, 2020, the Debtors filed their Notice of Effective Date [Dkt No. 1912], which states that the Plan became effective as of July 10, 2020 (the "Effective Date") and that all conditions precedent to the Effective Date were satisfied in accordance with Section 9.2 of the Plan. Unfortunately, Plan proceeds are insufficient at this time to pay all allowed claims in full.

19.     Section 8.1 of the Plan and the Confirmation Order provide for the creation of a Creditors Trust and the appointment of a Creditors Trustee. Plan, § 8.1; Confirmation Order, ¶ 9. On the Effective Date, Dennis Faulkner of Lain, Faulkner & Co. was appointed the Creditors Trustee and vested with all of the general powers and duties to administer the

4

Creditors Trust in accordance with the Plan, Creditors Trust Agreement, and Confirmation Order. *Id.*; Plan § 8.4.

20.     Under the Plan and this Court's order of July 10, 2020 [Dkt No 1907], all Assets (as defined in the Plan) vested in the Trust, free and clear of all liens, Claims, Causes of Actions, interests, rights, Security Interests, and other encumbrances. The Court's July 10 order further provides that

> Pursuant to § 1123(b) of the Bankruptcy Code, all Causes of Action (as defined in the Plan and Disclosure Statement, other than those Causes of Action specifically settled and released pursuant to the Plan, and specifically including, but not limited to, (i) Chapter 5 Causes of Action, (ii) all actions currently on file, and (iii) all actions listed on Exhibit "A" to this Order) are hereby preserved by this Plan, notwithstanding the occurrence of the Effective Date. The Creditors Trustee shall, on behalf of the Debtors, retain the exclusive authority and all rights to enforce, commence, and pursue, as appropriate, any and all Causes of Action, whether arising before or after the Petition Date, and the Creditors Trustee's rights to commence, prosecute, or settle such Causes of Action shall be preserved. For the avoidance of doubt, the preservation of Causes of Action herein includes, without limitation, the right to object to all Claims, including Secured Claims, Administrative Claims, Priority Claims, and General Unsecured Claims. The Trustee's right to commence and prosecute Causes of Action shall not be abridged or materially altered in any manner by reason of confirmation of the Plan.

21.     Article 2 of the Plan defines Causes of Action to include Chapter 5 Causes of Action. Plan, § 2.1. The Plan defines Chapter 5 Causes of Action as "any Cause of Action arising under §§ 510, 544 through 551 and 553 or otherwise under the Bankruptcy Code"

22.     Included within the Assets transferred to the Trust are the claims and Causes

5

of Action of the following Debtors:

     a.     Reagor Auto Mall Ltd. ("RAM") debtor in Chapter 11 Case No. 18-50324 pending in this Court.

     b.     Reagor-Dykes Amarillo, LP ("Amarillo") debtor in Chapter 11 Case No. 18-50216 pending in this Court.

     c.     Reagor-Dykes Floydada, LP ("Floydada") debtor in Chapter 11 Case No. 18-50219 pending in this Court.

     d.     Reagor-Dykes Imports, LP ("Lmitsu") debtor in Chapter 11 Case No. 18-50215 pending in this Court.

     e.     Reagor Dykes Auto Company, LP ("RDAC") debtor in Chapter 11 Case No. 18-50217 pending in this Court.

     f.     Reagor-Dykes Plainview, LP ("RDT") debtor in Chapter 11 Case No. 18-50218 pending in this Court.

     g.     Reagor-Dykes Motors, LP ("Lamesa" or "Spike Dykes") debtor in Chapter 11 Case No. 18-50214 pending in this Court.

     h.     Reagor-Dykes Snyder, LP ("Snyder") debtor in Chapter 11 Case No. 18-50321 pending in this Court.

## IV.    FACTUAL BACKGROUND.

### A.    FIRSTCAPITAL KNOWINGLY AND INTENTIONALLY PARTICIPATED IN SHANE SMITH'S FRAUDULENT SCHEMES TO DEFRAUD THE DEBTORS AND THE DEBTORS' CREDITORS.

23.    Debtors owned and operated automotive dealerships in the State of Texas along with several other affiliates. By 2018, Debtors and certain non-debtor affiliates employed approximately 700 employees and reported over $800 million in sales.

24.    Certain Reagor Dykes entities, including RAM, began banking with FirstCapital in approximately 2007.

25.    By 2011, FirstCapital considered its relationship with RAM and certain other

Reagor Dykes entities to be among its most significant. As part of that relationship, FirstCapital executives publicly endorsed various Reagor Dykes businesses as well as Mr. Reagor and Mr. Dykes.

26.    In particular, on April 27, 2011, Brad Burgess, who at the time was the Lubbock Market President for FirstCapital (and is now its Chief Executive Officer) wrote a letter "To Whom it May Concern" in which he endorsed, Mr. Reagor, Mr. Dykes, RAM, Spike Dykes Ford, and RDAC (among others). In the letter, Mr. Burgess states that "[w]e consider this relationship one of our most significant, as well as most loyal customers. All business has been handled as agreed with the utmost in honesty and integrity." Mr. Burgess further stated that FirstCapital "handles a low seven figure floor plan arrangement with Reagor Automall. Additionally, FirstCapital Bank provided start up financing for Spike Dykes Ford, Lincoln, and Mercury in Lamesa for all fixed assets and start up expenses." Mr. Burgess concluded his letter by stating that "Bart Reagor and Rick Dykes are the principals of the above referenced entities and FirstCapital Bank appreciates and highly recommends the abilities and performances these individuals have afforded FirstCapital Bank." Mr. Burgess's letter was included by Tex-Fi Capital (another Reagor Dykes business) as part of an information packet provided to potential investors.

27.    Over the following years, FirstCapital's relationship with Debtors and other Reagor Dykes entities continued to grow and expand, with Debtors and their affiliates becoming one of FirstCapital's largest borrowers.

28.    Shane Smith was the Chief Financial Officer for the Debtors and other Reagor-Dykes businesses. At some point, but no later than February 2017, Mr. Smith began

collaborating with FirstCapital in fraudulent schemes to defraud the Debtors and their creditors. At the core of Smith's schemes was the willingness of FirstCapital to allow Smith to engage in a massive transfer of funds between Reagor-Dykes accounts and to let him use checking accounts and sight drafts to create multi-million-dollar unsecured loan facilities that he could never legitimately repay without engaging in even further fraudulent activity. And FirstCapital's decisions were not the fault of a low-level employee of whom Smith took advantage. Rather, Smith worked directly with FirstCapital's CEO, Brad Burgess.

29.    In fact, in 2017 and 2018, Burgess and Smith communicated multiple times per week about the FCB Account Debtors' financial transactions involving FirstCapital. For example, in a December 20, 2017 email, Smith responded to Burgess's daily report of the negative balances on RAM and Amarillo's checking accounts. In his response, Smith stated that "I am working like crazy personally on RAM. I have several deals in my office working to get funded. We will keep battling, I am really trying to get it back positive by year end. Thank you for working with us. Sorry you have to do this everyday."

30.    But as early as March 2017, Burgess expressed that he "was passed [sic] where [his] comfort level is" when one FCB account of Amarillo was overdrawn by $611 [*sic*—appears to be $611,000 overdrawn] and had been overdrawn by $126,000 the previous day. Apparently, Burgess got comfortable with the situation because the FCB Account Debtors' overdrafts of their FCB checking accounts continued and grew.

31.    In January 2018, Burgess emailed Smith and noted that RAM, Amarillo, and Floydada each had overdrawn checking accounts totally nearly $1.4 million. Burgess again

stated, "This is really past my comfort zone." But again, neither Burgess nor FirstCapital stopped Smith from his manipulations and fraud.

32.     Again, the FCB Account Debtors' overdrafts continued to grow. By the end of May 2018, RAM's checking accounts were consistently overdrawn by more than $2 million a day.

33.     In short, FirstCapital and Burgess let Smith use the FCB Account Debtors' demand deposit accounts as unsecured lending facilities that had not gone through FirstCapital's standard loan review or underwriting processes.  For example, in February 2018, RAM's account x3144 had an average daily ledger balance of negative $1,414,770.82 and an average float of $2,535,736.33, which resulted in an average daily available balance of ***negative $3,950,507.15***. Similarly, in February 2018, Amarillo's account x9488 had an average daily ledger balance of negative $295,586.39 and an average float of $1,030,948.46, which resulted in an average daily balance of ***negative $1,328,534.85***. FirstCapital then charged RAM and Amarillo interest on the negative available balance at a rate of 6.25% (in addition to other fees)—a plain recognition that the overdrafts constituted loans.

34.     And February 2018 was not an isolated month. FCB's bank statements reflect that RAM and Amarillo had a negative average ledger balance and a negative average available balance ***every month from December 2016 through February 2018***. Suffice to say, nothing changed in the following months.

35.     Moreover, the volume and amount of funds being transferred into and out of the FCB Account Debtors' accounts at FCB made it crystal clear to anyone who paid

attention to the accounts that Smith was engaged in a massive fraudulent scheme. In early 2017 and early 2018, Smith provided FCB with financial statements that reflected, among other information, the monthly and annual sales of RAM, Amarillo, and Floydada. The financial statements Smith provided FirstCapital show that RAM had sales in 2016 of $154,711,951 and sales in 2017 of $172,091,742 (which reflects average monthly sales of about $14.3 million). But in the nine months from November 1, 2017 to July 31, 2018, RAM's x3144 account had over $637,000,000 in deposits and credits (an average of over $70.7 million per month) and had over $637,000,000 in debits. In other words, the average amount of money being deposited in RAM's FCB bank account each month was approximately five times as much as its average monthly sales in 2017.

36.    Moreover, much of these debits and credits were nothing more than transfers between Reagor-Dykes entities. During that same November 2017-July 2018 time frame, over $383,000,000 was disbursed from the RAM x3144 account to other Reagor-Dykes debtors. And, according to records kept by Mr. Smith, in June and July 2018 alone, there were over $88 million in deposits made into the RAM x3144 account that came from funds paid or transferred by other Reagor-Dykes entities. Moreover, these funds were transferred between the Reagor-Dykes' entities without adequate consideration, if any consideration was paid at all.

37.    But FirstCapital did not need to look at each deposit and debit to see that Smith was just churning funds between Reagor-Dykes entities—Smith told FirstCapital that he was using intercompany transfers to cover the massive, ongoing, multiday overdrafts on the FCB Account Debtors' accounts. For example, in a January 11, 2018

email to Burgess, Smith stated "Working with Ashley to get some collections in here from the group and outside the group to see if we can get these two accounts cleaned up for tomorrow." Burgess, an experienced banker, would have understood that "from the group" meant that Smith intended to just move funds from one Reagor-Dykes entity to another to try and pay back the overdrafts on the FCB checking accounts.  Again, there was no adequate consideration for these transfers.

38.    Similarly, on March 12, 2018, Burgess informed Smith that "Ram is ($305k) short after pending transactions. RAM was ($915k) after Friday's transactions." Smith responded to Burgess and told him "Let get with everyone on what they have for deposits today and see if we need to add some."  In other words, Smith's plan was to see what actual deposits they had available to make that day and, if it wasn't enough, Smith intended to find some other deposits. Where would such deposits come from? Apparently, other Reagor-Dykes checking accounts or sight drafts for cars purportedly being sold from one Reagor-Dykes entity to another.

39.    Based on the information available to FirstCapital through both the dealership's financial statements and bank statements generated by FirstCapital's own computer system, FirstCapital knew (1) the dealerships were making deposits into its checking account that were far in excess of their revenue generating capacity; (2) that these deposits were largely checks from other Reagor Dykes entities also known as "from me to me" checks; (3) that notwithstanding these massive deposits, the checking accounts were regularly overdrawn, sometimes by amounts aggregating in the millions of dollars; (4) large numbers of checks were written on FirstCapital accounts that were payable to other

Reagor Dykes entities; and (5) that notwithstanding all of these facts, FirstCapital elected to permit Smith to use the FCB Account Debtors' business checking accounts as lines of credit.

40.     Moreover, FirstCapital participated in Smith's schemes knowing that he was using his scheme to defraud the Ford Motor Credit Company and other floorplan lenders of the Plaintiffs. Smith regularly informed Burgess and others at FirstCapital that the overdrafts were going to be larger than normal due to the quarterly audits of floor-plan lenders.

41.     For example, on March 13, 2017, Burgess emailed Smith to inform him of RAM's and Amarillo's negative balances. In response, Smith told Burgess, "Getting it covered. Bear with me this week, we are doing are [sic] quarterly floorplan and inventory cleansing." In other words, Smith was telling Burgess he would need to overdraw the bank accounts at FCB more than usual to payoff out-of-trust floor plan loans. Similarly, on June 15, 2018, in response to an email from Burgess's assistant letting Smith know that the RAM, Floydada, and Amarillo had a combined negative balance in excess of $2.6 million, Smith noted that they were "doing some early payoffs on our quarterly floorplan reconciliations so they [the balances] might be lower next week, but I am managing it daily!"

42.     The persistent, ongoing, and massive ledger and daylight overdrafts on the RAM, Amarillo, and Floydada checking accounts was contrary to normal or routine practice at FirstCapital.

43.     FirstCapital treats any overdraft, whether overnight or intraday, as an

extension of credit. As FirstCapital has stated in its internal policies:

> Customer ledger overdrafts and daylight overdrafts should not be a regular occurrence. Occasionally, however, they will arise due to cash flow timing issues in the customer's normal course of business or due to various charges posted by FCBT. Customer should be encouraged to keep overdrafts to a minimum. Overdrafts are considered an extension of credit and may be approved for a credit worthy customer by a RM, within approved authorities. The bank will analyze carefully and may close accounts that are chronically overdrawn.

44.     FirstCapital's Brad Burgess, who was in charge of the daily account activity

on the RAM, Floydada, and Amarillo accounts, similarly testified as follows:

Q.     Who is in charge of managing the loan relationship?

A.     Timeframe?

Q.     January of '18.

Q.     Darrell Hill.

Q.     And what's the – so you're in charge of the daily account activity

on debits and credits, and Darrell Hill is in charge of the loan balances; correct?

A.     Yes.

Q.     But aren't you really extending credit in your department that

Darrell Hill should know about every single day almost?

**A.     *Yes, I was extending credit through overdrafts.***

45.     FirstCapital's actions regarding the Reagor-Dykes entities were not only

contrary to the bank's own routine and standard practices.  The bank's actions were also

contrary to the standard practices in the banking industry—and indeed, were far outside of

banking industry standards, practices, and norms.  FirstCapital's abnormal business

practices include but are not limited to the following:

46.    **First,** the bank allowed the Reagor-Dykes entities to run up ever increasing amounts of overdrafts over a period of years.  The situation was so extreme that the bank's CEO regularly monitored the accounts, and he and his assistant routinely sent emails to Smith about the negative daily balances—something in itself that is highly abnormal.  The standard in the banking industry is that banks will close accounts where customers are routinely writing checks, sending wires, and transferring funds on insufficient or uncollected funds and are not conducting business appropriately.  Banks want to do business with customers that are only writing checks, sending wires, and transferring funds where there are sufficient funds in the account, allowing for only an occasional overdraft. Here, the FirstCapital bank statement balances for the Reagor-Dykes entities, among other documents, show routine, extensive overdrafts and that Smith was not conducting business in a standard, routine, or appropriate business manner.  FirstCapital chose not to shut down the Reagor-Dykes' accounts even though it knew (or reasonably should have known) that Smith was engaging in a kite.

47.    **Second,** the overdrafts and other advances on the accounts constitute loans, as evidenced by the fact that FirstCapital charged 6.25% on the overdrawn amounts, in addition to other facts.  CEO Burgess admitted the overdrafts were loans, as quoted above. Lending to a bank customer through repetitive overdrafts is contrary to banking industry standards, norms, and practices.  Extending credit through overdrafts is an unsafe and unsound banking practice because it circumvents the rigorous underwriting procedures that are in place for lending to bank customers.  Lending through overdrafts is making a loan

on a surprise basis and is a very high-risk practice for a bank to conduct. Yet that is precisely what FirstCapital did.

48. **Third,** it is contrary to banking industry standards, practices, and norms for a bank to routinely honor overdrawn checks against uncollected funds, rather than send the checks back dishonored. Again, that is precisely what FirstCapital did. FirstCapital's statements show that the bank and Smith were manipulating deposits and overdrafts in an attempt to conceal their wrongdoing and hide behind the banking "midnight deadline rule." Under this rule, a bank must "decision" checks that are presented for payment and return any dishonored ones prior to midnight on the next business day after the date of receipt of the item.

49. Here, FirstCapital consistently honored overdrawn checks against uncollected funds for the Reagor-Dykes entities using deposits of related party checks to cover NSF checks—which is the essence of a check kite and which facilitated and prolonged the check kite— and using sight drafts and the line of credit to extend the float, instead of sending the overdrawn checks back on Day 2. This is contrary to standard, routine, and normal banking industry practices. While a bank may honor occasional NSF checks, it is wholly abnormal in the banking industry for a bank to consistently honor NSF checks as was done with the Reagor-Dykes accounts.

50. FirstCapital's actions caused substantial damage to the creditors. If FirstCapital had returned the NSF checks as dishonored, the kite would have collapsed, and the damage suffered by the Debtors' creditors would have been greatly reduced. Instead, FirstCapital allowed the kite to continue for almost two years (at least).

FirstCapital was aware (or reasonably should have been aware) of the kite during that time, and indeed, the bank raised issues with Shane Smith in late 2016 about the increasing overdrafts. If FirstCapital had done the right thing at that time—in keeping with industry standards—the kite would have been stopped much earlier on, while the sums at issue were much less. FirstCapital's actions allowed two more years (at least) of creditor damage to occur—damage to innocent creditors that, unlike FirstCapital, did not know about the fraud. While there may have been creditor losses in 2016 (or earlier), the losses were significantly more by 2018.

51. *Fourth*, FirstCapital ignored the financial statements that Smith provided to the bank, compared to the bank account balances. A simple comparison of the two would have shown, for example, that the average amount of money being deposited in RAM's FCB bank account each month was approximately five times as much as its average monthly sales in 2017.

52. *Fifth,* the Reagor-Dykes entities had millions of dollars, and for some accounts hundreds of millions of dollars, of affiliate transfers through their accounts at FirstCapital. These transfers were not rationally related to the companies' actual financial performance. Given these facts, it would have been standard, routine, and normal practice in the banking industry for FirstCapital to have closed the accounts, as such massive affiliate transfers are an obvious sign of check kiting. FirstCapital's actions in allowing the accounts to continue and extending more credit on these accounts violated banking standards, practices, and norms.

53. *Sixth,* FirstCapital's check kiting detection system and/or data analytic

16

software set off alarms for the debtors' accounts. The Reagor-Dykes accounts repeatedly appeared on the check kiting reports. The frequency of the kiting alerts for the Reagor-Dykes accounts demonstrates that the bank did not meet the standards in the banking industry regarding these accounts. It is abnormal for an account to be on the check kiting report routinely. Particularly given that these reports occurred in conjunction with the other facts at issue, FirstCapital should have closed the accounts. The bank's repeated failure to do so violates banking standards, practices, and norms.

54. **Seventh,** FirstCapital ignored other blatant signs of bank fraud, such as check kiting, contrary to banking industry standards, practices, and norms. FirstCapital chose to ignore these red flags, for going on two years (at least), allowing the overdrafts to continually increase. Again, had FirstCapital done the right thing and closed the accounts, the kite would have collapsed much sooner, and two years (at least) of additional harm to the innocent creditors would have been avoided. These red flags include the following:

a. The Reagor-Dykes accounts were overdrawn by ever-increasing amounts, which the bank itself viewed with increasing alarm as being past its "comfort zone." The emails quoted above establish this point. Also, for example, FCB's bank statements show that RAM and Amarillo had a negative average available balance every month from December 2016 through February 2018. By the end of May 2018, RAM's checking accounts were consistently overdrawn by more than $2 million a day. Other examples and facts are set forth above.

b. There were a large number and dollar amounts of debits and credits with low beginning and ending balances, a red flag of bank fraud, such as check

kiting.  For example, for the month of March 2018, the bank statements for the RAM

x3144 account show the following:

> Beginning balance on March 1, 2018 is *negative* $27,421.71.

> Ending balance on March 30, 2018 is $2,294.77.

> Number of credits and debits during the month:  4,665.

> Dollar amount of credits and debits during the month:
> $185,439,000.

This is an incredibly high dollar and number of credits and debits for one month—

over $185 million. Yet the beginning and ending balances were quite low, less than 1% of

the amount of the $185 million that flowed through the accounts for one month alone.

> c.    The dollar amount of credits and debits in any one month were
> roughly the same—another red flag of bank fraud, such as check kiting.  For
> example, for the month of March 2018, the bank statements for the RAM x3144
> account show that the credits were $92,734,768 and the debits were $92,705,052,
> roughly the same—and again, an incredibly high dollar amount.

55.    **Eighth,** upon information and belief, FirstCapital knew from emails and

other indicators that the Reagor-Dykes entities were selling vehicles out of trust.  Again,

this is evidence of fraud and continuing to do business with a customer who is selling

vehicles out of trust is contrary to standard banking industry standards, practices, and

norms.  The standard in the banking industry would have been to shut down the accounts,

stopping the fraud and reducing the harm suffered by the creditors, rather than letting the

fraud continue.  Instead, FirstCapital allowed the wrongdoing to continue.

56.     Allowing Smith to use checking accounts as credit lines was only part of Smith's fraudulent scheme in which FirstCapital knowingly participated. FirstCapital also let Smith create and control millions of dollars of "float" to fuel his financial schemes by creating "sales" of vehicles between the various Reagor Dykes dealerships and using an antiquated form of payment to support the transaction—the sight draft. As explained below, sight drafts have no legitimate business or financial purposes for purported sales or transfers between related entities. Specifically, FirstCapital would extend immediate credit against a deposited (sight) draft, which was to be dispatched to another bank for processing and ultimately payment. FirstCapital loaned[2] millions of dollars to RAM, Amarillo, Floydada based on the intercompany sight drafts that they presented to FirstCapital and for which FirstCapital extended credit. These loans were effectively paid back by other Reagor Dykes dealerships.

57.     A sight draft is a form of documentary draft, not unlike a letter of credit used in international business transactions.  At its heart, it is payment against documents of title.  The drafting process was designed long ago to facilitate transactions between unrelated buyers and sellers so they could each mitigate the credit and performance risk of the other by allowing their respective banks to act as intermediaries.

58.     In a normal transaction involving a sight draft and between unrelated parties, one dealership would "agree" to purchase a vehicle(s) from a third-party dealership. The

---

[2]    *See e.g. In re: C.M. Turtur Investments, Inc., 93 B.R. 526, 530-531* (Bankr. S.D. Tex. 1988) (finding provisional credit given to dealership by bank on deposited sight draft constituted a loan).

selling dealership, or the "drawer", would deposit the draft together with the certificate of title to the vehicle with its own bank. The selling dealership's bank would thereafter present the draft together with the certificate of title to the purchasing dealership's bank for payment (the "drawee"). The draft would contain instructions for payment, usually upon "sight" plus a certain number of days. Usually seven business days.

59.     During this time period, the purchaser's bank would inspect the certificate of title to insure its authenticity.  Upon expiration of the time period and assuming the title was good, the purchaser's bank would issue a cashier's check[3] by way of payment on the draft; cause the same to be delivered to the seller's bank, and concurrently deduct an equal amount from the buyer's bank account. Ostensibly, if the buyer lacked the funds to pay, the buyer's bank would return the draft, together with the documents of title to the seller's bank. When the seller's bank received the cashier's check from the buyer's bank— and not before—it would deposit a like amount of money into the seller's bank account. Suffice it to say, the sheer complication of this process belies its antiquated nature, as it could have just as easily been used to buy and sell herds of cattle between far-flung ranches in the 19th century as it could for the buying and selling of vehicles here.

60.     As noted above, the entire purpose of the documentary sight-draft process is

---

[3]     The use of the cashier's check is key to understanding the process. A cashiers' check constitutes immediately available funds, and because it is drawn on the bank instead of the buyer's account, the seller does not bear the credit risk of the buyer's insolvency. It also illustrates why using a sight draft between two related parties serves zero purpose unless it is to create "float" under the abnormal process implemented by Shane Smith and FirstCapital.

to mitigate credit and performance risk between unrelated parties. It serves virtually no purpose in a transaction between related parties, such as the various Reagor-Dykes dealerships. Moreover, the sheer volume of intercompany checks that were already being deposited between the dealerships would seem to moot any need for the use of this process at all.

61.     That is until Shane Smith and FirstCapital devised a way to deploy an aberrant version of the drafting process in order help create additional "float," which served as an unsecured lending facility that benefitted FirstCapital, while avoiding FirstCapital's loan-underwriting processes and review.

62.     Through their agreement, and once a selling Reagor Dykes dealership had deposited a draft, FirstCapital would give immediate credit to the selling dealership. It would transmit the draft to the purchasing Reagor-Dykes dealership's bank which, in turn, would have anywhere between seven to fourteen business days to pay on the draft. The "sale" of the vehicle would not officially be consummated until the buying dealership's bank paid the draft. At which time, presumably Smith would cause the floorplan lender to be paid—assuming he paid the floor-plan lender at all.[4] In receiving immediate credit for the drafts, Smith was essentially given free money for a period of seven to fourteen business days.

63.     FirstCapital knew of the enormous risks it was undertaking in giving

---

[4]     As stated above, Plaintiff alleges, on information and belief, that FirstCapital knew that Smith was regularly selling vehicles out of trust.

immediate credit on the drafts, as it did impose a backstop. In that regard, it required RAM, Amarillo, Floydada, RDAC, Plainview, and Lmitsu to jointly execute a promissory revolving line-of-credit note in the amount of $2,480,789 in June 2017, which was renewed in June 2018 (the "revolver"). FirstCapital would give immediate credit for any and all drafts deposited by RAM, Amarillo, and Floydada up to the limit of the revolver and until the revolver was paid back down. FirstCapital paid the line back down itself, using the cashier's checks from the purchasing Reagor Dykes dealership's banks. Nevertheless, if the purchasing dealership failed to cause payment to be made by its bank, then RAM, Floydada, and Amarillo would still remain liable for the immediate credit previously given on the deposited draft.

64.    After a time, FirstCapital gave up all pretense that this process was anything other than a construct to create float when it ceased requiring that the selling dealerships tender original certificates of title. All-in-all, hundreds of thousands of dollars changed hands between dealerships on a daily basis and through this process. Moreover, FirstCapital would regularly send Smith a list of incoming drafts and ask Shane for instructions on when the incoming drafts should be paid by FirstCapital. In other words, FirstCapital allowed Smith to control when and whether FirstCapital would honor an incoming draft. Often times, Smith would ask FirstCapital to delay honoring a draft because of how overdrawn the FCB checking accounts already were.

65.    While FirstCapital knew or should have known how Smith was using drafts between Reagor-Dykes entities to create float to inflate their account balances from the drafts themselves, FirstCapital did not need to figure it out from the transactions

themselves. Again, Smith told FirstCapital exactly what he was doing. For example, on April 18, 2017, Smith asked FirstCapital to pay by 4:00 P.M. approximately $183,000 in drafts that named RAM as payor and that had been given to another Reagor-Dykes debtor to present and receive credit. Smith told FirstCapital that if they did not pay the drafts in time, the other bank would return the drafts and debit the account of the other Reagor-Dykes debtor. Smith asked FirstCapital to pay the draft using FirstCapital's funds immediately, but not draw funds from RAM's account until the following day.

66.    Despite Smith telling FirstCapital exactly what he was doing with the drafts, FirstCapital continued to let the FCB Account Debtors (primarily RAM) transfer millions of dollars to other Reagor-Dykes entities via sight draft, which in turn, created millions of dollars of float (i.e., unsecured debt) for Smith to take advantage of as part of his scheme.

67.    Not only did FirstCapital knowingly and intentionally participate in Smith's fraudulent scheme to create days of float by using drafts to transfer funds between Reagor-Dykes entities for cars that were purportedly being sold from one Reagor-Dykes dealer to another, it even allowed Smith to use drafts to transfer funds between Reagor-Dykes entities that both had their bank accounts at FirstCapital.  For example, Smith could deposit a draft in Floydada's FCB account that reflected a purported car sold by RAM to Floydada and then get 7 to 14 days of float before FirstCapital would pay the draft to itself and then debit RAM's FirstCapital account.  There is no legitimate business or financial purpose for related entities to use drafts to transfer funds between checking accounts at the same bank.

68.    But FirstCapital routinely allowed Smith to do exactly that. To take but one example, on January 10, 2018, Floydada deposited a draft with FirstCapital in the amount

of $55,000 that identified RAM as the purported purchaser. Based on the draft, FirstCapital

loaned $55,000 to Floydada. Then, on January 30, 2018, FirstCapital sent itself a cashier's

check for $55,000 payable to FirstCapital from funds debited from RAM's checking

account at FirstCapital.

69.     FirstCapital itself apparently recognized the particularly unusual nature of

sight drafts being used to document purported sales of cars between two related entities

that both had their bank accounts at FirstCapital. In the spreadsheets FirstCapital

maintained to track the incoming and outgoing sight drafts associated with RAM,

Floydada, and Amarillo, FirstCapital would highlight in red when RAM or Floydada (as a

purported "seller") deposited a draft where the purported "buyer" was RAM, Floydada, or

Amarillo.

70.     Attached as Exhibits G and H are schedules of certain sight drafts deposited

at FirstCapital between July 2016 and July 31, 2018 by RAM and Floydada for which

FirstCapital loaned funds in the amount of the draft. The entity depositing the draft with

FirstCapital was the purported seller of a car identified on the draft. Each of these schedules

also reflect the date on which FirstCapital received a cashiers' check by the bank of another

Reagor Dykes debtor (often FirstCapital itself) based on funds drawn from the account of

the Reagor Dykes entity that was the purported buyer of the car. For each repayment of a

sight draft loan that Plaintiff seeks to avoid, Exhibits G and H identify (a) the amount of

the loan, (b) the date of the loan, (c) the Reagor Dykes entity that received a loan when it

deposited the draft with FirstCapital based on its purported sale of a car, (d) the Reagor

Dykes entity that purportedly bought the car, and (e) the Reagor-Dykes entity that received

payment from the purported buyers' bank via cashiers' check.

71.    As set forth above, FirstCapital knew the nature and extent of Shane's fraudulent schemes.  Far from stopping them, they took active measures to help Smith carry out his schemes. Nowhere is this assistance more evident that in the "float" created by the sham draft process that FirstCapital helped Smith carry out.  The "sales" were nothing more than the meaningless churning of inventory between dealerships. And the elaborate and antiquated method deployed to pay for these sales was utterly without purpose—save for giving Smith free money to deploy elsewhere.  To say the least, the manner in which FirstCapital made loans to the Reagor-Dykes entities utilizing sight drafts was outside of banking industry practices, routines, and norms.  For example, simply requiring the original title would have revealed the fraud, reducing the harm to the creditors.

## B.    FIRSTCAPITAL'S FINANCIAL AND BUSINESS REASONS FOR PARTICIPATING IN SMITH'S SCHEMES.

72.    Smith's schemes, in which FirstCapital knowingly and willingly participated inflated the financial position of the FCB Account Debtors and the RD Debtors. This resulted in masking their true insolvent financial condition from their officers and directors as well as their creditors until Smith's schemes collapsed in late July 2018, which triggered their respective bankruptcy filings.

73.    FirstCapital, however, did not participate in Smith's schemes out of benevolence. Rather, it benefited from this scheme. FirstCapital leveraged its insider knowledge of Debtors to game the system to allow the bank to continue to collect on fraudulently transferred deposits, delay declaring defaults on its loans to Debtors, and avoid

the financial impact to its own books, which would have consequently adversely impacted the cash price portion of a major acquisition of another bank.

74.    Indeed, FirstCapital benefited from the scheme and the appearance that Debtors were solvent. A disruption to Smith's fraudulent scheme could have caused a cascade of defaults on the Debtors' various loans and other debts owed to FirstCapital. If RAM were to default on its multi-million dollar floor-plan financing with FirstCapital, the bank would record a loss on the loan.

75.    But in 2018, such losses would be particularly problematic for FirstCapital because it was in the process of acquiring Fidelity Bank. Losses on FirstCapital's loans to Reagor-Dykes would have negatively affected FirstCapital's stock value and would have required FirstCapital to significantly increase the cash it would have to pay as part of the acquisition. And while consummating the Fidelity acquisition itself was important on its own terms, on information and belief, it was also part of FirstCapital Bank's longer-term plans to become a publicly traded bank. So, FirstCapital needed the acquisition to go through at the lower cash price.

76.    But FirstCapital was not just another commercial bank for the Debtors.  It was an insider for each of the Debtors through Rick Dykes and, upon information and belief, Bart Reagor.  Mr. Dykes owned approximately 50% of the Debtors, directly and indirectly through his ownership in LLCs, making him an insider of the Debtors.   He was also a member of FirstCapital's Board of Advisors until just before Reagor-Dykes filed bankruptcy. His title at FirstCapital had been Director on FirstCapital's board of directors, but FirstCapital changed his title from Director to Member of its Board of Advisors to avoid

26

regulatory scrutiny and to potentially increase the amount FirstCapital could lend Reagor-Dykes. Defendant told Dykes that his title was changing because of Federal Banking Regulation O. But his authority, role, responsibilities, and influence at FirstCapital remained essentially the same after they changed his title from director to advisory member. He continued to attend and participate at meetings of FirstCapital's Board of Directors without change. Additionally, Mr. Dykes holds approximately 375,000 of FirstCapital's shares, and upon information and belief, Mr. Bart Reagor also owned shares in FirstCapital.

77.     These facts create an obvious conflict of interest and are yet another reason for FirstCapital's extraordinary actions towards and preferential treatment of the Reagor-Dykes Debtors.    Further, Mr. Dykes and Mr. Bart's roles at the bank may implicate Regulation O, and discovery is ongoing.  Plaintiff reserves all rights to amend his complaint to add allegations of violations of Regulation O as discovery proceeds.

### C.     THE DEBTORS DECLARE BANKRUPTCY.

78.     In late July 2018, Ford Motor Credit Company, LLC ("Ford"), Reagor-Dykes's largest inventory lender, began a surprise audit of the Debtors. During the audit, Ford discovered Smith's massive fraud and Reagor-Dykes's insolvency. Ford terminated the funding it provided to various Debtors, declared default, and threatened immediate legal action to seize Reagor-Dykes's assets, among other actions.

79.     On August 1, 2018, Lmitsu, RDAC, RDT, Spike Dykes Ford, and Snyder filed voluntary petitions for relief under Chapter 11 of the Bankruptcy Code.  On November 2, 2018, RAM and Snyder filed voluntary petitions for relief under Chapter 11 of the Bankruptcy Code.

80.     Between August 2 and August 7, 2018, in a series of three pledge agreements, Dykes pledged an additional $7.5 million in collateral to FirstCapital, approximately $2.75 million in cash and $4.7 million in FirstCapital stock (260,302 shares), and Reagor pledged currently unknown amounts in mutual funds to FirstCapital. In return, FirstCapital agreed to provide an additional $2.1 million in floorplan financing for RAM.

81.     On August 6, 2018, a letter from Mr. John Massouh, an attorney for FirstCapital, was sent to Mr. David Langston, then-counsel for various Reagor-Dykes entities, to set forth a proposed pledge on additional assets for Messrs. Reagor and Dykes in exchange for $2.1 million in additional floorplan financing. Messrs. Reagor and Dykes and their spouses signed the pledge agreement.

82.     FirstCapital did not advance any Reagor-Dykes entity any of the additional $2.1 million in floorplan financing to RAM, despite the additional pledges of collateral, by fraudulently taking this additional collateral and promises to do so. By doing so, FirstCapital sealed the demise of the Reagor-Dykes Auto Group and ensured that hundreds of its employees would lose their jobs. This also deprived other creditors of the ability to recover for the damages they suffered. This is another example of FirstCapital using its insider status to the detriment of others as FirstCapital pursued its quest to become a publicly traded bank.

**D.      SCHEDULES OF LOANS, EXTENSIONS OF CREDIT, AND TRANSFERS.**

83.     Attached as Exhibit A is a list of the days between August 1, 2016 and August 1, 2018, when funds were transferred to FirstCapital to repay loans or extensions of credit

provided to RAM by FirstCapital via overdrafts. Exhibit A also identifies the amount loaned during the days in question.

84.    Attached as Exhibit B is a list of RAM's deposits made on days identified in Exhibit A into FCB account x3144 of checks and other funds from another Reagor Dykes entity that sought relief under Chapter 11.

85.    Attached as Exhibit C is a list of the days between August 1, 2016 and August 1, 2018, when funds were transferred to FirstCapital to repay loans or extensions of credit provided to Amarillo by FirstCapital via overdrafts. Exhibit C also identifies the amount loaned during the days in question.

86.    Attached as Exhibit D is a list of Amarillo's deposits made on days identified in Exhibit C into FCB account x9488 of checks and other funds from another Reagor Dykes entity that sought relief under Chapter 11.

87.    Attached as Exhibit E is a list of the days between August 1, 2016 and August 1, 2018, when funds were transferred to FirstCapital to repay loans or extensions of credit provided to Floydada by FirstCapital via overdrafts. Exhibit E also identifies the amount loaned during the days in question.

88.    Attached as Exhibit F is a list of deposits made by Floydada into FCB account x5013 of checks and other funds from another Reagor Dykes entity that sought relief under Chapter 11 on the days identified on Exhibit E.

89.    Attached as Exhibit G is a list of certain sight drafts deposited by RAM with FirstCapital between July 2016 and July 2018, for which FirstCapital loaned RAM the amount listed on the draft. Exhibit G also includes information regarding the other Reagor

Dykes entity whose funds were used to repay the loan and the date of the transfer.

90.     Attached as Exhibit H is a list of sight drafts deposited by Floydada with FirstCapital between July 2016 and July 2018 for which FirstCapital loaned Amarillo the amount listed on the draft. Exhibit H also includes information regarding the other Reagor Dykes entity whose funds were used to repay the loan and the date of the transfer.

91.     Column A in Exhibits G and H identify the "FCB Customer Depositing Draft." The entity depositing the draft is the purported seller of a car to another Reagor Dykes entity.

92.     Column B of Exhibits G and H identify the date the draft was deposited. This was the day (or, in a few cases, the business day before), FirstCapital loaned the amount of the draft to the draft depositor.

93.     Column C of Exhibits G and H identify FirstCapital's item number for each draft listed on the exhibits.

94.     Column D of Exhibits G and H identify the amount of the draft, which was also the amount FirstCapital loaned to the draft depositor.

95.     Column E of Exhibits G and H identify the "outgoing bank." This is the bank of the purported buyer of a car that would issue the cashiers' check that was then delivered to FirstCapital.

96.     Column F of Exhibits G and H is labeled "Transferor." This is the purported buyer of the car from the selling Reagor Dykes entity.

97.     Column G of Exhibits G and H is labeled "Date Transfer Received by FCB." This is the date FirstCapital received the cashiers' check that was based on funds from the

purported "buyer" Reagor Dykes entity that would then be used to repay the loan FirstCapital had previously made to the purported "seller" Reagor Dykes entity.

98.    Attached as Exhibit I is a list of the principal and interest payments made by RAM to FirstCapital on the floorplan loans provided by FirstCapital.

### E.    FIRSTCAPITAL'S PURPORTED CLAIMS SHOULD BE DISALLOWED.

99.    To the extent Defendant's liability exceeds the balance of Defendant's purported claims against Debtors' Bankruptcy Estates, Defendant will not hold an enforceable right to payment against the Estates under 11 U.S.C. § 502(d). Without an enforceable right to payment, no debt would exist, and Defendant cannot hold a "claim" as defined under 11 U.S.C. § 101(5). Without a claim against Debtors, any and all security interests pledged to secure such nonexistent debt will also cease to exist.

100.    Through this adversary proceeding and pursuant to Rule 3007(b) of the Bankruptcy Rules, Plaintiffs object to and seek to disallow any and all portions of Defendant's secured and unsecured claims against the Estates, both secured and unsecured, during the ongoing investigation of FirstCapital's involvement and potential liability for its fraudulent conduct.

## V.    CLAIMS FOR RELIEF.

### A.    COUNT 1: AVOIDANCE OF PREFERENTIAL TRANSFERS—11 U.S.C. § 547

101.    Plaintiff hereby incorporates all preceding paragraphs as if fully set forth herein.

102.    Defendant extended immediate credit to RAM, Amarillo, and Floydada any

time they presented a sight draft for payment. By doing so, Defendant created a short-term credit facility outside of its standard underwriting and credit procedures and practices. Each such loan, which constitutes antecedent debt, the date of the loan, and the amount of the loan are reflected on Exhibits G and H attached hereto.

103.   By providing immediate credit to RAM, Amarillo, and Floydada upon presentment of a sight draft for payment, Defendant had a right to payment on account of an obligation owed to Defendant by the Debtor.

104.   RAM, Amarillo, and Floydada transferred funds to Defendant to pay the obligations (the "Deposited Sight Transfers"). The Deposited Sight Transfers were to or for the benefit of a creditor within the meaning of section 547(b)(1).

105.   The Deposited Sight Transfers either reduced or fully satisfied a debt then owed by a Debtor to the Defendant.

106.   The Deposited Sight Transfers were for, or on account of, antecedent debts owed by a Debtor before the Deposited Sight Transfers were made within the meaning of section 547(b)(2).

107.   Each Deposited Sight Transfer is identified on Exhibits G and H attached hereto. Defendant was a creditor of the Debtor at the time of the Deposited Sight Transfers within the meaning of 11 U.S.C. § 101(10)(A).

108.   The Debtors were insolvent at all times during the 90 days prior to the Petition Date within the meaning of section 547(b)(3) and (4). Debtors were also insolvent during the one year prior to the Petition Date.

109.   Pursuant to section 547(b)(5), the Deposited Sight Transfers enabled the

Defendant to receive more than it would have received if: (i) the Debtor's case was under chapter 7 of the Bankruptcy Code; (ii) the Deposited Sight Transfers had not been made; and (iii) Defendant received payment of its debt under the provisions of the Bankruptcy Code.

110.    By reason of the foregoing, the Deposited Sight Transfers to the Defendant are avoidable pursuant to 11 U.S.C. § 547(b). As a result, the Plaintiff may recover the amount or value of the Deposited Sight Transfers from the Defendant pursuant to 11 U.S.C. § 550.

111.    Defendant also extended credit to RAM, Amarillo, and Floydada by allowing "True Overdrafts" that lasted two or more days and that served as short-term loans made outside of FirstCapital's normal loan review or loan committee processes. By doing so, Defendant wrongfully created a short-term credit facility outside of its standard underwriting and credit procedures and practices.

112.    The dates and amounts of the debts created by FirstCapital's extensions of credit via overdraft are identified on Exhibits A, C, and E attached hereto.

113.    By providing these short-term loans to RAM, Amarillo, and Floydada, Defendant had a right to payment on account of an obligation owed to Defendant by the Debtor.

114.    RAM, Amarillo, and Floydada transferred funds to Defendant to pay the amounts it owed for True Overdrafts (the "True Overdraft Transfers"). The True Overdraft Transfers were to or for the benefit of a creditor within the meaning of section 547(b)(1). The True Overdraft Transfers and the antecedent debt each transfer satisfied are identified

on Exhibits B, D, and F attached hereto.

115.    The True Overdraft Transfers either reduced or fully satisfied a debt then owed by the Debtor to Defendant.

116.    The True Overdraft Transfers were for, or on account of, antecedent debts owed by the Debtor before the True Overdraft Transfers were made within the meaning of section 547(b)(2).

117.    Defendant was a creditor of the Debtor at the time of the True Overdraft Transfers within the meaning of 11 U.S.C. § 101(10)(A).

118.    Pursuant to section 547(b)(5), the True Overdraft Transfers to the Defendant enabled the Defendant to receive more than it would have received if: (i) the Debtor's case was under chapter 7 of the Bankruptcy Code; (ii) the True Overdraft Transfers had not been made; and (iii) Defendant received payment of its debt under the provisions of the Bankruptcy Code.

119.    By reason of the foregoing, the True Overdraft Transfers to the Defendant are avoidable pursuant to 11 U.S.C. § 547(b).  As a result, Plaintiff may recover the amount or value of the True Overdraft Transfers from the Defendant pursuant to 11 U.S.C. § 550.

120.    Alternatively, Plaintiff is entitled to recover for these overdraft transfers because FirstCapital's actions regarding the transactions and the Reagor-Dykes accounts went far beyond standard banking practices, pursuant to *Laws v. United Missouri Bank of Kansas City*, 98 F.3d 1047 (8th Cir. 1996).  In *Laws*, the Eighth Circuit addressed a check kiting case in which the debtor obtained provisional credits on checks it deposited and then drew down on those provisional credits, creating a large negative collected funds balance.

The debtor paid off that negative balance with a $4 million deposit and subsequently filed for bankruptcy. The bank moved for summary judgment, contending *inter alia* that the provisional credit did not constitute antecedent debts.

121.   The Eighth Circuit determined, *inter alia*, that summary judgment was properly denied on whether the provisional credit constituted antecedent debts because the bank's actions in advancing the credit was ***not*** routine or normal. The court explained:

> *What If the Advances Were Not Routine?* Our analysis thus far has dealt with advances that a bank routinely makes available against a depositor's uncollected deposits. But this is not the usual case. Here, as Kroh's negative collected funds balance grew rapidly in mid–1986, UMB viewed the situation with alarm. Internal bank documents described Kroh's negative balance as "an interest free loan," and a bank officer testified, "we were lending money and the loan was not approved." Concluding that the situation was unacceptable, UMB gave Kroh the option of eliminating the negative balances or paying interest on them. When Kroh agreed to pay interest, its negative collected funds balance began to reflect a banking relationship having many indicia of a loan. Had Kroh and UMB explicitly agreed to convert future negative collected funds balances into loans, Kroh would have been legally bound to pay such debts as incurred. Whether such an agreement may here be implied is a disputed issue of material fact. Thus, while we arrive at this conclusion by a different analysis, we agree with the district court that UMB was not entitled to summary judgment on the issue whether the $4 million transfer satisfied Kroh's antecedent debt to UMB. *Id.* at 1051-52.

122.   The instant case is strikingly similar to the *Laws* case, and the Eighth Circuit's analysis directly applies here. The transfers and the antecedent debt each transfer satisfied are identified on Exhibits B, D, and F attached hereto, as the *Laws* analysis is an alternative theory of recovery for these transactions.

123.   FirstCapital's actions regarding the NSF checks, overdrafts, and extensions of credit on the Reagor-Dykes accounts were most definitely not routine—FirstCapital grossly deviated from routine and ordinary banking practices. The overdrafts were contrary

to routine and normal practices at FirstCapital. They were contrary to the bank's internal policies, quoted above. And upon information and belief, FirstCapital cannot point to any other customer that it allowed to run up such massive overdrafts for the length of time that the Reagor-Dykes entities did.

124. The overdrafts were not routine extensions of credit under banking industry standards, practices, and norms either. FirstCapital's actions regarding the Reagor-Dykes overdrafts were contrary to such industry norms, as set forth above. Simply requiring the original title would have caused the fraudulent scheme to collapse, reducing the harm suffered by the creditors.

125. The transfers recoverable under *Laws* satisfy the other requirements for recovery under 11 U.S.C. § 547—the transactions are the same as the True Overdraft Transfers, and *Laws* is simply an alternative theory of liability. Accordingly, the allegations regarding the Trust Overdraft Transfers in paragraphs 111-119 apply equally to the transfers pursuant to the *Laws* alternative theory. Plaintiff incorporates those paragraphs as though fully set forth herein regarding those recoverable transfers pursuant to *Laws* and are not repeating the allegations here solely to avoid repetition. Thus, Plaintiff is alternatively entitled to recover under *Laws* for the transfers identified above as "True Overdraft Transfers."

126. In addition to the Deposited Sight Transfers and True Overdraft Transfers, RAM, Floydada, and Amarillo made other transfers of funds to Defendant to pay various fees owed to FirstCapital as well as principal and interest on existing loans and credit facilities. These payments, which are specifically identified on Exhibit I attached hereto,

include principal and interest on the floor plan loans FirstCapital provided to RAM. Any lien or perfected security interest FirstCapital may purport to have under the floorplan loan should be transferred to RAM pursuant to 11 U.S.C. § 510.

127.   The transfers in paragraphs 102-126 shall be referred to as "Bank Transfers."

128.   The Bank Transfers were to or for the benefit of a creditor within the meaning of section 547(b)(1).

129.   The Bank Transfers either reduced or fully satisfied a debt then owed by the Debtor to Defendant.

130.   The Bank Transfers were for, or on account of, antecedent debts owed by the Debtor before the Bank Transfers were made within the meaning of section 547(b)(2).

131.   Defendant was a creditor of the Debtor at the time of the Bank Transfers within the meaning of 11 U.S.C. § 101(10)(A).

132.   Pursuant to section 547(b)(5), the Bank Transfers to the Defendant enabled the Defendant to receive more than it would have received if: (i) the Debtor's case was under chapter 7 of the Bankruptcy Code; (ii) the Bank Transfers had not been made; and (iii) Defendant received payment of its debt under the provisions of the Bankruptcy Code.

133.   By reason of the foregoing, the Bank Transfers to the Defendant are avoidable pursuant to 11 U.S.C. § 547(b).  As a result, the Plaintiff may recover the amount or value of the Bank Transfers from the Defendant pursuant to 11 U.S.C. § 550.

134.   Defendant was an insider at the time of the Transfers that occurred between 90 days and one year before the Petition Date. Defendant was a statutory insider of the Debtors under 11 U.S.C. § 101(31)(E). Defendant was an insider with respect to Mr. Dykes

because he was a director of Defendant. 11 U.S.C. § 101(31)(A)(iv). Mr. Dykes, in turn, was an affiliate of the Debtors because he owned more than 20% of their voting securities. 11 U.S.C. § 101(2)(A). Because Defendant was an insider of an affiliate (Mr. Dykes) of the Debtors, Defendant was an insider of the Debtors, too. 11 U.S.C. § 101(31)(E).

135.   Additionally, Defendant was a non-statutory insider of the Debtors. The closeness of the relationship between the Debtors and Defendant was so great that the advantage the Defendant gained is attributable to affinity rather than the course of business dealings and the Transfers were no longer conducted at arms' length. Moreover, the credit that Defendant extended through Mr. Smith's check-kiting scheme was not documented through the usual instruments, such as promissory notes.  Defendant extended the credit on an unsecured basis while not even questioning whether the Debtors had the ability to repay. On information and belief, the Defendant knew or should have known that the Debtors were insolvent. There were numerous transfers, each amounting to an extension of unsecured credit. Defendant placed no restrictions on how Mr. Smith could use the proceeds from the scheme. Defendant did not extend the credit through the check-kiting scheme for commercial purposes. Mr. Smith treated Defendant differently from the Debtors' other unsecured creditors.

136.   Because Defendant was an insider of the Debtors, any Deposited Sight Transfers, True Overdraft Transfers (or alternatively, the overdraft transfers at issue pursuant to *Laws*), and Bank Transfers within one year of the Petition Date that meet the other necessary requirements of 11 U.S.C. §547 are avoidable preferences and should be avoided.

**B.    COUNT 2: AVOIDANCE, PRESERVATION, AND RETURN OF ACTUAL FRAUDULENT TRANSFERS—11 U.S.C. § 544, 548(A)(1)(A) AND (A)(1)(B), 550, AND 551 AND TEXAS BUSINESS & COMMERCE CODE § 24.005 AND § 24.006.**

137.    Plaintiff hereby incorporates all preceding paragraphs as if fully set forth herein.

138.    During at least the two years (and likely more) prior to November 2, 2018 (for Debtors who had a Petition Date of November 2, 2018) and prior to August 1, 2018 (for Debtors who had sought bankruptcy relief on August 1, 2018), each FCB Account Debtor that had a demand deposit or checking account with FirstCapital routinely and repeatedly carried negative balances on their respective accounts for multiple days at a time. Each such multi-day negative balance constituted an unsecured loan or extension of credit or debt.

139.    Deposits made into each FCB Account Debtor's demand deposit or checking accounts, that served to pay off such multi-day negative balances, were made from the property of an FCB Account Debtor. Each such transfer and the negative balance they satisfied are identified on Exhibits B, D, and F attached hereto. Simply put, one Reagor-Dykes entity was paying off another one's debts to FirstCapital, with the first Reagor-Dykes entity receiving inadequate consideration, if any consideration at all, for paying off the other's debts, loans, or extensions of credit or debt. And FirstCapital *knew* that was occurring.

140.    Each such transfer was in violation of 11 U.S.C. §548(a)(1)(A) and the Texas Business & Commerce Code § 24.005(a)(1).

141.    Each such transfer was made with the actual intent to hinder, delay, or
defraud creditors of the FCB Account Debtor because the transfer was made in connection
with and in furtherance of Smith's fraudulent scheme.   For example:

- Smith told FirstCapital that he was using intercompany transfers to cover the massive, ongoing, multi-day overdrafts—the deposits to pay off the overdrafts and negative balances were "from the group."

- The accounts were constantly overdrawn by ever increasing amounts.

- The amount of money flowing in and out of the Reagor-Dykes accounts was not rationally related to the debtors' actual business performance, shown in the financial statements given to FirstCapital.

- Much of the debits and credits through the accounts were nothing more than transfers between Reagor-Dykes entities.   And those transfers were massive—tens of millions and hundreds of millions of dollars in the aggregate.

- Smith used sight draft transactions for affiliate sales—even though sight drafts had no legitimate business purpose for those transactions.   That in itself was a blatant tipoff.   Indeed, FirstCapital subsequently did not even bother following the required steps for the sight drafts, an admission, *inter alia*, that the sight drafts were not a legitimate form of financing for the affiliate sales.

- FirstCapital recognized the enormous risks it was taking in granting yet more financing to Plaintiffs for the affiliate sales—a red flag that the transfers were not legitimate.   It required five of the Debtors to execute a $2.4 million promissory revolving line of credit note.

Plaintiff has also pleaded facts showing many of the "badges of fraud" under TEX. BUS. &
COM. CODE § 24.005(b), including but not limited to:

- A close relationship exists.   The Reagor-Dykes parties on both sides of the transactions were obviously corporate affiliates. A close relationship also existed with FirstCapital.   Rick Dykes—who owned approximately 50% of the Reagor-Dykes Debtors, directly and through LLCs—was a bank shareholder and sat on its board of directors and advisory board.

- The value of the consideration received was certainly not reasonably equivalent to the value of the asset transferred or the obligation incurred. The Reagor-Dykes debtor paying off the other's debt received little or no consideration in return. One company's funds just paid off the debts of another.  Moreover, transfers made in furtherance of a check kiting scheme do not confer reasonably equivalent value as a matter of law.

- The transfers occurred shortly before or shortly after a substantial debt was incurred—the continuing, ever-increasing overdrafts in the accounts.

- It can be reasonably inferred that the initial debtor was or became insolvent at the time of the transfers, and the transfers occurred shortly before or shortly after a substantial debt was incurred.  These transfers were for no small amounts—individual transactions were for thousands, hundreds of thousands, and more.  In the aggregate, hundreds of millions of dollars were transferred between the affiliates.  And during this time period, the Reagor-Dykes accounts were continually overdrawn by ever-increasing, substantial sums—sums that debtors could never legitimately repay.

- The transfers were to an insider, both under the Bankruptcy Code and as a non-statutory insider.

142.    Defendant is either the initial transferee or the immediate or mediate transferee of such initial transferee.

143.    As of the date hereof, Defendant has not returned any such transfer to the FCB Account Debtors.

144.    The Defendant did not receive such transfers in good faith and without knowledge of the voidability of such transfers.

145.    Additionally, Plaintiff is entitled to recover under 11 U.S.C. § 548(a)(1)(B).

146.    The Reagor-Dykes debtor that made the transfer or incurred the obligation did not receive reasonably equivalent value in exchange for the transfer or obligation. Again, the transferor debtor received little or no consideration for the transfer—it was just paying off the debt or extension of credit its affiliate owed to Defendant.

147.    The transferor Reagor-Dykes debtor was insolvent on the date that each such transfer was made or such obligation was incurred, or became insolvent as a result of such transfer or obligation; was engaged in business or a transaction, or was about to engage in business or a transaction, for which any property remaining with the debtor was an unreasonably small capital; and/or intended to incur, or believed that the debtor would incur, debts that would be beyond the debtor's ability to pay as such debts matured.

148.    At the time of the transfer, the Reagor-Dykes entities were insolvent or became insolvent as a result of the transfer or obligation.  Again, the transfers were for no small amounts—individual transactions were for thousands, hundreds of thousands, or more.  In the aggregate, hundreds of millions of dollars were transferred between the Reagor-Dykes affiliates.  The transfers were far more than the Reagor-Dykes entities could legitimately afford based on the businesses' actual performance, shown in its financial statements.  And during these times, the Reagor-Dykes entities were continually overdrawn by ever-increasing, substantial sums.  Further, the transferor Reagor-Dykes entity was part of a fraudulent scheme to create float—a scheme that was by definition necessary because the debtors were insolvent and could never legitimately pay the overdraft amounts.  Indeed, once the fraudulent scheme collapsed, the Reagor-Dykes entities were forced to file for bankruptcy, making it obvious that the transferee debtor was or would become insolvent as a result of the transfers.

149.    Defendant is either the initial transferee or the immediate or mediate transferee of such initial transferee.

150.    As of the date hereof, Defendant has not returned any such transfer to the

FCB Account Debtors.

151. The Defendant did not receive such transfers in good faith and without knowledge of the voidability of such transfers.

152. The checks and transfers from the Reagor-Dykes debtors that were deposited into the FCB Account Debtors' accounts described in paragraphs 138-144 (and the exhibits cited therein) were also fraudulent transfers under Section 24.006(a) of the Texas Uniform Fraudulent Transfer Act, TEX. BUS. & COM. CODE § 24.006. The transfers made or obligation incurred by the Reagor-Dykes debtors are fraudulent as to a creditor whose claim arose before the transfer was made or the obligation was incurred because: the debtor made the transfer or incurred the obligation without receiving a reasonably equivalent value in exchange for the transfer or obligation, and the debtor was insolvent at that time, or the debtor became insolvent as a result of the transfer or obligation. Further, the transfers made by the Reagor-Dykes debtor are fraudulent as to a creditor whose claims arose before the transfer was made because: the transfer was made to an insider for an antecedent debt, the debtor was insolvent at that time, and the insider had reasonable cause to believe that the debtor was insolvent. Defendant is either the initial transferee or the immediate or mediate transferee of such initial transferee. As of the date hereof, Defendant has not returned any such transfer to the Reagor-Dykes debtors. The Defendant did not receive such transfers in good faith and without knowledge of the voidability of such transfers.

153. Alternatively, each multi-day negative balance constituted an unsecured loan or extension of credit or debt because FirstCapital's actions in extending such loans or extensions of credit or debt were most certainly not routine or ordinary. The transfers from

another Reagor-Dykes debtor that were deposited into each FCB Account Debtor's demand deposit or checking accounts that served to pay off such multi-day negative balances are thus alternatively recoverable as fraudulent transfers pursuant to *Laws, supra*.  Plaintiff incorporates paragraphs 114-125 and 137-151 as though fully set forth herein.  Each such transfer and the negative balance it satisfied are identified on Exhibits B, D, and F attached hereto.

154.     Pursuant to *Laws*, FirstCapital's actions regarding the Reagor-Dykes multi-day negative balances grossly deviated from routine and ordinary banking practice. FirstCapital's actions regarding the multi-day negative balances were contrary to its own routine and normal practices.  They were contrary to the bank's internal policies.  And upon information and belief, FirstCapital cannot point to any other customer that it allowed to run up such massive multi-day negative balances.

155.     Nor were the multi-day negative balances routine extensions of credit or debt under banking industry standards, customs, and practices either.  FirstCapital's actions regarding the Reagor-Dykes multi-day negative balances were contrary to such industry norms.  As set forth above, FirstCapital's actions violated banking industry standards, practices, and norms regarding the multi-day negative balances, for numerous.

156.     The negative daily balances and transfers, recoverable under *Laws,* satisfy the other requirements for recovery under 11 U.S.C. §§ 544, 548(a)(1)(A) & (B), 550, and 551, and Texas Business & Commerce Code § 24.005(a)(1) and 24.006.  The transactions are the same as those discussed above, and *Laws* is simply an alternative theory of liability. Accordingly, the allegations in paragraphs 137-155 apply equally to the multi-day negative

balances and transfers pursuant to the *Laws* alternative theory.  Plaintiff incorporates those paragraphs as though fully set forth herein regarding those recoverable transfers pursuant to *Laws*, and are not repeating the allegations here to avoid repetition.   Thus, Plaintiff is alternatively entitled to recover under *Laws* for the transfers from one Reagor-Dykes entity to another's account and used to pay off the multi-day negative balances.

157.    As a result of the foregoing, pursuant to 11 U.S.C. §§544, 548(a), 550, and 551 and Texas Business and Commerce Code Chapter 24, §§ 24.005, and § 24.006, Plaintiff is entitled to a judgment (a) avoiding and preserving the transfers; (b) directing that the transfers be set aside; and (c) recovering the transfers, or the value thereof, from the Defendant.  Each such transfer was in violation of 11 U.S.C. §548(a)(1)(A) and/or § 548(a)(1)(B) and is avoidable thereunder. Each such transfer is also avoidable under Texas Business and Commerce Code §24.005(a)(1) and § 24.006. Each such transfer is set forth on Exhibits B, D, and F attached hereto.

158.    Moreover, the Deposited Sight Transfers identified in Exhibits G and H were transfers made with the intent to hinder, delay, or defraud creditors of the Debtor on whose funds the cashiers' checks were based because the transfer was made in connection with and in furtherance of Smith's fraudulent scheme.   Each such transfer was in violation of 11 U.S.C. §548(a)(1) and Texas Business and Commerce Code §24.005(a)(1) and is avoidable thereunder. Each such transfer is also avoidable under, 11 U.S.C. § 548(a)(1)(B) and § 24.006. Each such transfer is set forth on Exhibits G and H attached hereto.

159.    Defendant is either the initial transferee or the immediate or mediate transferee of such initial transferee.

160.    As of the date hereof, Defendant has not returned any such Deposited Sight Transfer.

161.    The Defendant did not receive the Deposited Sight Transfers, either as initial transferee or the immediate or mediate transferee of such initial transferee, in good faith and without knowledge of the voidability of such transfers.

162.    The other elements supporting the recovery of the Deposited Sight Transfers under 11 U.S.C. § 548 and Tex. Bus. & Com. Code §24.005 and 24.006 are set forth above in paragraphs 1-161.  Those paragraphs are incorporated by reference and will not be repeated here solely to avoid repetition.

163.    As a result of the foregoing, pursuant to 11 U.S.C. §§544, 548(a)(l), 550, and 551 and Texas Business and Commerce Code §§24.005 and 24.006, Plaintiff is entitled to a judgment (a) avoiding and preserving the Deposited Sight Transfers; (b) directing that the transfers be set aside; and (c) recovering the transfers, or the value thereof, from the Defendant.  Each such transfer was in violation of 11 U.S.C. §548(a)(1)(A) and (a)(1)(B) and is avoidable thereunder. Each such transfer is also avoidable under Texas Business and Commerce Code §24.005(a)(1) and § 24.006. Each such transfer is set forth on Exhibits G and H.

## C.    COUNT 3: RECOVERY OF AVOIDED TRANSFERS—11 U.S.C. § 550.

164.    Plaintiff re-alleges and incorporates by reference the preceding paragraphs of the Complaint.

165.    All transfers referred to in Counts 1 to 2 are collectively referred to as "All

Avoided Transfers."

166.    Defendant was the initial transferee of the All Avoided Transfers or the immediate or mediate transferee of such initial transferee or the person for whose benefit All Avoided Transfers were made.

167.    Pursuant to § 550(a), Plaintiff is entitled to recover from Defendant an amount not less than the total aggregate balance of all the All Avoided Transfers, plus interest thereon to the date of payment and the costs of this action.

168.    Pursuant to 11 U.S.C. § 551, all of the Avoidable Transfers are preserved for the benefit of the Creditors' Trust.

169.    All conditions precedent to the bringing of this action have been performed or have occurred.

### D.    COUNT 4: EQUITABLE SUBORDINATION OF DEFENDANT'S CLAIM(S) AGAINST THE ESTATE.

170.    Plaintiff re-alleges and incorporates by reference the preceding paragraphs of the Complaint.

171.    Subject to proof, any claim asserted by Defendant against the Debtors' Bankruptcy Estates arises from inequitable conduct, including conduct described in this Complaint, which has resulted in injury to creditors or the conferring of an unfair advantage on Defendant. This inequitable conduct has resulted in hardship to Debtors' Bankruptcy Estates and the entire creditor body. Accordingly, pursuant to §§ 510(c)(1) and 105(a), Defendant's claims should be equitably subordinated to the allowed claims of legitimate general unsecured creditors for distribution purposes, and the Plan contains a provision for

such subordinated unsecured claims, under class 17.   Main Bankruptcy Dkt. No. 1897, Third Amended Chapter 11 Plan of Liquidation for Reagor-Dykes Auto Group, as Modified, § 5.15, p. 25.

172.   All conditions precedent to the bringing of this action have been performed or have occurred.

**E.     COUNT 5: OBJECTION TO AND DISALLOWANCE OF ALL CLAIMS—11 U.S.C. § 502(D) AND (J).**

173.   Plaintiff re-alleges and incorporates by reference the preceding paragraphs of the Complaint.

174.   Pursuant to Rule 3007(b) of the Bankruptcy Rules, a party in interest shall not include a demand for relief of a kind specified in Rule 7001 of the Bankruptcy Rules in an objection to the allowance of a claim but may include such objection in an adversary proceeding. Rule 7001(8) specifies that an "adversary proceeding" includes any proceeding to subordinate any claim or interest. Because Debtors' objections to Defendant's  claims include a request to equitably subordinate such claims, Debtors' objection to any and all claims of Defendant against Debtors' Bankruptcy Estates should be merged into and included within this Adversary Proceeding.

175.   Defendant is a transferee of transfers avoidable under § 549 of the Bankruptcy Code, which property is recoverable and preserved under §§ 550 and 551 of the Bankruptcy Code.

176.   Defendant has not paid the amount of the Avoidable Transfers, or turned over such property, for which Defendant is liable under 11 U.S.C. § 550.

177.   Pursuant to 11 U.S.C. § 502(d), any and all claims of Defendant or its assignees, against Debtors' bankruptcy Estates must be disallowed until such time as Defendant pays to Plaintiff an amount equal to the aggregate amount of the Avoidable Transfers, plus interest thereon and costs.

178.   In addition, Plaintiff's investigation of the fraud allegations raised by Ford Motor Credit Company is ongoing. Included within Plaintiff's investigation is the extent of Defendant's involvement in the fraudulent activities alleged by Ford. The extent of Defendant's potential involvement and liability remains undetermined at this time. To the extent Defendant's liability exceeds the balance of Defendant's claims against Debtors' Bankruptcy Estates, Defendant will not hold an enforceable right to payment against the Estates under 11 U.S.C. § 502(d). Without an enforceable right to payment, no debt would exist, and Defendant cannot hold a "claim" as defined under 11 U.S.C. § 101(5). Without a "claim" against Debtors, any and all security interests pledged to secure such nonexistent debt will also cease to exist.

179.   Through this adversary proceeding and pursuant to Rule 3007(b) of the Bankruptcy Rules, Plaintiff objects to, seeks to disallow, and seeks to withhold any distributions to Defendant and seek to prevent Defendant from enforcing any and all portions of Defendant's alleged claims against the Estates, both secured and unsecured, until such time as (i) Plaintiff's investigation against Defendant is concluded, and (ii) Defendant pays to Plaintiff an amount equal to the aggregate amount of the Avoidable Transfers, plus interest thereon and costs.

180.   Pursuant to 11 U.S.C. § 502(j), any and all claims of Defendant or its

assignee(s) against Debtors' Bankruptcy Estates previously allowed, if any, must be reconsidered and disallowed until such time as (i) Plaintiff's investigation against Defendant is concluded, and (ii) Defendant pays to Plaintiff an amount equal to the aggregate amount of the Avoidable Transfers, plus interest thereon and costs.

181.    All conditions precedent to the bringing of this action have been performed or have occurred.

### F.    COUNT 6: COMPENSATORY DAMAGES FOR WILLFUL VIOLATION OF AUTOMATIC STAY.

182.    Plaintiff re-alleges and incorporates by reference the preceding paragraphs of the Complaint.

183.    The Post-Petition Deposits represent the cash proceeds of receivables and other property interests owned by Debtors. Debtors' receivables were property of the Estates pursuant to 11 U.S.C. §§ 541(a)(1), (7). Debtors' property interests in the credits deposited into the Pre-Petition Accounts are property of the Estates pursuant to 11 U.S.C. §§ 541(a)(1), (7). As such, the Post-Petition Deposits are property of the Estates under 11 U.S.C. §§ 541(a)(6), (7).

184.    Debtors demanded that Defendant transfer all funds deposited, specifically including the Post-Petition Deposits, into the Pre-Petition Accounts on and after the Petition Date into Debtors' DIP Accounts.

185.    Defendant has failed and refused, and continues to fail and refuse, to transfer the Post-Petition Deposits to Debtors' DIP Accounts or Plaintiff.

186.    Defendant has not released any of the Post-Petition Deposits to Debtors or

Plaintiff.

187.    Under 11 U.S.C. § 362(a)(3), Defendant has willfully violated the automatic stay by knowingly retaining possession of, and intentionally exercising control over, property of Plaintiffs' Bankruptcy Estates.

188.    Plaintiff has sustained actual damages as a result of Defendant's willful stay violations, including, without limitation, attorneys' fees and costs.

189.    Debtors did not have access to their cash proceeds in Defendant's possession, which damaged their ability to their maximize business operations during the pendency of these Bankruptcy Cases.

190.    Defendant is liable to Plaintiff for compensatory damages arising from Defendant's unlawful control over the Post-Petition Deposits and corresponding restriction of Debtors' Post-Petition Date cash flow.

191.    All conditions precedent to the bringing of this action have been performed or have occurred.

### G.    COUNT 7: DEMAND FOR ATTORNEYS' FEES AND RECOVERY OF COSTS.

192.    Plaintiff re-alleges and incorporates by reference the preceding paragraphs of the Complaint.

193.    Plaintiff has had to retain attorneys to prepare, file, and prosecute this action and have incurred fees and expenses in connection therewith.

194.    Based on the facts and circumstances surrounding Defendant's willful and intentional acts described herein, it is equitable and just that Plaintiff recovers his costs and

reasonable legal fees. Accordingly, Plaintiff seeks recovery of costs, including reasonable attorneys' fees and legal expenses incurred by Plaintiff in connection with the preparation and filing of all pleadings in this case and in prosecuting the same.

195.    All conditions precedent to the bringing of this action have been performed or have occurred.

## VI.    DAMAGES

196.    Plaintiff re-alleges and incorporates by reference the preceding paragraphs of the Complaint.

197.    Plaintiff is entitled to recover all damages and all other recoveries, at law and in equity, to which he may be entitled, including but not limited to:

- Nominal, general, compensatory, and actual damages

- Consequential damages

- Special damages, including but not limited to reasonable attorneys' fees

- All equitable relief, including equitable subordination of any and all alleged liens

- All statutory relief under the Bankruptcy Code and the Texas Business & Commerce Code

- Attorneys' fees, expert costs/expenses, other costs/expenses of litigation, and costs of court

- Pre and post judgment interest, and

- All other relief, at law and in equity, to which Plaintiff is entitled.

## VII.    RESERVATION OF RIGHTS

198.    During this Adversary Proceeding, Plaintiff may learn through discovery (or otherwise) additional facts and circumstances regarding the relationships among Debtors,

their affiliates, Defendant, and other third parties that were unknown to Plaintiff as of the date of this Complaint. The allegations in this Complaint are formed on Plaintiff's ongoing investigation to date regarding the transactions evidenced by Debtors books and records.

199.   Plaintiff reserves all rights to supplement and amend this Complaint, including, without limitation, the right to (a) further state, allege, or aver information regarding the Ford Litigation; (b) seek to avoid additional obligations, transfers, or conveyances; (c) seek to recover additional transfers; (d) modify, add, subtract, revise, or otherwise amend the parties; (e) allege additional defendant parties; or (f) allege additional causes of action that may become known to Plaintiff at any time during this Adversary Proceeding through discovery or otherwise, and for the all such amendments to this Complaint to relate back to the filing of the Original Complaint.

## VIII.   CONCLUSION AND REQUEST FOR RELIEF

For the foregoing reasons, Plaintiff asks the Court to grant him all of the relief requested in this Complaint. Plaintiff further requests all other relief, at law and in equity, to which he may be justly entitled.

Respectfully submitted,

By:    /s/ Andrew S. Hicks
Andrew S. Hicks
Texas Bar No. 24032419
Marc S. Tabolsky
Texas Bar No. 24037576
Daniel E. Hinde
Texas Bar No. 24002289
SCHIFFER HICKS JOHNSON PLLC
700 Louisiana Street, Suite 2650
Houston, Texas 77002
Tel:    (713) 357-5150
Fax:    (713) 357-5160
ahicks@shjlawfirm.com
mtabolsky@shjlawfirm.com
dhinde@shjlawfirm.com

Dustin Burrows
Texas Bar No. 24048375
LIGGETT LAW GROUP, P.C.
1001 Main Street, Suite #300
Lubbock, Texas 79401
Tel:    (806) 744-8478
Fax:    (806) 744-8479
dustin@liggettlawgroup.com

**ATTORNEYS FOR PLAINTIFF**

## CERTIFICATE OF SERVICE

I hereby certify that on this June ___, 2021, the foregoing was filed in the papers of this case with those parties receiving electronic notices herein presumptively receiving a copy of same.

/s/ Andrew S. Hicks
By: Andrew S. Hicks